No. 25-10754

# In the United States Court of Appeals For the Fifth Circuit

KNIFE RIGHTS, INCORPORATED.; RUSSELL ARNOLD; RGA Auction Solution, doing business as Firearm Solutions; JEFFERY FOLLODER; MOD Specialties; EVAN KAUFMANN; ADAM WARDEN; RODNEY SHEDD,

*Plaintiffs-Appellants,*

V.

PAMELA BONDI, U.S. ATTORNEY GENERAL; UNITED STATES DEPARTMENT OF JUSTICE,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of Texas, Fort Worth Division

## APPELLANTS' BRIEF

John W. Dillon (Cal. State Bar No. 296788)
DILLON LAW GROUP, APC
2647 Gateway Road
Suite 105, No. 255
Carlsbad, California 92009
Email: jdillon@dillonlawgp.com
Telephone: (760) 642-7150
Fax: (760) 642-7151

*Counsel for Appellants*

# CERTIFICATE OF INTERESTED PARTIES

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Cir. Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Plaintiffs-Appellants | Counsel for Plaintiffs-Appellants |
|---|---|
| Knife Rights Inc.; Russell Arnold; RGA Auction Services, LLC, dba Firearm Solutions; Jeffery E. Folloder; MOD Specialties; Evan Kaufmann; Adam Warden; and Rodney Shedd | John W. Dillon DILLON LAW GROUP APC<br><br>Brent Cooper COOPER & SCULLY PC |
| Defendants-Appellees | Counsel for Defendants-Appellees |
| Pamela Bondi, in her official capacity as Attorney General of The United States;<br><br>United States Department of Justice | Syed Ahmad Sean Janda U.S. Department of Justice |

DILLON LAW GROUP, APC

September 24, 2025

/s/ John W. Dillon
John W. Dillon
California State Bar No. 296788
jdillon@dillonlawgp.com
**DILLON LAW GROUP APC**
2647 Gateway Road
Suite 105, No. 255
Carlsbad, California 92009
Phone: (760) 642-7150
Fax: (760) 642-7151

Attorneys for Appellants

## STATEMENT OF ORAL ARGUMENT

Plaintiffs-Appellants, Knife Rights, Inc., *et al.*, request oral argument because this case raises important constitutional questions under *District of Columbia v. Heller* (554 U.S. 570 (2008)) and *New York State Rifle & Pistol Ass'n v. Bruen* (597 U.S. 1 (2022)), and challenges a nationwide federal prohibition on common arms in violation of the Second Amendment. This case is not frivolous, and the Appellants believe that oral argument will significantly assist in the decision-making process in this case.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES ......................................... 2

STATEMENT OF ORAL ARGUMENT ...................................................... 4

TABLE OF CONTENTS ...................................................................... 5

TABLE OF AUTHORITIES ................................................................. 7

INTRODUCTION ............................................................................... 11

JURISDICTIONAL STATEMENT ........................................................ 13

ISSUES PRESENTED ........................................................................ 14

    A.    Standing Issues .................................................................. 14
    B.    Issues Presented on Appellee's Motion to Dismiss .............. 14
    C.    Issues Presented Regarding the Second Amendment ......... 15

STATEMENT OF THE CASE ............................................................... 15

    A.    Legal Background ............................................................... 15
    B.    Factual and Procedural Background .................................... 17
    C.    The Prior Case .................................................................. 21
    D.    The Current Case ............................................................... 25

SUMMARY OF ARGUMENT ............................................................... 28

STANDARDS OF REVIEW ................................................................. 34

    A.    This Court's Review is De Novo ........................................ 34
    B.    Standard of Review for Motions to Dismiss ........................ 35

ARGUMENT ..................................................................................... 35

I.    SECTION 1242 STANDING HAS BEEN ESTABLISHED .......... 35

    A.    The Individual and Retail Plaintiffs Have Standing to Challenge Section 1242 of the FSA. ...................................... 35

    B.    Appellant Knife Rights Has Standing in its Own Right and on Behalf of its Members to Challenge Sections 1242 and 1243 of the FSA ................................................................. 39

II.    SECTION 1243 STANDING HAS BEEN ESTABLISHED .......... 42

    A.    The Individual and Retail Plaintiffs Have Standing to Challenge Section 1243 of the FSA ...................................... 42

      1.   Section 1243's Scope and Reach are Broad ................... 43

      2.   Plaintiff-Appellant Rodney Shedd, Alone, Establishes Standing under Section 1243 ........................ 43

      3.   Applicable Case Law Applies to Establish Standing under Section 1243 ....................... 45

III.   SECOND AMENDMENT ISSUES MUST BE ADDRESSED...... 49

   A.   Appellants Stated a Claim—the FSA Implicates, Burdens, and Infringes Upon the Second Amendment Right to Keep and Bear Arms .................... 49

   B.   The District Court's "No Ban" Reasoning Misconstrues the Evidence ................ 60

   C.   The Government Concessions, and the Fifth Circuit's Decision In *United States v. Peterson* Demand Reversal of the Judgment ........................ 66

   D.   Because Standing was Established, the District Court Erred in Refusing to Address Plaintiffs' Summary Judgment Motion................ 71

IV.   PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT UNDER *BRUEN* AND *HELLER* ................ 71

      1.   The Federal Switchblade Act Prohibits Protected Arms Possessed by "the People." .............. 74

      2.   Switchblade Knives Are in Common Use and Are Therefore Categorically Protected Under the Second Amendment .................. 74

      3.   The Government Has Not Met Its Burden of Identifying Analogous Historical Regulations .............. 76

CONCLUSION ........................ 80

CERTIFICATE OF SERVICE ................ 81

CERTIFICATE OF COMPLIANCE ....................... 82

# TABLE OF AUTHORITIES

## Cases

*Association of American Physicians and Surgeons Educ. Found. v.
American Board of Internal Medicine*,
103 F.4th 383 (5th Cir. 2024) ......................................... 34

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*,
Nos. 24-2415, 24-2450, 24-2506
(3d Cir. Sept. 18, 2025) (en banc) ................................. 70

*B&L Productions, Inc. v. Newsom*,
104 F.4th 108 (9th Cir. 2024) ......................................... 55

*Babbitt v. United Farm Workers Nat'l Union*,
442 U.S. 289 (1979) ......................................................... 36

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007).................. 35

*Caetano v. Massachusetts*, 577 U.S. 411 (2016)............... 64, 65

*Department of Commerce v. United States
House of Representatives*, 525 U.S. 316 (1999) .............. 48

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ............................................. *Passim*

*Env't Conservation Org. v. City of Dallas*,
529 F.3d 519 (5th Cir. 2008)........................................ 34

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ......................................................... 40

*Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010) .......... 36

*Hunt v. Washington State Apple advertising Com'n.*,
432 U.S. 333 (1977) ................................................... 29, 39

*Joint Heirs Fellowship Church v. Akin*,
629 F.App'x 627 (5th Cir. 2015)...................................... 25

*Knife Rights, Inc. v. Garland*,
No. 4:23-cv-00547-0, 2024 WL 2819521
(N.D. Tex. June 3, 2024) .............................................. 21

*La Union del Pueblo Entero*,

614 F.Supp.3d at 516 (W.D. Tex 2022) .................................... 29, 39

*Laufer v. Mann Hosp.*, 996 F.3d 269 (5th Cir. 2021) ............................. 34

*McDonald v. City of Chicago, Ill.,* 561 U.S. 742 (2010) ................... 31, 71

*McRorey v. Garland*, 99 F.4th 831 (5th Cir. 2024) ............... 49-52, 60, 69

*Meador v. Apple, Inc.*, 911 F.3d 260 (5th Cir. 2018) ............................ 71

*NRA of Am., Inc. v. McCraw,*
    719 F.3d 338 (5th Cir. 2013) ........................................................ 34

*Nat'l Ass'n for Gun Rights, Inc. v. Garland,*
    4:23-cv-00830-0, 2024 WL 3517504
    (N.D. Tex. July 23, 2024) ...................................................... 22, 47

*Nat'l Press Photographers Ass'n v. McCraw,*
    90 F.4th 770 (5th Cir. 2024) ..................................................... 45

*New York State Rifle & Pistol Ass'n v. Bruen,*
    597 U.S. 1 (2022) ................................................................. *Passim*

*Nguyen v. Bonta,*
    140 F.4th 1237 (9th Cir. 2025) ................... 30, 32, 56, 58, 59, 72, 73

*Nunn v. State,* 1 Ga. 243 (1846) ............................................................ 78

*Oppenheimer v. Prudential Securities Inc.,*
    94 F.3d 189 (5th Cir.1996) ......................................................... 35

*People v. Yanna,*
    297 Mich. App. 137, 824 N. W. 2d 241 (2012).............................. 65

*Ramming v. United States*, 281 F.3d 158 (5th Cir. 2001) ...................... 35

*Reese v. ATF*, 127 F.4th 583 (5th Cir. 2025) .......................... 30, 52, 53, 54

*Reliable Consultants, Inc. v. Earle,*
    517 F.3d 738 (5th Cir. 2008) ....................................................... 35

*Rhode v. Bonta*, 145 F.4th 1090 (9th Cir. 2025) ............. 30, 32, 55, 57, 72

*Rocky Mountain Gun Owners v. Polis,*
    121 F.4th 96 (10th Cir. 2024) ..................................................... 54

*Sedita v. United States*, 763 F. Supp. 3d 63 (D.D.C. 2025) ................... 55

*Students for Fair Admissions, Inc. v. President*
    *& Fellows of Harvard Coll.,* 600 U.S. 181 (2023) ................... 29, 39

*Susan B. Anthony List v. Driehaus,*
573 U.S. 149 (2014) ................................................................ 45

*Umphress v. Hall,*
133 F.4th 455 (5th Cir. 2025) ................................................ 35, 36

*United States v. Peterson,*
No. 24-30043, 2025 WL 2462665 (5th Cir. Aug. 27, 2025)...... 66, 67

*Village of Arlington Heights v. Metropolitan*
*Housing Development Corp.*, 429 U.S. 252 .................................... 48

**Statutes**

Section 501(c)(4) ...................................................................... 17

Title 18, Section 7 .................................................................... 16

Title 18, Section 1151 ............................................................... 16

Code of Federal Regulations Title 19, Ch. 1, Part 12, sections 12.95-
12.103 ........................................................................................ 15

15 U.S.C. §§ 1241-1245 ............................................................ 11

15 U.S.C. § 1241 ....................................................................... 14

15 U.S.C. § 1241(a) .................................................................. 15

15 U.S.C. § 1241(b) .................................................................. 15

15 U.S.C. § 1242 ............................................................. *Passim*

15 U.S.C. § 1243 ............................................................. *Passim*

15 U.S.C. § 1244(1)-(5) ............................................................ 16

18 U.S.C. § 1241-1244 .............................................................. 38

28 U.S.C. § 1291 ....................................................................... 13

28 U.S.C. §§ 1331 ..................................................................... 13

42 U.S.C. § 1983 ....................................................................... 13

**Rules**

F.R.C.P. Rule 12(b)(6) .............................................................. 35

U.S. Constitution............................................................... *Passim*

Second Amendment......................................................... *Passim*

**Other**

Federal Switchblade Act of 1958 ...................................... 11, 64

Dictionary of the English Language 107 (4th ed.)
      (reprinted 1978)....................................................... 32, 72

1 Malachy Postlethwayt, The Universal Dictionary of Trade and
Commerce (4th ed. 1774)................................................. 32, 73

## INTRODUCTION

The Supreme Court has made clear that the "Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 28 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008)). Further, in *Heller*, the Supreme Court stated the Second Amendment protects weapons that are "'in common use at the time' for lawful purposes like self-defense" and that weapons "typically possessed by law-abiding citizens for lawful purposes" are within the scope of the Second Amendment. *Heller*, 554 U.S. at 625.

However, the Federal Switchblade Act of 1958 ("FSA"), 15 U.S.C. §§ 1241-1245, outright bans a huge category of such bearable arms that are in common use, in direct violation of the Second Amendment.

The FSA's ban on the sale and/or possession of switchblade knives dates back to fictional accounts from Broadway and Hollywood that stimulated fear and imagination, which held more sway with legislators than concern for adherence to the Constitution.

Broadly prohibiting the distribution, sale, and transportation of such arms in interstate commerce (everywhere) and outright banning *mere possession* of such arms on federal and federally connected lands such as National Parks, land managed by the Bureau of Land Management ("BLM"), and statutorily defined "Indian country" (where Plaintiff and Muscogee Nation Tribe member Rodney Shedd lives), the FSA strips Plaintiffs and their members of their fundamental right to keep and bear these common arms.

The district court allowed Plaintiffs to be stripped of their fundamental right to keep and bear these arms by utterly side-stepping the core constitutional issues presented in this lawsuit. Rather than subject the FSA to the rigorous constitutional scrutiny required by *Heller* and *Bruen*, the district court avoided the actual issues in the case by gymnastically employing an incorrect notion of standing to rule that the Plaintiffs, who are directly targeted by the prohibitions on the FSA, do not have standing to challenge it – even to the extent of ignoring that the FSA directly prohibits Plaintiff and Muscogee Tribe Member Shedd from possessing a switchblade knife on the Indian reservation where he lives.

The district court was required to resolve the merits of this challenge and should have found the FSA unconstitutional.

## JURISDICTIONAL STATEMENT

Appellants invoked the original jurisdiction of the district court over the operative complaint in this action pursuant to 28 U.S.C. §§ 1331, because this case arises under the Second Amendment of the Constitution and laws of the United States, and 42 U.S.C. § 1983, because the case is a civil action depriving Appellants of their rights and privileges secured by the Second Amendment and laws of the United States. ROA.9-55. This Court has jurisdiction under 28 U.S.C. § 1291 because the district court's order and judgment are final district court decisions. ROA.1529-1549, 1550.[1]

---

[1] The ROA refers to the Fifth Circuit's adopted Electronic Record on Appeal, cited in this brief as ROA.[page number(s)].

# ISSUES PRESENTED

**A.  Standing Issues.**

1.  Whether the Individual and Retail Plaintiffs-Appellants have standing to challenge Section 1242 of the FSA, 15 U.S.C. § 1242.[2]

2.  Whether the Organizational Plaintiff Knife Rights has standing to challenge Section 1242 of the FSA in its own right and in association with, and on behalf of, its members.

3.  Whether the Individual and Retail Plaintiffs have standing to challenge Section 1243 of the FSA. See 15 U.S.C. § 1243.

4.  Whether the Organizational Plaintiff Knife Rights has standing to challenge Section 1243 of the FSA in its own right and in association with, and on behalf of, its members. *Id*.

**B.  Issues Presented on Appellee's Motion to Dismiss**

5.  Whether Plaintiffs stated a claim to the effect that the FSA implicates or burdens the Second Amendment.

6.  Whether the district court erred in granting Appellees' motion to dismiss on the grounds that the FSA does not "implicate" the Second

---

[2] This brief will interchange "Plaintiffs," "Plaintiffs-Appellants," or "Appellants." Defendant-Appellees are generally referred to as Appellees or the government.

Amendment and in refusing to address Plaintiffs' motion for summary judgment motion as "moot." ROA.1529-1549, 1550.[3]

## C. Issues Presented Regarding the Second Amendment

7. Whether the district court erred in dismissing Plaintiffs' motion for summary judgment as moot.

8. Whether the record before this Court compels judgment in Plaintiffs' favor as to their summary judgment motion.

## STATEMENT OF THE CASE

### A. Legal Background

The FSA defines a "switchblade knife" to mean any knife having a blade which opens automatically — (1) by hand pressure applied to a button or other device in the handle of the knife, or (2) by operation of inertia, gravity, or both. ROA.157-159; *see also* 15 U.S.C. 1241(b). Under the FSA, "interstate commerce" means "commerce between any State, Territory, possession of the United States, or the District of Columbia, and any place outside thereof." *Id.*; 15 U.S.C. § 1241(a). The FSA's

---

[3] As below, Plaintiffs do not challenge the ban on the importation of switchblade knives into the United States from foreign jurisdictions. 15 U.S.C. 1241; Code of Federal Regulations Title 19, Ch. 1, Part 12, sections 12.95-12.103.

criminal penalties are severe. Under the challenged federal switchblade knife ban, "[w]hoever knowingly introduces, or manufactures for introduction into interstate commerce, or transports or distributes in interstate commerce, any switchblade knife, shall be fined not more than $2,000 or imprisoned not more than five years, or both." *Id.*; 15 U.S.C. § 1242.

Further, "[w]hoever, within any Territory or possession of the United States, within Indian country (as defined in section 1151 of title 18), or within the special maritime and territorial jurisdiction of the United States (as defined in section 7 of title 18), manufactures, sells, or possesses any switchblade knife, shall be fined not more than $2,000 or imprisoned not more than five years, or both." *Id.*; 15 U.S.C. § 1243.

The ban contains extremely limited exceptions to the applicability of Sections 1242 and 1243 that do not apply to the general public, are not applicable, and Appellees do not rely on any such exception in this case. *See* 15 U.S.C. § 1244(1)-(5).

Thus, the FSA prohibits: (1) the introduction, manufacture for introduction, transportation, or distribution into interstate commerce of all switchblade knives; and (2) the manufacture, sale, or possession of

any switchblade knife within federal land/territory, National Parks, BLM land, Indian country, including tribal reservations, and maritime areas. 15 U.S.C. §§ 1242, 1243. Combined, Sections 1242 and 1243 institute an outright ban on the interstate commerce of any switchblade knives, and an absolute prohibition on their possession over more than one-third of the United States. ROA.16, 56, 1468.

### B. Factual and Procedural Background

Plaintiff Knife Rights is a section 501(c)(4) member advocacy organization incorporated under the laws of Arizona with a primary place of business in Gilbert, Arizona. ROA.17-23, 179-184. Knife Rights serves its members, supporters, and the public through efforts to advance the right to keep and bear bladed arms. *Id*. Knife Rights brought this action in its own right and in association with, and on behalf of, its members, including the named Individual Plaintiffs. *Id*. Knife Rights' members include peaceable, law-abiding individuals residing in Texas, Utah, Oklahoma, and other states, all of whom who wish to acquire and possess switchblade knives but fear prosecution under the FSA. ROA.17-41,161-166, 168-176,178-197, 199-203, 205-209, and 211-214.

Other Plaintiffs are Russell Arnold and his retail business RGA Auction Services (dba, Firearm Solutions); Jeffrey Folloder and his retail business MOD Specialties; Evan Kaufmann; Adam Warden; and Rodney Shedd. Plaintiffs Arnold, Folloder, Kaufmann, Warden, and Shedd ("Individual Plaintiffs") are peaceable, nonviolent individuals who are otherwise eligible to keep and bear arms under state and federal law.

The Complaint summarizes the facts supporting Plaintiffs' standing allegations (ROA.11-14); and it devotes approximately 24 pages to the facts supporting standing for:

(a)     Plaintiff-Appellant Knife Rights. ROA.17-23;

(b)     Johan Lumsden, a current member of Knife Rights, whose home and business were raided for alleged violations of the FSA. ROA.11, 14, 43-44;

(c)     Plaintiffs Russell Arnold, individually, as the owner and operator of Plaintiff RGA Auction Services, dba Firearm Solutions, and as a member of Knife Rights; and Plaintiff Jeffery E. Folloder, individually, as the owner and operator of MOD Specialties, and as a member of Knife Rights. ROA.23-31;

(d)     Firearm Solutions and MOD Specialties, as Plaintiff retailers and federally licensed firearms dealers. ROA.23-31 (¶¶ 37-45 (Firearms Solutions); and ROA.23-31 (¶¶ 47-60 (MOD Specialties); *see also* ROA.40-41 (¶¶ 93-95);

(e)     Evan Kaufmann, individually and as a member of Knife Rights. ROA.31-34 (¶¶ 61-72);

(f)     Adam Warden, individually and as a member of Knife Rights. ROA.34-37 (¶¶ 73-83); and

(g)     Rodney Shedd, Individual Plaintiff and member of both the Muscogee Nation Tribe and Knife Rights. ROA.37-40 (¶¶ 84-92).

The Complaint's exhaustive standing allegations for all the named Plaintiffs, in turn, are substantiated by the sworn declarations submitted in support of Plaintiffs' summary judgment motion. They comprise the Declarations of Russell Arnold, Jeffrey E. Folloder, Doug Ritter, Evan Kaufmann, Adam Warden, and Rodney Shedd. *See* ROA.161-214.

The Individual Plaintiffs intend to acquire, possess, carry, and offer for sale and distribute switchblade knives for lawful purposes through interstate commerce. ROA.17-41, 161-166, 168-176, 178-197, 199-203, 205-209, 211-214. The Individual Plaintiffs allege and declare they would

acquire, possess, carry, offer for sale, and distribute such knives through interstate commerce but for the government's enforcement of the FSA. *Id*. The Individual Plaintiffs are members of Knife Rights. *Id*. RGA Auction Services and MOD Specialties ("Retail Plaintiffs) are small businesses that desire to buy and sell switchblades through interstate commerce for the benefit of the retailers' business and their existing and prospective customers. ROA.23-31, ROA.161-166, 168-176.

The named individuals, retailers, and Knife Rights organization challenge the FSA's prohibitions on the grounds that "switchblades" are bearable arms within the meaning of the Second Amendment and the ability to manufacture, sell, purchase, acquire, and possess switchblades constitutes arms-bearing conduct, and are therefore presumptively protected. Despite Second Amendment protection, the FSA makes it crime for (1) "whoever" to manufacture, transport, or distribute into interstate commerce any "switchblade knife;" and (2) "whoever" to manufacture, sell, or possess any "switchblade knife" within any federal land/territory, National parks, BLM land, Indian country (as defined), or maritime areas. 15 U.S.C. §§ 1242, 1243. The crimes are punishable by a

fine of not more than $2,000 or up to five years imprisonment, or both. *Id*.

### C. The Prior Case.

Plaintiffs brought a prior case, *Knife Rights, Inc. v. Garland*, No. 4:23-cv-00547-0, 2024 WL 2819521 (N.D. Tex. June 3, 2024), District Judge Reed O'Connor, presiding ("*Knife Rights I*"). This prior case is inapplicable and distinguishable for several reasons.

**First**, the district court in *Knife Rights I* dismissed on standing grounds "without prejudice." *Id*. at *6.

**Second**, the two cases are not the same. Without conceding the point, even Appellees point out that *Knife Rights I* was a Second Amendment challenge only "against Section 1242." ROA.1260. This case, in contrast, is undoubtably a Second Amendment challenge to Sections 1242 and 1243 of the FSA. ROA.10-17, 42-54.

**Third**, this case includes different and additional Individual Plaintiffs (Evan Kaufmann, Adam Warden, and Rodney Shedd—all Knife Rights members). ROA.31-34, 34-37, 37-40.

As instructed by *Knife Rights I*, the Complaint in this case is also different, with additional facts supporting the standing of the Individual Plaintiffs (Russell Arnold, Jeffery Folloder, Evan Kaufmann, Adam Warden, and Rodney Shedd), the Organizational Plaintiff Knife Rights and its members, and the Retail Plaintiffs RGA Auction Services (Firearm Solutions) and MOD Specialties. ROA.17-41(¶¶ 23-95). The facts supporting standing for all Plaintiffs, and each of them, are substantiated in sworn declarations and evidence. *See* ROA.161-214.

Indeed, this case is more akin to District Judge Reed O'Connor's more recent case, *Nat'l Ass'n for Gun Rights, Inc. v. Garland*, 4:23-cv-00830-0, 2024 WL 3517504 (N.D. Tex. July 23, 2024).

Additionally, in contrast to *Knife Rights I*, Plaintiff Rodney Shedd, an individual, a Knife Rights' member, and member of the Muscogee Nation Tribe, declared under oath that he legally owned and possessed an automatically opening knife, or a switchblade, in Arizona, and before moving to Oklahoma, he abandoned his knife due to the FSA's prohibition on the possession of such a knife within Indian country, namely, Muscogee Nation tribal land. 15 U.S.C. § 1243; and ROA.212-213; *see also* ROA.37-40 (¶¶ 84-92). Mr. Shedd was forced to abandon this property

due to the FSA, and but for the FSA prohibitions, he would continue to legally possess his knife at his residence in Oklahoma (Indian country). *Id.*

Further, Plaintiffs Arnold and Folloder, as individuals, owners, operators, and federally licensed firearms dealers of Firearm Solutions and MOD Specialties; members of Knife Rights; and on behalf of their actual and prospective customers, have alleged and proven that: (a) they cannot make any purchases of switchblade knives from manufacturers and distributors, nor any sales to such customers due to the prohibitions in the FSA; (b) they are "ready, willing, and able to immediately purchase and sell" such knives and "the only thing stopping them, now and in the future," are their "fear of prosecution for violating Sections 1242 and 1243" of the FSA; (c) "[c]ommerce in such knives is … a prerequisite to keeping and possessing bladed arms for self-defense and other purposes;" (d) they "pursue the Second Amendment claim in this case for [their] own interests and business interests; (e) their "business interests are derived from [their] actual and prospective customers, all of whom have a corollary right to keep and bear bladed arms for self-defense and other lawful purposes;" and (f) "the core Second Amendment right … is

meaningless without the ability for [their] customers … to acquire [such knives] in interstate commerce," and to sell, possess, and use such knives "throughout the United States, including within and through Native American (Indian) land … and federal land." ROA.23-26 (¶¶ 36-45); *see also* ROA.26-31(¶¶46-60); and ROA.161-165 (¶¶ 1-14), ROA.168-174 (¶¶1-21)).

Moreover, concrete injury, and risk of prosecution, are shown by the other Individual Plaintiffs, who are also members of Knife Rights. *See e.g.*, ROA.23-41,161-214.

Additionally, Plaintiff Knife Rights has alleged and shown its organizational and associational standing, including injury and a concrete fear of prosecution comprised of documentary evidence confirming that as recently as September 2020, Knife Rights' member Johan Lumsden was subjected to a raid, arrest, and search and seizure of his switchblades knife and knife parts inventory—establishing that a Knife Rights' member was *directly targeted* for allegedly violating Section 1242 of the FSA. This constitutes Appellees' active and unconstitutional enforcement of the FSA. ROA.17-23,178-197.

These facts also confirm a point not seriously disputed by Appellees. Mr. Lumsden, a member of Plaintiff Knife Rights, has had the FSA enforced against him, which is enough to establish standing for Knife Rights. ROA.1263 (where Appellees state that a "substantial threat may also arise where a 'statute has already been enforced against a plaintiff, ....'" citing *Joint Heirs Fellowship Church v. Akin*, 629 F.App'x 627, 631 (5th Cir. 2015)).

### D. The Current Case.

The Complaint was filed on September 27, 2024. ROA.54. Before the district court were two motions: (1) Plaintiffs' motion for summary judgment and consolidated opposition to Appellees' motion to dismiss and reply in further support of the summary judgment motion. ROA.109-112, ROA.113-150; and (2) Appellees' motion to dismiss ROA.1243.

The district court issued its opinion and order on May 22, 2025. ROA.1529-1549. On that same date, the district court issued its Judgment. ROA.1550. Appellants timely filed their notice of appeal on June 17, 2025. ROA.1551-1552.

Considering the serious criminal penalties, the past enforcement, and the potential for future enforcement, coupled with Appellees'

*continued* refusal to disavow any intent to invoke the FSA's criminal penalty provisions in the future (ROA.21, 44-45, 53, 182, 1425-1426, 1430-1436), Appellees nonetheless assert that Plaintiffs, all of them, lack standing to challenge the constitutionality of Sections 1242 and 1243 of the FSA. Under Appellees' standing argument, the disputed prong is that Plaintiffs have purportedly not sustained "injury," in that the operative complaint and supporting sworn declarations do not allege and prove any credible threat of future enforcement of the FSA.[4] The argument is unsupported by the record. *See* ROA.9-55, ROA.161-214. Having alleged and established standing, the district court erred in refusing to address Appellants' motion for summary judgment as moot, which undisputedly shows that switchblade knives are "Arms" in common use and protected under the plain text of the Second Amendment.

In spite of *Heller*, reaffirmed in *Bruen*, 597 U.S. at 31, the district court erred in granting Appellees' motion to dismiss Plaintiffs' Section 1243 claims on standing grounds. ROA.1542-1543. And while the district court ruled that Plaintiffs had standing to challenge Section 1242, it

---

[4] The district court accurately points out "[t]he second and third elements [of standing] are uncontested, but the Parties dispute whether Plaintiffs have sufficiently established an injury in fact". See ROA.1534

denied standing to Plaintiff Knife Rights in its own right. ROA.1540-1542.

Further, the district court erred in ruling that Section 1242's prohibition on the interstate commerce of switchblade knives *does not implicate* Appellants' Second Amendment rights to keep and bear arms. ROA.1544-1548. The district court granted Appellees' motion to dismiss and refused to address Plaintiffs' summary judgment motion as "moot." ROA.1548-1549.

As part of deciding Plaintiffs failed to state a claim, the district court also "assum[ed] without deciding" that switchblades are "arms" under the Second Amendment. ROA.1544-1545. However, the district court refused to apply the proper *Bruen* analysis for Second Amendment cases, and dismissed the case on the grounds that the FSA does not impose a sufficiently significant burden on Second Amendment conduct to warrant application of the *Bruen* analysis, concluding that Plaintiffs failed to state a Second Amendment claim. ROA.1544-1548.

By this appeal, Appellants respectfully request that this Court conduct: (a) a *de novo* review; (b) uphold the district court's ruling that the Individual and Retail Plaintiffs have standing to challenge Section

1242 of the FSA; (c) reverse the ruling that Plaintiff Knife Rights does not have standing in its own right; (d) reverse the ruling that Plaintiffs do not have standing to challenge Section 1243 of the FSA; (e) reverse the ruling that Plaintiffs failed to state a Second Amendment claim; (f) apply the *Bruen* constitutional analysis to Plaintiffs' Second Amendment claim or remand with direction to uphold the district court's assumption that switchblades are "arms" under the plain text of the Second Amendment, and require the government to justify the FSA's ban through historically analogous arms regulations under *Bruen*; and/or (i) declare that Sections 1242 and 1243 are unconstitutional and permanently enjoin their enforcement.

## SUMMARY OF ARGUMENT

The district court's failure to reach the merits of Plaintiff's claims should be reversed for several reasons.

**First**, Plaintiffs have standing to challenge section 1242 because Defendant has refused to disavow enforcement of the FSA, *Umphress v. Hall*, 133 F.4th 455, 461-62 (5th Cir. 2025). This failure to disavow enforcement puts Plaintiffs in actual jeopardy of prosecution and therefore they suffer injury-in-fact. This is particularly so due to the

recent prosecution of Johan Lumsden under the FSA and Spyderco's plea agreement and probation conditions from 2007, which still apply today. ROA.980-982, 984-997.

**Second**, Appellant Knife Rights has standing in its own right and on behalf of its members to challenge Sections 1242 and 1243 of the FSA because the Complaint alleges that Knife Rights has incurred "extraordinary" and "distinct" "expenditures of time, effort, and cost on litigation matters to protect knife rights" and that those extraordinary expenditures "have placed a real, concrete drain on Knife Rights' resources, particularly the funds relied upon from our member contributions to also pursue our other customary political, educational, and legislative efforts." ROA.20-22, ROA.178-197. Further, members of Knife Rights, including the Individual and Retail Plaintiffs, are subject to enforcement action under the FSA. *Hunt v. Washington State Apple advertising Com'n.*, 432 U.S. 333, 343 (1977); *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,* 600 U.S. 181, 199 (2023); *and La Union del Pueblo Entero,* 614 F.Supp.3d at 516 (W.D. Tex 2022).

**Third**, the Individual and Retail Plaintiffs have standing to challenge Section 1243 of the FSA because they have made clear they would possess and carry switchblade knives while traveling across state lines, through federal lands, including National Parks and BLM land, and within and through "Indian country," but are prohibited from doing so by the prohibitions under Section 1243.

Plaintiff Shedd, as a member of the Muscogee Nation Tribe, and a member of Knife Rights, lives on the Muscogee Nation Tribal reservation in Tulsa, Oklahoma, and is prohibited from possessing a switchblade knife by Section 1243.

**Fourth**, the district court's ruling that Plaintiffs lack standing because acquisition is *merely ancillary* is utterly contrary to this Circuit's decision in *Reese v. ATF*, 127 F.4th 583 (5th Cir. 2025) and the decisions in *Rhode v. Bonta*, 145 F.4th 1090 (9th Cir. 2025) and *Nguyen v. Bonta*, 140 F.4th 1237, 1242 (9th Cir. 2025).

Appellants met their burden to show Article III standing under the "injury" prong. The district court was required to reach the merits of Plaintiffs' challenge, and the district court's rulings to the contrary constitute reversible error.

The Second Amendment of the Constitution provides:

"A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

U.S. Const. amend II.

The Second Amendment "guarantees the individual right to keep and bear arms (*Heller*, 554 U.S. at 592), and is incorporated against the States through the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. *McDonald v. City of Chicago, Ill.,* 561 U.S. 742, 791 (2010).

*Bruen* abrogated the two-step means-end scrutiny approach previously employed by this Circuit and other circuit courts, rejecting the "approach as having one step too many." *Bruen*, 597 U.S. at 19. The *Bruen* court also affirmed and clarified "the constitutional standard endorsed" in *Heller* in analyzing Second Amendment challenges. *Bruen*, 597 U.S. at 31. The *Heller/Bruen* framework is summarized twice in *Bruen*. *Id.* 597 U.S. at 17, 24. The *Bruen* court held that:

"[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."

*Id.* at 17.

Switchblade knives are "arms" under the plain text of the Second Amendment. *Bruen*, 597 U.S. at 28. In *Heller*, the Supreme Court made clear that "'[t]he 18th-century meaning' of the term 'arms' is 'no different from the meaning today.'" *Id.* 554 U.S. at 581. In the 18th century and now, the term "arms" generally referred to "'[w]eapons of offence, or armour of defence.'" *Id.* (quoting 1 Dictionary of the English Language 107 (4th ed.) (reprinted 1978)). *Id.* "The Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding. *Heller*, 554 U.S. at 581-584; *See also Rhode v. Bonta*, 145 F.4th 1090, 1104 (9th Cir. 2025) and *Nguyen v. Bonta*, 140 F.4th 1237, 1242 (9th Cir. 2025) ("This 'guarantee[s] the individual right to possess and carry *weapons.*' And not only is "Arms" stated in the plural, but this term refers to more than just guns. It includes other weapons and instruments used for defense.).

Similarly, like firearms in *Heller*, knives are "arms" within the meaning of the Second Amendment because they are instruments that constitute bearable arms. As with firearms, knives fit the definition of weapons of offense or armor of defense. ROA.126-131; *see also Nguyen,*

140 F.4th at 1242 (9th Cir. 2025) and *Rhode*, 145 F.4th at 1104 (9th Cir. 2025). Further, other sources confirm that, at the time of the adoption of the Second Amendment, the term "arms" was understood as generally encompassing knives. See 1 Malachy Postlethwayt, The Universal Dictionary of Trade and Commerce (4th ed. 1774) (including among "arms" fascines, halberds, javelins, pikes, and swords). And bladed arms ranging from small "pocket" knives, to daggers, and even swords were regularly carried long before this Country's founding and to the present. ROA.389-390.

Because the Second Amendment encompasses "arms," and because "arms" includes switchblade knives, the Second Amendment presumptively guarantees "keeping and bearing" such "arms" for self-defense and any other lawful purpose. *Bruen*, 597 U.S. at 32-33. And in the factual context of this case, Appellants desire to keep and bear these arms for self-defense and other lawful purposes. ROA.161-166, 168-176, 178-197, 199-203, 205-209, 211-214. As such, there is no legitimate dispute that switchblade knives constitute "Arms" under the plain text of the Second Amendment. Indeed, the district court "assumed" so, but without deciding. ROA.1544-1545.

Further, the Second Amendment categorically protects arms that are in common use under *Heller's* historical analysis of arms bans. Because the record demonstrates unequivocally that switchblade knives are in common use they are categorically protected. The government is not permitted to offer additional historical analogs to justify the FSA since the complete historical analysis for arms bans like the FSA was already performed under *Heller*, resulting in the common use test.

Even if the government *were* to offer historical analogs in an attempt to justify the FSA under *Heller* and *Bruen*, it has failed to do so. Thus, the government cannot carry its burden under the Second Amendment, and Plaintiffs were entitled to summary judgment.

## STANDARDS OF REVIEW

### A. This Court's Review is De Novo.

Motions to dismiss receive *de novo* review. "Legal questions relating to standing *and* mootness receive the same." *See Association of American Physicians and Surgeons Educ. Found. v. American Board of Internal Medicine*, 103 F.4th 383, 389 (5th Cir. 2024) (emphasis added), citing *NRA of Am., Inc. v. McCraw*, 719 F.3d 338, 343 (5th Cir. 2013) (finding that court reviews questions of standing *de novo*); and *Env't Conservation*

*Org. v. City of Dallas*, 529 F.3d 519, 524 (5th Cir. 2008). Additionally, reviewing courts review *de novo* the dismissal for lack of subject matter jurisdiction. *Laufer v. Mann Hosp.*, 996 F.3d 269, 271 (5th Cir. 2021).

### B.  Standard of Review for Motions to Dismiss.

"'[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001), and cases there cited.

"'[T]he plaintiff's complaint is to be construed in a light most favorable to the plaintiff, and the allegations contained therein are to be taken as true." *Oppenheimer v. Prudential Securities Inc.,* 94 F.3d 189, 194 (5th Cir.1996). A plaintiff need only allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). The plausibility test applies to Rule 12(b)(6) motions. See *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 742 (5th Cir. 2008).

## ARGUMENT

## I.  SECTION 1242 STANDING HAS BEEN ESTABLISHED

### A.  The Individual and Retail Plaintiffs Have Standing to Challenge Section 1242 of the FSA.

The district court correctly ruled it was bound by the recent *per curiam* decision by this Court in *Umphress v. Hall*, 133 F.4th 455, 461-62 (5th Cir. 2025), and thus, found that the Individual and Retail

Plaintiffs have standing to challenge Section 1242 of the FSA. ROA.1533-1540. In *Umphress*, as here, the question centered on the "injury-in-fact" element of standing. ROA.1539-1540.

Specifically, Judge Umphress challenged a commission's potential future enforcement of the ethics canon against him, if he elected not to perform same-sex weddings. *Id.* at 461-462. This district court ruled that Umphress had failed to show a substantial threat of future enforcement because there were no current or pending disciplinary proceedings or investigations against him. *Id.* at 462-467.

This Court *reversed* the district court's ruling that Umphress lacked standing, holding that the commission had issued a warning to a different judge (Hensley) stating that her refusal to perform same-sex weddings may violate the ethics canon. *Id.* at 462. This Court was also struck by "the Commission's *striking refusal to disavow future enforcement* against Umphress." *Id.* at 466 (emphasis added), and citing *Holder v. Humanitarian L. Project*, 561 U.S. 1, 16 (2010) (holding plaintiffs' claims justiciable because, *inter alia*, "[t]he Government has not argued to this Court that plaintiffs will not be prosecuted if they do what they say they wish to do"); and *Babbitt v. United Farm Workers*

*Nat'l Union*, 442 U.S. 289, 302 (1979) (in concluding that the claims were justiciable, the court stated that because "the State has not disavowed any intention of invoking the criminal penalty provision against unions that commit unfair labor practices," "[a]ppellees are thus not without some reason in fearing prosecution for violation of the ban on specified forms of consumer publicity").

Here, there has been previous enforcement of FSA. *See* ROA.11-12, ROA.1430-1441. Although it has had multiple opportunities to do so, the government has not disavowed any intent of invoking the FSA's severe criminal penalty provisions now or in the future. ROA.1536, 1430-1441; *see also* ROA.182-183, 1505-1508. Additionally, here, Appellant Knife Rights' member Johan Lumsden's federal search warrant and raid on his residence and home business under Section 1242 is more than sufficient to establish standing for the Individual and Retail Plaintiffs and Knife Rights on behalf of its member ROA.1505-1508. The district court found as much. *See* ROA.1539-1542.

Further, though summarily rejected by the district court, the Complaint and sworn declarations show that the Spyderco[5] prosecution

_____

[5] Notably, Spyderco, like the Plaintiffs, is a member of Knife Rights, Inc.

and well-publicized plea agreement continue to serve as a "shot across the bow" to the knife industry because the prosecution and plea agreement are well known in the industry and due to the very real threat of enforcement, the industry has universally adopted this same written acknowledgments and representations requiring their distributors to comply with the FSA. *See* ROA.11-12, 976-997, 1002, 1009; *see also* 182-183. Plaintiff Retailers fear prosecution, like Spyderco, and that fear cannot be trivialized. *Id.* The district court dismissed this evidence and ignored the facts and evidence in the record. While Spyderco in fact agreed to a plea deal under a different statute, the probation conditions enforced by Spyderco's prosecution require lawful compliance with 18 U.S.C. 1241-1244. *See* ROA.992. Moreover, Spyderco was forced to issue an acknowledgement for its dealers and distributors requiring compliance under the FSA for all switchblade knife sales and distribution. ROA.997. This same acknowledgement *continues to be used* by Spyderco and the rest of the switchblade knife industry to the present date. ROA.976-997, 1002, 1009; *see also* 182-183. While it may be selective, the facts and evidence show that the FSA has been enforced and is actively enforced.

**B.     Appellant Knife Rights Has Standing in its Own Right and on Behalf of its Members to Challenge Sections 1242 and 1243 of the FSA.**

The district court ruled that under Section 1242, Knife Rights had failed to establish standing in its own right (organizational standing) because "its alleged injury (spending substantial assets on litigation challenging the FSA) is not distinct from its normal activities and are related to litigation—which are both insufficient to confer standing." ROA.1540-1542. The court also found that Knife Rights had failed to establish standing in its own right under Section 1243. ROA.1543. The court contradicted the allegations in the Complaint (ROA.17-23) and the sworn testimony (ROA.178-197), and erred in doing so.

Plaintiffs do not dispute the law the district court relied on in analyzing Knife Rights' organizational standing. ROA.1540-1542.); *but see also Hunt*, 432 U.S. at 343 (1977); *Students for Fair Admissions, Inc.,* 600 U.S. at 199 (2023); *and La Union del Pueblo Entero,* 614 F.Supp.3d at 516 (W.D. Tex 2022) (showing standing established for organization if "at least one member will suffer injury-in-fact"). The crux for reversal purposes are Knife Rights' facts and evidence.

The Complaint alleges that Knife Rights has incurred "extraordinary" and "distinct" "expenditures of time, effort, and cost on

litigation matters to protect knife rights" and that those extraordinary expenditures "have placed a real, concrete drain on Knife Rights' resources, particularly the funds relied upon from our member contributions to also pursue our other customary political, educational, and legislative efforts." ROA.20-22, 178-197. The Complaint also alleges that "[b]y expending substantial and extraordinary organizational time, effort, money, and other resources to challenge the [FSA] in court, Plaintiff Knife Rights has sustained injury, harm, and losses that are over, above, and beyond its customary actions and accomplishments. Such expenditures are exceptional and not merely in furtherance of Knife Rights' mission, goals, and purposes." ROA.21. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (organization had standing to challenge policy based on allegation that organization "had to devote significant resources to identify and counteract the Defendant's" practices). But it does not stop there. The Complaint further alleges that Knife Rights and its members face a chilled-rights dilemma: either forgo exercising their Second Amendment rights or risk enforcement under FSA. ROA.13 A temporary drop in prosecutions is not a disavowal; and

future prosecutions and criminal penalties are still enforceable for violating the FSA. *Id*.

The Complaint also alleges that but for the FSA, Knife Rights would devote its resources elsewhere; a nationwide injunction would fully redress that organizational injury. Until then, Knife Rights and its members face substantial risk of prosecution for engaging in interstate commerce in switchblades or for purchasing, possessing, or carrying them on Indian or federal lands. ROA.23.

These allegations are supported by Mr. Ritter's sworn declaration. See ROA.178-197.[6] The facts and evidence are more than enough to establish Knife Right's organizational standing under Sections 1242 and 1243 of the FSA.

---

[6] Mr. Ritter's declaration shows that Knife Rights members have recently faced FSA enforcement despite Defendant's prior "no prosecutions" claims. **Exhibit A** documents a 2020 search-and-seizure warrant for member Johan Lumsden. ROA.184, 189-197.

## II.  SECTION 1243 STANDING HAS BEEN ESTABLISHED

### A.  The Individual and Retail Plaintiffs Have Standing to Challenge Section 1243 of the FSA.

The district court found that the Individual and Retail Plaintiffs do not have standing to challenge Section 1243 of the FSA.  ROA.1542-1543. In reaching this erroneous conclusion, the district court was forced to at least summarize *some* of the record evidence regarding Appellants' Section 1243 claims:

> "With regard to Section 1243, they assert that if it was not for their fear of prosecution under the FSA they: (1) would travel across state line or onto federal property with their switchblades for either personal or business reasons (ECF No. 18 at 21, 52–53)]; (2) take a switchblade with them for hunting on federal land or across state lines (id. at 58–59)]; and (3) possess a switchblade for personal protection at their home on federal land (id. at 62–64)].  Just as above, none of these allegations are sufficient to confer standing unless their fear of prosecution is based on a substantial threat of enforcement."

ROA.1542.

The court's dismissal of such evidence because there is purportedly no "fear of prosecution . . . based on a substantial threat of enforcement" is far too exacting under the injury-in-fact element of standing for several reasons.

### 1. **Section 1243's Scope and Reach are Broad**.

Section 1243 prohibits all possession of switchblade knives in more than one-third of the United States. ROA.158.  Appellants made clear they would possess and carry switchblade knives while traveling across state lines, through federal lands, including National Parks and BLM land, and within and through "Indian country," but that they are prohibited from doing so by the prohibitions under Section 1243, including a threat of future enforcement, which Appellees have not disavowed. ROA.162-165,169-176, 178-197, 200-203, 206-209, 212-214.

### 2. **Plaintiff-Appellant Rodney Shedd, Alone, Establishes Standing under Section 1243.**

The district court *fails to address* Plaintiff Rodney Shedd's allegations and sworn declaration. ROA.1542-1543. Plaintiff-Appellant Shedd, a member of the Muscogee Nation Tribe and resident on the Muscogee Nation Tribal reservation in Tulsa, Oklahoma, moved from Arizona to the Muscogee Nation reservation in September 2024. ROA.211-214. As a Muscogee tribal member, Section 1243 directly prohibits the lawful possession of Mr. Shedd's switchblade knife on tribal land. ROA.158, 212-214. As a result, when Mr. Shedd moved from Arizona, he was forced to abandon his lawfully acquired switchblade

knife before entering tribal land or face a real and credible threat of prosecution for merely possessing a switchblade under Section 1243. *Id.* at 212. This case also demonstrates the government's striking refusal to disavow future enforcement against the Individual and Retail Appellants, including Mr. Shedd. ROA.178-197.

Mr. Shedd is not only prohibited from possessing any switchblade knife, even in his own home, due to Section 1243's blanket prohibition on possession, he is also prohibited from acquiring any switchblade knife through intrastate commerce. The interplay between Section 1242 and 1243's prohibitions preclude any switchblade knife acquisition by Mr. Shedd for two reasons. First, there is no evidence of any switchblade knife manufacturer within the State of Oklahoma, nor are Appellants aware of any. As such, Mr. Shedd's *only means* of acquiring a switchblade knife is through interstate commerce (which is prohibited under Section 1242). ROA.158, 212-214. Second, even if Mr. Shedd were to find a switchblade manufacturer in Oklahoma, he would still be prohibited from purchasing a switchblade and returning to his home on the reservation, because mere possession of the knife is prohibited under Section 1243, subjecting him to criminal liability. *Id.*

In ruling that the Individual and Retail Plaintiffs did not have standing to challenge Section 1243, the district court failed to take these facts into consideration. ROA.1542-1543. There is no mention of Mr. Shedd in the district court's ruling. *Id.* Nor did the government offer any contrary evidence to Mr. Shedd's allegations and sworn testimony. ROA.1244-1295.

### 3. Applicable Case Law Applies to Establish Standing under Section 1243.

To establish a credible threat of prosecution, a plaintiff must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (describing the factors). Though the leading Supreme Court precedent, the government did not cite *Driehaus*. It also wrongly suggests that the "credible threat" component requires that Plaintiffs allege and prove they have not only been arrested, but subsequently prosecuted *and* convicted for violating Sections 1242 and 1243 of the FSA, citing *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 782-783 (5th Cir. 2024). The *McCraw* case is inapposite.

In *McCraw*, which involved a due process issue and *not* a Second Amendment challenge, defendants showed that "they have not arrested or prosecuted anybody" for violating the statute and that they "have never enforced" the statute "against Plaintiffs (or anybody)." *Id*. at 782. This is a far cry from the enforcement efforts under Sections 1242 and 1243 of the FSA. Moreover, Appellees' own evidence concedes there have been four criminal cases filed under 15 U.S.C. § 1242; and an undisclosed number of prosecutions under 15 U.S.C. § 1243 prior to 2004. ROA.1296-1297. And, Appellees "have never disavowed enforcement of the FSA." Specifically, Mr. Ritter correctly points out that the government has never claimed it has stopped enforcing the FSA or will refrain from enforcing it in the future. ROA. 182-183. A low number of prosecutions since 2010 does not prove there were no arrests, searches/raids, charges, seizures, or pleas. *Id*. The FSA remains on the books and is enforceable going forward by this or any future administration. *Id*. Plaintiff Ritter's point regarding the "low prosecutions" being insufficient proof of no enforcement was borne out. Knife Rights subsequently learned of Knife Rights member Johan Lumsden's case, where he was searched, his home and business were seized/raided, and he suffered injury during an

arrest—even though he was never charged or convicted. *See* ROA.11, 14, 43-44, 184, 189-197.

In *Nat'l Ass'n for Gun Rights, Inc. v. Garland*, 4:23-cv-00830-0, 2024 WL 3517504 (N.D. Tex. July 23, 2024), gun rights organizations and individuals challenged federal regulations broadening the classification of firearms and the government renewed its standing and pre-enforcement credible-threat assertions. *Id*. at *6. The district court rejected the government's assertions, finding that "Defendants have twice refused—and *continue* their refusal—to disavow prosecution against these Plaintiffs" so "credible threats of enforcement continue to loom over Plaintiffs such that there is standing to sue." *Id*. at *7 (original emphasis). The district court added:

> "What is disputed is whether engaging in the newly proscribed [forced reset trigger] ownership carries "a credible threat of prosecution." *Id*. Defendants liken the Plaintiffs' concern to no more 'than a generalized threat of prosecution' that cannot support pre-enforcement relief, particularly because the ATF has no current 'intentions to take enforcement actions against the Individual Plaintiffs.' The Court disagrees and instead finds that a sufficiently credible threat exists to establish standing."

*Id*. at *7.

Here, in addition to Mr. Shedd's sworn declaration, Plaintiffs Arnold and Folloder, as individuals, owners, operators, and federally

licensed firearms dealers of Firearm Solutions and MOD Specialties; members of Knife Rights; and on behalf of their actual and prospective customers, have alleged and proven standing. *See* ROA.161-214

Moreover, the other Individual Plaintiffs, who are also members of Knife Rights, have shown concrete injury and fear of future enforcement and criminal prosecution.[7]

Because both the Individual and Retail Appellants have standing to challenge Section 1243, the organization plaintiff, Knife Rights necessarily has associational standing on behalf of its members to challenge Section 1243.

Moreover, the standing requirement is satisfied for *all plaintiffs if any plaintiff* has standing on the same complaint seeking the same relief, which is the case here. See *Department of Commerce v. United States House of Representatives*, 525 U.S. 316, 330 (1999); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264 and n.9 (holding that presence of one party with standing assures that

---

[7] *See* ROA.23-41; *see also* ROA.162-165, 169-174, 200-203, 206-209.

the controversy before the Court is justiciable). Within this context, the Complaint and sworn declarations and evidence establish standing.

## III. SECOND AMENDMENT ISSUES MUST BE ADDRESSED

### A. Appellants Stated a Claim—the FSA Implicates, Burdens, and Infringes Upon the Second Amendment Right to Keep and Bear Arms.

The district court agreed with the government's wrongful assertion that Plaintiffs failed to state a claim because the prohibitions under section 1242 of the FSA did not burden or violate the Second Amendment. ROA.1544-1549. In reaching this conclusion, the court improperly reduced the broad reach of the FSA, claiming the Second Amendment's plain text "'does not include purchase' of arms," citing *McRorey v. Garland*, 99 F.4th 831, 838 (5th Cir. 2024). ROA.1545-1546. The district court misses the point.

**First**, Plaintiffs' conduct, protected by the Second Amendment, is broader than the act of "purchasing" — the conduct at issue here extends to whoever manufactures, transports, or distributes any switchblade knife in interstate commerce *and* "whoever" manufactures, sells *or* possesses any such a knife within any federal land/territory, National Parks, BLM land, Indian country, and maritime areas. 15 U.S.C. §§ 1242, 1243. Nonetheless, the court relied on *McRorey v. Garland*, 99 F.4th 831

(5th Cir. 2024), in which this Court considered a challenge to an "expansion of federal background check procedures that required a ten-day waiting period in which to await the results of a background check before a gun could be acquired." ROA.1545.

*McRorey* is distinguishable. It involved a challenge to background checks and an extended ten-day waiting period applied to a certain age-group of legal adults aged 18-to-20-years-old. *McRorey*, 99 F.4th at 835. Appellants contend that regulations placed on lawful adults in *McRorey* constitute unconstitutional bans. However, for the sake of argument, Appellants acknowledge the government could at least *argue* (however incorrectly) these regulations could be considered "conditions or qualifications" on the commercial sale of arms because they are finite hurdles that can be eventually satisfied.[8] *Id*. at 838–40. The FSA, by contrast, imposes neither qualifications nor conditions which can ever be satisfied to acquire switchblade knives. Section 1242 does not merely regulate the manner of purchase — it makes it a crime to engage in any of the ordinary acts that constitute commerce in arms. 15 U.S.C. § 1242. Section 1242 is not a procedural hurdle but instead a categorical

---

[8] Again, Appellants do not concede this argument.

prohibition, backed by imprisonment and fines, that forecloses the entire interstate channel of acquisition, manufacture, transport, and distribution of switchblade knives. *Id*.

Moreover, Section 1243 compounds Section 1242's interstate commerce ban by imposing a ban on possession of switchblades on all federal land/territory, National parks, BLM land, Indian country, and maritime area — territory that collectively covers more than one-third of the United States.[9] ROA.1475, 1486-1487, 1488-1489, 1501-1504; *see also* 15 U.S.C. § 1243. This ban is sweeping, perpetual, and leaves no avenue for lawful compliance within these broad geographical regions.

Unlike in *McRorey*, where an individual could at least submit to the process and ultimately acquire the firearm, the FSA provides no path to lawful acquisition through interstate commerce, nor any conditions that could ever be met in which lawful possession is possible within all federal lands/territory, National parks, BLM land, Indian Country, and

---

[9] Again, Section 1243 does not just prohibit possession. It also prohibits the manufacture and sale of switchblade knives.

maritime areas. The FSA's text establishes a prohibition, *not* a qualification.[10]

Importantly, *McRorey* did not insulate such laws from *Bruen*. To the contrary, this Court acknowledged that even waiting periods or background checks can, when extended or abused, become "de facto prohibition[s] on possession" and thereby require *Bruen*'s historical-tradition inquiry. *Id.* at 836-837, 840. The district court, here, inverted that reasoning: it invoked *McRorey*'s language about "presumptively lawful" regulations to avoid applying *Bruen*.

*Reese v. ATF*, 127 F.4th 583 (5th Cir. 2025) also underscores why the FSA cannot be dismissed as "ancillary." ROA.1547. The statute at issue in *Reese* prohibited licensed dealers from selling handguns to individuals aged 18–20. The government defended the statute, arguing it was not a true prohibition, because (1) 18–20-year-olds could still lawfully purchase long guns from licensed dealers, and (2) they could

---

[10] In fact, per the U.S. DOJ, the FSA was described as a "prohibition" on an "item that is not inherently dangerous." ROA.771 ("[t]he instant measures would extend the doctrine upon which such prohibitions are based by prohibiting the transportation of a single item [switchblades] which is not inherently dangerous but requires the introduction of a wrongful human element to make it so.").

acquire handguns through private, intrastate sales from unlicensed individuals. *Id.* at 589–90.

This Circuit rejected that reasoning. It held that despite those limited exceptions, the ban *remained* unconstitutional because it foreclosed "the most common way to secure" a handgun — purchase from federally licensed dealers. *Id.* at 600. The fact that alternative means for an 18-to-20-year-old to acquire a handgun remained *did not* alter the practical reality that the primary channel of acquisition was closed off. *Id.*

The parallel here is direct. Interstate commerce is not just one common method of acquiring arms — it is the *ordinary and dominant* channel for virtually all consumer goods in the United States. Section 1242 eliminates that dominant channel outright, and Section 1243 imposes a sweeping possession ban across more than one-third of the United States. If this Circuit in *Reese* struck down a prohibition that left open some alternative methods of acquisition, then necessarily the FSA— which eliminates the dominant channel of acquisition—must also be treated as a prohibition and subject to *Bruen*.

Moreover, knives are not regulated to the extent of firearms. Federal law requires that firearms be purchased through federally licensed dealers, creating a distinct category of regulated transactions. Knives, by contrast, are sold in the open market, without federal (or state) licensing requirements. As a result, Section 1242's sweeping prohibition extinguishes a *substantially greater* portion of the market than the prohibition in *Reese*: it prevents any individual or business from engaging in the introduction, manufacture for introduction, transport, or distribution of switchblades in interstate commerce. In practical terms, it obliterates the interstate market for these arms.

The court's invocation of *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96 (10th Cir. 2024), is equally unpersuasive. ROA.1546. Again, like *Reese*, the Colorado statute barred firearm purchases by individuals under 18-to-20-years-old. Again, even assuming, *arguendo*, the Tenth Circuit's characterization that such laws can be viewed as "conditions or qualifications" because they lapse once the individual turns 21, that court still recognized that such restrictions implicate the Second Amendment and must be tested under *Bruen*. *Id.* at 118, 122 — a fact that this district court ignored.

The same is true in *Sedita v. United States*, 763 F. Supp. 3d 63 (D.D.C. 2025). *Sedita* involved delays in background checks based on inaccurate criminal record information. However, unlike the district court here, the *Sedita* court acknowledged that the right to *acquire* arms falls within the Second Amendment and applied *Bruen*'s analysis. *Id.* at 78–80. The district court in this case turned *Sedita* on its head—citing *Sedita* as justification to avoid *Bruen*'s framework altogether.

The Ninth Circuit's recent decision in *Rhode v. Bonta*, 145 F.4th 1090 (9th Cir. 2025) further illustrates the district court's error. In *Rhode,* the Ninth Circuit considered California's ammunition background check scheme and framed its inquiry by asking whether the regulation "meaningfully constrain[ed]" the right to keep and bear arms. *Rhode v. Bonta*, 145 F.4th at 1105-1106 (quoting *B&L Productions, Inc. v. Newsom*, 104 F.4th 108, 119 (9th Cir. 2024)). The court distinguished between "minor constraint[s] on the precise locations within a geographic area where one can acquire firearms," which it held do not implicate the Second Amendment, and laws like "monthly metering of firearms purchases," which "meaningfully constrain[] the right to purchase and possess firearms and [are] thus presumptively unconstitutional." *Id.*

(citing *Nguyen v. Bonta, 140* F.4th at 1243). Because California's ammunition law denied tens of thousands of lawful purchasers access to ammunition, the court concluded that the law *did* "meaningfully constrain" acquisition, and therefore, implicated the Second Amendment, requiring a historical analysis under *Bruen*.

This reasoning is telling for three reasons.

**First**, it underscores that even under the Ninth Circuit's watered-down approach of *Bruen*, regulations that foreclose meaningful avenues of acquisition necessarily fall within the Second Amendment's text. Sections 1242 and 1243 of the FSA surpass that threshold: Section 1242 criminalizes the introduction, manufacture for introduction, transportation, or distribution of switchblades in interstate commerce—backed by criminal penalties of up to five years' imprisonment. Section 1243 imposes an outright possession ban across all federal land/territory, National parks, BLM land, Indian country and maritime areas, encompassing more than one-third of the United States. These are not "minor" constraints on the margins of commerce and possession; they are sweeping prohibitions that eliminate entire channels of acquisition,

manufacture, transport, sale, and possession in huge geographic areas throughout the United States.

**Second**—and fundamentally—*Rhode* illustrates the error of the very approach *Bruen* repudiated. *Bruen* rejected threshold "burden" tests at step one, holding instead that once the Second Amendment's plain text is implicated, the burden shifts squarely to the government to justify the regulation with historical tradition. 597 U.S. at 24, 29–30. The Second Amendment does not protect only against "meaningful" infringements; it protects the people's right to keep and bear arms, period. Thus, to the extent *Rhode* suggests a law must "meaningfully constrain" acquisition *before Bruen* applies, it cannot be reconciled with the Supreme Court's command. Even if that erroneous filter were applied, the FSA's prohibitions are far more burdensome than the ammunition restrictions struck down in *Rhode*.

In short, *Rhode v. Bonta* shows that under any conceivable framework—whether faithful application of *Bruen* or the Ninth Circuit's flawed substantial-burden gloss—the FSA implicates the Second Amendment and the government must justify the regulation by historical tradition, which it cannot do.

**Third**, the Ninth Circuit's recent decision in *Nguyen v. Bonta*, supports Plaintiffs' challenge to the FSA and highlights the district court's error in concluding Plaintiffs failed to state a Second Amendment claim. In *Nguyen*, the court struck down California's "one-gun-a-month" law prohibiting individuals from acquiring more than one firearm within any thirty-day period. The court held unequivocally: *"California's law is facially unconstitutional because possession of multiple firearms and the ability to acquire firearms through purchase without meaningful constraints are protected by the Second Amendment." Nguyen*, 140 F.4th at 1239.

That principle is applicable here. The ability to acquire arms is not an ancillary activity outside the Second Amendment's scope; it is a necessary predicate to the right to keep and bear them. *Nguyen* makes clear that even acquisition restrictions that fall short of a complete ban are *presumptively unconstitutional* when they meaningfully constrain access. If limiting firearm purchases to one per month "meaningfully constrains" the right, then the FSA's elimination of the entire interstate channel of commerce and the ban on possession in more than one-third of the United States necessarily do so as well.

Finally, the *Nguyen* court emphasized that the burden of proof rests on the government. "We first ask whether 'the Second Amendment's plain text' covers the regulated conduct at issue. *Id.* If it does, 'the Constitution presumptively protects that conduct.' *Id.* That presumption can be overcome only if 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation." *Nguyen*, 140 F.4th at 1241 (9th Cir. 2025). The district court here inverted that rule by labeling the FSA "ancillary" to acquisition and declining to apply *Bruen*'s historical-tradition analysis. The court's conclusion is unfounded.

At bottom, the district court erred in classifying the FSA as an "ancillary regulation" imposing "preconditions on acquisition." ROA.1546. That description is wrong. The FSA does not impose preconditions or qualifications—it imposes prohibitions. No amount of waiting, paperwork, permits, licensing, training, or age eligibility can render lawful the introduction, transport, or possession of switchblades in the areas Congress has proscribed.

Even courts that have upheld restrictions—whether waiting periods, background checks, or age-based bans—have uniformly

recognized that such laws implicate the Second Amendment and must be analyzed under *Bruen*. The district court here did the opposite: it used *Bruen* to justify refusing to apply *Bruen*.

Sections 1242 and 1243 of the FSA are not ancillary conditions. They are prohibitions that eliminate the most common means of acquisition and criminalize the actions. The district court's ruling should be reversed, and this Court can and should apply the *Bruen* analysis to Plaintiffs' motion for summary judgment under *de novo* review.

## B. The District Court's "No Ban" Reasoning Misconstrues the Evidence.

Relying on the misapplication of *McRorey*, above, the district court considered the question of whether Section 1242's prohibition against interstate commerce serves as "a de facto prohibition on possession of switchblade knives when they are widely available in *intrastate* commerce" and concluded that the FSA did not amount to a ban citing to "Plaintiffs own evidence." ROA.1547-1548.

The district court erred in misconstruing the evidence presented to the district court as a part of Plaintiffs' summary judgment motion that the court refused to address. According to the court, Plaintiffs' evidence showed:

"(1) the number of switchblade knives "owned and used in the United States is in the **millions** . . ." (ECF No. 22 at 106) (emphasis added); (2) current "monthly shipments distribute three to four thousand knives per month" (ECF No. 29 at 35–36); (3) "thousands of different models of [switchblade] knives exist for sale for lawful use" (id. at 36); (4) switchblades are legal to purchase, posses, and carry in more than forty states (id.); and (5) switchblades account for approximately **eighty percent** of the current knife market (id. at 38) (emphasis added)."

ROA.1548 (original emphasis).

**First**, Plaintiffs agree that the number of switchblade knives "owned and used in the United States is in the millions." This was true back in 1958 *before* Congress enacted the FSA and acknowledged the numbers in the Congressional reports. See ROA.137-138, 536-537, 763, 797; *see also* ROA.979-980,1008-1009. In other words, the FSA enacted a ban on arms that were *already in common use*. Indeed, while there is still some *intrastate* commerce throughout the country, this occurs only in the states that happen to have a switchblade manufacturer within the respective state. Any other sales or interstate commerce must comply with the FSA. 15 U.S.C. §§ 1242, 1243.

However, this evidence does not show that there is a "robust *intrastate* market" of switchblades. (Emphasis added.) *Heller* and *Bruen* made it clear, the government cannot prohibit arms that are in common

use for lawful purposes. Plaintiffs' evidence proves that before the FSA was passed switchblades were already commonly owned and used lawfully. ROA.136-140, 536-537, 763, 797; *see also* ROA.836, 842-843, 404, 979-980, 1008-1009. This evidence was undisputed. ROA.1441-1442; *see also* ROA.768-769, 771. But this evidence says *nothing* about the current *intrastate* sales market or the effect of the interstate commerce ban.

The fact that an arm is in common use, despite the negative effects of the prohibitions in the FSA, cannot be relied on to conclude that the FSA does not impose a substantial enough "burden" to implicate the Second Amendment. This kind of discussion is the epitome of the interest balancing approach *Bruen* rejected.

**Second**, the district court's contention that "monthly shipments distribute three to four thousand [switchblades] per month" is misapplied. The court's quoted language comes from the 1958 Congressional report detailing how many switchblades were being sold and shipped every month via interstate commerce *prior to the enactment of the FSA*. ROA.1548. Again, Plaintiffs offered this evidence to show that switchblades were in common use *prior* to the FSA's passage in support

of Plaintiffs' motion for summary judgment. ROA.665. However, the court misconstrued this evidence to claim that three-to-four thousand switchblade knives are *currently* being shipped every month via *intrastate* commerce. ROA.1548. As such, the district court erred in relying on this evidence to support its notion that the FSA does not place any significant "burden" on interstate commerce because there is a "robust intrastate market." *Id.*

**Third**, the district court relied on Plaintiffs' evidence supporting their motion for summary judgment that "thousands of different models of [switchblades] knives exist for sale for lawful use." ROA.1548. Again, in citing such evidence, the court misconstrued it. While there are thousands of models of [switchblades] knives in existence for sale for lawful use, this evidence proves *commonality* under the *Bruen* standard. ROA.139-140. It does *not* provide any meaningful evidence or analysis regarding the size of the *intrastate* market of switchblades. Even if one were to try and do so, the thousands of available models of switchblades that can be lawfully purchased and sold within state lines is entirely dwarfed by the massively larger market of other unrestricted knives in both the intrastate and interstate markets.

**Fourth**, while the district court claimed to not consider Appellants' summary judgment motion, it again pulled from Plaintiffs' evidence supporting its summary judgment motion on the argument that switchblades are in common use as they are legal to purchase, possess, and carry in more than forty states. ROA.1548. Again, this evidence supports the undisputed fact that switchblades are arms in common use and that have been in common use since before the 1958 FSA ban. ROA.142. With *at least 45 states* currently allowing for their lawful possession, these arms are *jurisdictionally common* under the vast majority of this Country's state laws. ROA.142, 320-324. This evidence was undisputed. ROA.1441-1442,1452-1453. This "jurisdictional commonality" has permitted individuals to lawfully acquire switchblades in various states through *intrastate* commerce since the passage of the 1958 FSA ban, despite the complete ban on interstate commerce and the possession ban on federal lands/territory, National parks, BLM land, Indian country, and maritime areas.

In *Caetano*, Justice Alito issued a concurring opinion, joined by Justice Thomas, explaining that, in determining whether an arm is protected under the Second Amendment, "the pertinent Second

Amendment inquiry is whether stun guns are commonly possessed by law-abiding citizens for lawful purposes today." *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016). As Justice Alito explained, "[t]he more relevant statistic is that hundreds of thousands of Tasers and stun guns have been sold to private citizens, *who it appears may lawfully possess them in 45 States.*" *Id.* (quoting *People v. Yanna*, 297 Mich. App. 137, 144, 824 N. W. 2d 241, 245 (2012) (holding Michigan stun gun ban unconstitutional) (cleaned up) (emphasis added).

**Fifth**, the district court misapplied Plaintiffs evidence in claiming that Plaintiffs' submitted evidence that switchblades "account for approximately eighty percent of the current knife market." ROA.1548. Again, Plaintiffs offered this evidence to support their position that switchblades are *categorically in common use* under the *Bruen* common use historical analysis as they fall within the *category* of folding one-hand opening pocket knives that account for 80% of the pocket knife market. ROA.140-141, 850, 853-854, 952. In other words, switchblades are in common use because they are a merely a variation of a common pocket knife. *Id.*, *see also* ROA.857-860, 979-980, 1001-1002, 1008-1009. While switchblades fall within this broader category of common pocket knives,

the district court incorrectly concluded that *switchblades alone* account for 80% of the current knife market. ROA.1548. Thus, this evidence does not support the district court's conclusion that there is a "robust intrastate market" and that Sections 1242 and 1243 do not act as a ban. However, this undisputed evidence supports the fact that switchblades are categorically in common use.

Neither Plaintiffs nor the government provided the district court with any figures regarding *intrastate* sales of switchblade knives. Nor did the district court review any data related to intrastate sales of switchblades within Texas, Utah, and Oklahoma, in which the individual Plaintiffs reside. As such, its conclusion that Section 1242 (and Section 1243) do not act as a "sufficient ban" to implicate the Second Amendment due to a "robust intrastate market" is unsupported, conjecture, and the incorrect constitutional test that must be applied under *Bruen*.

C. **The Government Concessions, and the Fifth Circuit's Decision in *United States v. Peterson* Demand Reversal of the Judgment**

The district court concluded that the prohibitions Sections 1242 and 1243 do not implicate the Second Amendment. ROA.1544-1549. That conclusion is irreconcilable with the government's recent litigation

position in *United States v. Peterson*, and this Court's recent decision in that same case. The court's decision fails under even the narrowest reading of *Bruen*. 597 U.S. 1.

This Court issued its recent decision in *United States v. Peterson*. *United States v. Peterson*, No. 24-30043, 2025 WL 2462665 (5th Cir. Aug. 27, 2025). In *Peterson*, George Peterson entered a conditional guilty plea to possess of an unregistered suppressor in violation of federal law. This Circuit affirmed the district court's denial of Peterson's motion to dismiss concluding that the "NFA's shall-issue licensing regime is presumptively constitutional under [Bruen], and because that presumption cannot be overcome on this record." *Peterson*, 2025 WL 2462665, at *1.

This Circuit acknowledged the government's concession that "suppressors constitute 'arms' under the Second Amendment." *Peterson*, 2025 WL 2462665, at 6. Indeed, prior to the issuance of this decision, the government submitted a supplemental response to the petition for rehearing *en banc*. Supplemental Response to the Petition for Rehearing En banc ("Suppl. Br."), *Peterson*, 2025 WL 2462665 (5th Cir. Aug. 27, 2025). In that brief, the government's position is that a "restriction on the possession of suppressors burdens the right to bear arms, and a ban on

the possession of suppressors or other similar accessories would be unconstitutional." Suppl. Br., at p. 4.

In *Peterson*, the government acknowledged that "regardless of whether suppressors themselves constitute 'arms,' *restrictions on suppressors burden the right to 'keep and bear Arms' and so must be closely scrutinized to ensure compliance with the Second Amendment.*" Suppl. Br. at 2. (emphasis added). The government further conceded:

> In the view of the United States, the Second Amendment protects firearm accessories and components such as suppressors. As a result, restrictions on the possession of suppressors burden the right to bear arms, and a ban on the possession of suppressors or other similar accessories would be unconstitutional.

Suppl. Brief at 1.

And, the government conceded that "*restrictions* on suppressors impose a burden on using firearms that implicates the Second Amendment." *Id*. at 5 (emphasis added). These statements are not confined to suppressors. They reflect the government's broader and now-expressed position that *restrictions* on arms or their accessories "implicate" the Second Amendment and require constitutional review under *Bruen*. *Id*. at 1-5.

69

Nevertheless, this Court affirmed the district court's denial of Mr. Peterson's motion to dismiss, stating that the NFA's "suppressor-licensing scheme is presumptively constitutional because it is a shall-issue licensing regime…" that "is precisely the 'objective[] and definite' licensing criterion held permissible under *Bruen*. *Peterson*, 2025 WL 2462665, at *6.[11]

Here, however, assuming arguendo that the NFA's restrictions are a "shall-issue licensing regime" and "presumptively constitutional" under *Bruen*, there is no question that the FSA's prohibitions could not possibly be classified as a "licensing regime." Sections 1242 and 1243 impose a *categorical ban* on all interstate commerce of switchblades and criminalize their possession on all federal lands/territories, National parks, BLM land, Indian country, and maritime areas. Federal law does not subject switchblades to a tax or registration requirement (as in *Peterson*), nor does it require any background check or any purchasing requirement (as in *McRorey*). Section 1242 establishes an outright prohibition on all interstate commerce; and Section 1243 establishes an

---

[11] Because this Court treated *Peterson* as an as-applied challenge to the NFA, it does not foreclose later as-applied challenges with stronger records.

outright prohibition on possession in more than one-third of the United States. These two provisions under the FSA combine to form an absolute prohibition on acquisition, transport, and possession in vast geographic areas throughout the United States.

Thus, while this Court affirmed the district court's decision in *Peterson*, this Court's conclusion supporting a "presumption of constitutionality for shall-issue licensing regimes" cannot be applied here.

Notably, in addition to the government's *Peterson* filing, the United States recently submitted an amicus brief in the Third Circuit (en banc) in *Association of New Jersey Rifle & Pistol Clubs v. Attorney General of New Jersey*, Nos. 24-2415, 24-2450, 24-2506, arguing that the Second Amendment protects arms "in common use" for lawful purposes and that categorical bans on common arms (*e.g.*, rifles and magazines) are unconstitutional under *Heller* and *Bruen*. *See Brief for the United States as Amicus Curiae in Support of Appellants/Cross-Appellees on Rehearing En Banc* at 1-25, *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, Nos. 24-2415, 24-2450, 24-2506 (3d Cir. Sept. 18, 2025) (en banc). *Bruen's*

historical analysis must be applied in this case—and the government cannot justify the FSA's ban.

### D. Because Standing was Established, the District Court Erred in Refusing to Address Plaintiffs' Summary Judgment Motion.

This Court reviews the grant of a motion to dismiss and the denial of summary judgment *de novo. See, e.g., Meador v. Apple, Inc.*, 911 F.3d 260, 264 (5th Cir. 2018). Because the district court never addressed Plaintiffs' summary judgment motion, this Court can and should consider it in the first instance.

## IV. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT UNDER *BRUEN* AND *HELLER*

The Second Amendment of the Constitution provides:

> "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

U.S. Const. amend II.

The Second Amendment "guarantees the individual right to keep and bear arms (*Heller*, 554 U.S. at 592), and is incorporated against the States through the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution (*McDonald*, 561 U.S. at 791 (2010).

*Bruen* abrogated the two-step means-end scrutiny approach rejecting the "approach as having one step too many." *Bruen*, 597 U.S. at

19. The *Bruen* court also affirmed "the constitutional standard endorsed" in *Heller* in analyzing Second Amendment challenges. *Bruen*, 597 U.S. at 31. The *Heller/Bruen* framework is summarized twice in *Bruen*. *Id.* 597 U.S. at 17, 24. Although *Bruen* discussed "firearm regulation[s]," that was because the arm at issue in that case was a firearm. No reason exists to vary the *Bruen/Heller* framework by type of "arm."

Switchblade knives are "arms" under the plain text of the Second Amendment. *Bruen*, 597 U.S. at 28. In *Heller*, the Supreme Court made clear that "'[t]he 18th-century meaning' of the term 'arms' is 'no different from the meaning today.'" *Id.* 554 U.S. at 581. In the 18th century and now, the term "arms" generally referred to "'[w]eapons of offence, or armour of defence.'" *Id.* (quoting 1 Dictionary of the English Language 107 (4th ed.) (reprinted 1978)). *Id.* "The Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding. *Heller*, 554 U.S. at 581-584; *See also Rhode v. Bonta*, 145 F.4th 1090, 1104 (9th Cir. 2025) and *Nguyen v. Bonta*, 140 F.4th 1237, 1242 (9th Cir. 2025) ("This 'guarantee[s] the individual right to possess and carry *weapons.*' And not

only is "Arms" stated in the plural, but this term refers to more than just guns. It includes other weapons and instruments used for defense.).

Similarly, like firearms in *Heller*, knives are "arms" under the Second Amendment because they are instruments that constitute bearable arms. As with firearms, knives also fit the definition of weapons of offense or armor of defense. ROA.126-131; *see also Nguyen,* 140 F.4th at 1242 (9th Cir. 2025) and *Rhode*, No. 24-542, 2025 WL 2080445, at *6 (9th Cir. July 24, 2025). Further, other sources confirm that, at the time of the adoption of the Second Amendment, the term "arms" was understood as generally encompassing knives. See 1 Malachy Postlethwayt, The Universal Dictionary of Trade and Commerce (4th ed. 1774) (including among "arms" fascines, halberds, javelins, pikes, and swords). And bladed arms ranging from small "pocket" knives, to daggers, and even swords were regularly carried long before this Country's founding and to the present. ROA.389-390. The government failed to dispute any of these facts.

Because the Second Amendment encompasses "arms," and because "arms" includes switchblades, the Second Amendment presumptively guarantees "keeping and bearing" such "arms" for self-defense and any

other lawful purpose. *Bruen*, 597 U.S. at 32-33. And in this case, Appellants desire to keep and bear these arms for self-defense and other lawful purposes. ROA.161-166, 168-176, 178-197, 199-203, 205-209, 211-214. As such, there is no dispute that switchblades constitute "Arms" under the plain text of the Second Amendment. Indeed, the district court "assumed" so, without deciding. ROA.1544-1545.

1. **The Federal Switchblade Act Prohibits Protected Arms Possessed by "the People."**

Plaintiffs are plainly among "the people" whose Second Amendment rights are implicated. ROA.127. Switchblades are "arms" under every conceivable definition of the term, and the FSA directly regulates arms-bearing conduct. ROA.127-131, 1441-1442, 1442-1448. These facts are not disputed. This Court has recognized that such claims fall within the Second Amendment. As such, the burden is on the government to justify the FSA through historically analogous arms regulations.

2. **Switchblade Knives Are in Common Use and Are Therefore Categorically Protected Under the Second Amendment.**

When it comes to arms bans, the Supreme Court has already conducted the relevant historical inquiry. In *Heller*, and reaffirmed in *Bruen*, the Supreme Court held that an arms ban is unconstitutional

unless the government can show that the arms are *both* "dangerous and unusual." *Heller* was clear, the dangerous and unusual analysis was part of the historical tradition of arms regulations. Consequently, if an arm is commonly possessed and used by lawful citizens, it necessarily cannot be unusual. Thus, arms in "common use" for lawful purposes cannot be banned according to *Heller's* historical analysis of arms bans. *Heller*, 554 U.S. at 627; *Bruen*, 597 U.S. at 4-5, 21, 46-49.

While the burden is on the government to show that switchblades are both dangerous and unusual under the historical analysis of *Heller/Bruen*, and thus not in common use, Plaintiffs provided undisputed evidence that switchblades are in "common use" under every conceivable metric. ROA.134-142. Switchblades are common numerically (ROA.137-140); common jurisdictionally (ROA.142), and common categorically (ROA.140-141). Plaintiffs' evidence shows that millions of switchblades have been purchased and are owned throughout the United States since before the FSA was passed in 1958. *See* ROA.536-537, 404, 763, 797, 836, 842-843, 859, 979-980, 1008-1009. The record shows that switchblades are legal to purchase, own, possess, and carry in the overwhelming majority of states. ROA.142, 320-324. And the record

shows that switchblades belong to a category of arms—one-hand opening folding pocket knives—which account for millions of lawfully owned and used knives throughout the United States. ROA.142, 857-860, 979-980, 1001-1002, 1008-1009. Simply, switchblades are commonly possessed and used by lawful citizens throughout the United States. By definition, they cannot be *both* "dangerous and unusual."

Moreover, any unsupported claim by the government that switchblades are both dangerous and unusual is not only explicitly contradicted by Appellants' knife experts (ROA.859, 978-980, 1008-1009), but is contradicted by the government's own statements (ROA.768-769, 771 ("[t]he instant measures would extend the doctrine upon which such prohibitions are based by prohibiting the transportation of a single item [switchblades] which is not inherently dangerous but requires the introduction of a wrongful human element to make it so."). This Court's historical analysis can end here. Plaintiffs' motion can and should be granted and the FSA ruled unconstitutional.

### 3. The Government Has Not Met Its Burden of Identifying Analogous Historical Regulations.

Even if this Court were to re-conduct *Heller's* historical analysis of an arms ban, the undisputed evidence before this Court proves that there

are no relevant historically analogous arms regulations in this Country's history that justify the FSA's ban on switchblades. ROA.142-149, 1454-1464. The government has not—and cannot—identify any Founding-era analogue banning a class of "arms" in common lawful use.

Plaintiffs' summary judgment briefing already catalogues why the scattered statutes the government invoked fail to meet *Bruen's* demanding standard ROA.142-149, 1454-1464. The government bears the burden, and Plaintiffs need not predictively rebut every conceivable historical law in this opening brief.

However, Plaintiffs will direct this Court to several undisputed facts regarding this historical record. First, even if Plaintiffs and this Court were to accept all the cited historical laws that allegedly justify the FSA, the government—*at most*— has cited to nine *state laws* from the Founding Era through 1885, and an additional 12 *state* laws enacted in the 1950s in its opposition to Plaintiffs' summary judgment. ROA.1455. In other words, the government claims that in approximately *188 years* (1837 through 2025), a total of 21 state laws that regulated various actions with certain bladed arms—*mainly restricting the manner in which said arms were carried*—justify an outright ban on all interstate

commerce and the possession of automatically opening knives. ROA.1455-1456. This is insufficient to satisfy its burden under *Heller* and *Bruen*—especially because at least half of the regulations come well *after* the appropriate historical period identified in Bruen. *Bruen*, 597 U.S. at 36, 66; see also ROA.131-134, 1458.

Second, the government *fails to provide a single federal law* that banned the sale, transfer, transportation, or possession of any bladed arm within the entire history of the United States.[12] ROA.1455-1456.

The government cites only *two state laws* enacted before 1850 that prohibited sale and possession of knives of any kind. ROA.1456. However, the 1837 Georgia law was held unconstitutional in *Nunn v. State* and invalidated *in its entirety*. *Nunn v. State,* 1 Ga. 243, 251 (1846). And the single remaining 1838 Tennessee law is simply an outlier. *Id.*

Moreover, any reliance by the government on early *tax laws* provides no justification for the challenged prohibitions. ROA.1457. Any such tax law is far removed from an outright ban on all interstate

---

[12] When the FSA—the first federal knife ban—was introduced, DOJ (Deputy AG William P. Rogers) opposed enactment, noting switchblades are not inherently dangerous and are "useful and even essential" for lawful users such as sportsmen and shipping clerks. ROA.767-768.

commerce and the possession of switchblades in over one-third of the United States. *Id.* Nor do any restrictions or prohibitions on a *legal minor* provide any historical justification. ROA.1456-1457.

This Court should also refuse to accord any weight to the government's reliance on the claim that "14 states banned *concealed carry* of bowie knives between 1850 and 1875, and between 1875 and 1900 that number rose to 22 states." ROA.1458. This fails to meet the standard required under *Bruen*. First, these are *state laws* prohibiting the *manner of carrying* certain bladed arms in public. *Id.* There are no restrictions on the manufacture, transport, or distribution of bladed arms in interstate commerce, nor any restrictions on the possession of bladed arms within any federal land or Indian country. *Id.* Second, the time period in which these prohibitions were enacted provides little guidance as to the original interpretation of the Second Amendment at the Founding, especially when these late restrictions are contradicted by that era. *Bruen*, 597 U.S. at 66 ("late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence"); see also *id.*, 597 U.S. at 36 ("[T]o the extent

later history contradicts what the text says, the text controls."); *see also* ROA.131-134, 1458.

## CONCLUSION

Appellants respectfully request that this Court reverse the district court's order granting the motion to dismiss and denying Appellants' summary judgment motion, review Appellants' motion for summary judgment, and enter judgment in Appellants' favor.

September 24, 2025

Respectfully submitted,

DILLON LAW GROUP, APC

 */s/ John W. Dillon*
John W. Dillon
jdillon@dillonlawgp.com
**DILLON LAW GROUP APC**
2647 Gateway Road, Suite 105
Carlsbad, California 92009
Phone: (760) 642-7150
Fax: (760) 642-7151

Attorneys for Plaintiffs-
Appellants

## CERTIFICATE OF SERVICE

This is to certify that the foregoing instrument has been served via the Court's ECF filing system in compliance with Rule 25(b) and (c) of the Federal Rules of Appellate Procedure, on September 24, 2025, on all registered counsel of record, and has been transmitted to the Clerk of the Court.

*/s/ John W. Dillon*
John W. Dillon

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Fed. R. App. P. Rule 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), This brief contains 12,919 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), and with 5th Cir. R. 32.1 because this brief has been prepared in a proportionally spaced typeface using Microsoft Word (version 11), in Century Schoolbook font (font size 14) for the text and 12-point font for footnotes.

*/s/ John W. Dillon*
John W. Dillon