No. 25-10754

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

KNIFE RIGHTS, INC., RUSSEL ARNOLD; RGA AUCTION SOLUTION,
DOING BUSINESS AS FIREARM SOLUTIONS; JEFFREY FOLLODER;
MOD SPECIALTIES; EVAN KAUFMANN; ADAM WARDEN;
RODNEY SHEDD,

*Plaintiffs-Appellants*,

v.

PAMELA BONDI, in her official capacity as
Attorney General of the United States;
UNITED STATES DEPARTMENT OF JUSTICE,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Northern District of Texas
Civil Case No. 4:24-cv-926

**BRIEF OF AMICUS CURIAE FIREARMS POLICY COALITION, INC.
IN SUPPORT OF PLAINTIFFS-APPELLANTS**

David H. Thompson
Peter A. Patterson
John D. Ohlendorf
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C.  20036
(202) 220-9600
dthompson@cooperkirk.com
*Counsel for Amicus Curiae*

## <u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

The undersigned counsel of record certifies that the following listed persons and entitles as described in the fourth sentence of 5th Cir. Rule 28.2.1 have an interest in the outcome of this case. Amicus, Firearms Policy Coalition Inc., certifies that it has no parent corporation, nor is there any publicly held corporation that owns 10% or more of its stock. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| *Plaintiffs-Appellants* | *Counsel for Plaintiffs-Appellants* |
|---|---|
| Knife Rights Inc.;<br>Russell Arnold;<br>RGA Auction Services, LLC, dba<br>Firearm Solutions;<br>Jeffery E. Folloder;<br>MOD Specialties;<br>Evan Kaufmann;<br>Adam Warden; and<br>Rodney Shedd | John W. Dillon<br>DILLON LAW GROUP APC<br><br>Richard Brent Cooper<br>COOPER & SCULLY PC |
| *Defendants-Appellees* | *Counsel for Defendants-Appellees* |
| Pamela Bondi, in her official<br>capacity as Attorney General of<br>The United States;<br>United States Department of<br>Justice | Syed Ahmad<br><br>Sean Janda<br><br>U.S. Department of Justice |
| *Amicus Curiae* | *Counsel for Amicus Curiae* |
| Firearms Policy Coalition, Inc. | David H. Thompson<br>Peter A. Patterson<br>John D. Ohlendorf<br>William V. Bergstrom |

i

| | COOPER & KIRK, PLLC |
|---|---|

SO CERTIFIED this 1st day of October 2025

/s/ David H. Thompson
David H. Thompson

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT.........................................................i

TABLE OF AUTHORITIES ......................................................................... v

INTEREST OF AMICUS .............................................................................. 1

SUMMARY OF THE ARGUMENT.................................................................. 1

ARGUMENT ............................................................................................. 5

I.  The "in common use" test is the product of the second, historical phase of the *Bruen* inquiry, and it requires the Government, in order to justify an infringement of the right to keep or carry bearable arms, to demonstrate that the arms are not commonly used by Americans. ............................................. 5

    A.  The "in common use" test is the result of the historical inquiry prescribed by *Bruen*'s historical analysis and it is irrelevant to the threshold textual question. ............................................................... 5

    B.  To determine whether a type of arm is "in common use," a court should look to nationwide evidence of the total number of the arms in circulation. ............................................................... 13

II.  The historical tradition of restricting "dangerous and unusual" weapons constitutes the historical basis for the "in common use" test, and the two standards are inverse and mutually exclusive. ............................................. 29

    A.  To justify an infringement of the right to keep or carry bearable arms, the Government must demonstrate that the arms are "dangerous and unusual" under *Bruen*'s historical inquiry. ........... 29

    B.  The question whether an arm is "in common use" and the question whether it is "dangerous and unusual" are inverse and mutually exclusive. ............................................................... 30

    C.  Accordingly, the proper understanding and application of *Heller* and *Bruen*'s "dangerous and unusual" language mirrors the proper understanding and application of the "common use" test. ............ 31

CONCLUSION ............................................................................................31

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*ANJRPC v. Bruck*,
    142 S. Ct. 2894 (2022) ....................................................................26

*Ass'n of N.J. Rifle & Pistol Clubs Inc. ("ANJRPC") v. Att'y Gen. New Jersey*,
    974 F.3d 237 (3d. Cir. 2020)............................................................26

*Bailey v. United States*,
    516 U.S. 137 (1995)........................................................................21

*Bevis v. City of Naperville*,
    85 F.4th 1175 (7th Cir. 2023) ..................................................16, 17

*Caetano v. Massachusetts*,
    577 U.S. 411 (2016)....................................17, 18, 22, 27, 29

*Commonwealth v. Caetano*,
    26 N.E.2d 688 (Mass. 2015) ........................................................17

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)....................................1, 4, 6, 7, 8, 9, 10, 13, 14, 18, 19,
                       20, 21, 22, 23, 24, 25, 26, 30

*Friedman v. City of Highland Park*,
    577 U.S. 1039, 136 S. Ct. 447 (2015)..............................20, 22, 25

*Heller v. District of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011) ......................................20, 22, 29

*National Ass'n for Gun Rts. v. Lamont*,
    685 F. Supp. 3d 63 (D. Conn. 2023) ......................................20, 23

*National Ass'n for Gun Rts. v. Lamont*,
    No. 23-1162, 2025 WL 2423599 (2d Cir. Aug. 22, 2025).....................16, 20

*New York State Rifle & Pistol Association v. Bruen*,
    597 U.S. 1 (2022)............................................1, 2, 3, 4, 5, 6, 7, 8, 10, 11, 12,
                       14, 15, 16, 17, 24, 28

*Roper v. Simmons*,
    543 U.S. 551 (2005)........................................................................28

*Snope v. Brown*,
    145 S. Ct. 1534 (2025) ...................................................................25

*Stanford v. Kentucky*,
    492 U.S. 361 (1989) .................................................................28

*United States v. Bridges*,
    150 F.4th 517 (6th Cir. 2025) ...........................................27, 28

*United States v. Price*,
    111 F.4th 392 (4th Cir. 2024) ...................................................2

## **Statutes**

U.S. CONST. amend. II..........................................................18, 28

U.S. CONST. pmbl. ................................................................18, 19

D.C. CODE § 7-2502.02(a)(4) ...................................................18

## **Other Authorities**

Joel Alicea, Bruen *Was Right*,
    174 PA. L. REV. __ (forthcoming 2025) ...............................11, 12

Frank H. Easterbrook, *Abstraction and Authority*,
    59 U. CHI. L. REV. 349 (1992).....................................................19

WILLIAM ENGLISH, 2021 NATIONAL FIREARMS SURVEY (2022) ...........................24

Michael J. Klarman, *Rethinking the Civil Rights and Civil Liberties Revolutions*,
    82 VA. L. REV. 1 (1996) ...............................................................19

Peter A. Patterson, *Common Use Is Not a Plain-Text Question*,
    PER CURIAM, HARV. J.L. & PUB. POL'Y (Aug. 4, 2025),
    https://perma.cc/BF4V-UW67 .....................................9, 10, 11, 12

*Profile of the Legal Profession 2024: Demographics*, AMERICAN BAR ASSOC.,
    https://perma.cc/3B6H-6FAK ...................................................26

Mark W. Smith, *What Part of "In Common Use" Don't You Understand?:
    How Courts Have Defied* Heller *in Arms-Ban-Cases—Again*,
    PER CURIAM, HARV. J.L. & PUB. POL'Y (Sep. 27, 2023),
    https://perma.cc/Q6CA-CTH5 ...........................................14, 15, 16

Order, *Knife Rights, Inc. v. Bonta*, No. 24-5536 (9th Cir. Sept. 5, 2025),
    Doc. 25 ................................................2, 5, 6, 29, 30, 31

JAMES D. WRIGHT & PETER H. ROSSI, ARMED AND CONSIDERED DANGEROUS
    (1994 ed.) ................................................................................24

## INTEREST OF AMICUS[1]

Firearms Policy Coalition, Inc. is a nonprofit membership organization that works to create a world of maximal human liberty and freedom. FPC works to protect, defend, and advance the People's rights, especially but not limited to the inalienable, fundamental, and individual right to keep and bear arms. FPC is interested in this case because it raises fundamental and important questions about the nature and application of the "in common use" test the Supreme Court has established to govern Second Amendment challenges to laws banning a type of weapon. The answers to these questions are of critical importance to FPC's many members throughout the country, including within this Circuit, who wish to keep and bear common arms for self-defense and other lawful purposes.

## SUMMARY OF THE ARGUMENT

In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment prohibits the government from banning "arms in common use at the time for lawful purposes," 554 U.S. 570, 624 (2008) (quotation marks omitted), and in *New York State Rifle & Pistol Association v. Bruen*, the Court reaffirmed its reasoning that while the Government may restrict "dangerous and unusual weapons"

---

[1] No party's counsel authored this brief in whole or in part, and no person other than amici, their members, and their counsel contributed money intended to fund the preparation or submission of this brief. The parties have been notified of amici's intent to file this brief and have consented to its filing.

1

as a matter of "historical tradition," "the Second Amendment protects the possession and use of weapons that are in common use at the time." 597 U.S. 1, 21 (2022) (quotation marks omitted). But application of the Supreme Court's precedents in arms ban cases like this one has proven to be a thorny issue, with significant disagreement among the courts as to how the analysis should be run. *See, e.g.*, *United States v. Price*, 111 F.4th 392, 415 (4th Cir. 2024) (Quattlebaum, J., concurring) (referring to the question of where "common use" fits into the analysis as "*Bruen*'s puzzle"). In another case involving Knife Rights the Ninth Circuit recently invited amicus input on several questions relating to this standard, such as where the "in common use" test fits into the *Bruen* analysis and how it should be applied. *See* Order, *Knife Rights, Inc. v. Bonta*, No. 24-5536 (9th Cir. Sept. 5, 2025), Doc. 25 ("Order").

Amicus respectfully submits that the questions posed by the Ninth Circuit are fundamental, as they go to the proper understanding and application of the test the Supreme Court has established for determining which "Arms" are protected by the Second Amendment, and submits this brief to address the proper application of the Supreme Court's precedents in this case. Fortunately, the importance of these questions is not matched by their difficulty. A plain reading of *Heller* and *Bruen* unambiguously resolves several of them. Determining which arms are "in common use" and which are "dangerous and unusual" are two ways of asking the same

question, or inverse ways of drawing the same constitutional line. Because that line comes from "the Nation's historical tradition of firearm regulation," *id.* at 24, not anything in the semantic meaning of the Second Amendment's text, it must be the result of the historical inquiry prescribed by *Bruen*, where the Government shoulders the burden. Indeed, the "common use" and "dangerous and unusual" inquiry is the very product of the Supreme Court's already having *done* the historical analysis that is relevant to an arms ban case and constitutes a standard that is binding on this Court. And thus, this Court need not, and indeed may not, revisit the Supreme Court's historical analysis in weapons ban cases to water that standard down.

Therefore, under *Heller* and *Bruen*, to sustain a ban on a particular type of weapon the government has the burden of demonstrating that it is not in common use but rather is a dangerous and unusual weapon. In some cases this will be an exceedingly simple inquiry. For example, if millions of Americans own a particular type of weapon for lawful purposes, then it would be impossible to consider that a dangerous *and* unusual weapon. And a type of weapon that is not overwhelmingly common numerically can still be "in common use" if it is generally lawful for typical Americans to own across the country. The key insight of the "common use" test is that the right protects the arms that the American people choose. If a substantial number of the People have chosen to keep or bear a type of arm that is generally

3

lawful for typical people to possess, the Government simply cannot show that the arm in question lies outside of our constitutional tradition.

And this Court should bear in mind that when asking whether an arm is common, the relevant question is whether a *type* of arm is common. *Heller*, for instance, asked whether "handguns" writ large are common, not whether any specific model or make is. And given that it is the Government's burden to prove an arm is bannable, unless the Government can show some relevant distinction between the arm it chooses to ban (here, for instance, switchblades) and the broader category of arms it belongs to (concealable bladed weapons) that makes the banned arm materially distinct from others in the broader group, as long as the broader group of weapon is common, the targeted arm is protected. *Even if* the Government could show that the arm its banning is distinct from a class of common arms, it must still prove that the arm it is banning is "dangerous and unusual" and not itself common.

When the American people enshrined the Second Amendment in our fundamental charter, they "elevate[d] above all other interests" the right to keep and bear arms, *Heller*, 554 U.S. at 635; a right the Supreme Court has reasoned is subject only to those limits widely accepted as part of "the Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 24. "It is this balance—struck by the traditions of the American people—that demands our unqualified deference." *Id.* at 26. And while one strand of those traditions may permit the Government to restrict

"dangerous and unusual weapons," *id.* at 21, it may only do so consistent with the Second Amendment and the Supreme Court's cases interpreting it if the Government can provide convincing evidence that the weapons in question have been adjudged by the people themselves to lie definitively outside the constitutional mainstream by the people themselves not choosing those weapons for lawful purposes. Any restriction that the Government cannot justify in this way is proscribed by "the Second Amendment's unqualified command." *Id.* at 24 (quotation marks omitted).

## ARGUMENT

### I.  The "in common use" test is the product of the historical phase of the *Bruen* inquiry, and it requires the Government, in order to justify an infringement of the right to keep or carry bearable arms, to demonstrate that the arms are not commonly used by Americans.

The first set of questions posed by the Ninth Circuit concern the timing and application of the "in common use" test set forth by the Supreme Court in *Heller*, 554 U.S. at 624, and then reaffirmed in *Bruen*, 597 U.S. at 21.

### A. The "in common use" test is the result of the historical inquiry prescribed by *Bruen*'s historical analysis and it is irrelevant to the threshold textual question.

The first question was:

Does a Court assess whether a weapon is "in common use" under *Bruen*'s "step one… threshold inquiry" or "step two" historical inquiry? *See United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023).

Order at 1. The answer, under a straightforward and unambiguous reading of both *Heller* and *Bruen*, is clear: the "in common use" test applies at the historical phase of the inquiry set forth in *Bruen*—indeed, it supplants the need for historical analysis since it is the *product* of *Heller*'s application of that inquiry.

1.    In *Bruen*, the Supreme Court established a framework for Second Amendment challenges, rejecting the old tiers-of-scrutiny, interest-balancing test applied by essentially all of the courts of appeals, as adding "one step too many" To the analysis. 597 U.S. at 19. In its place, courts are instructed to ask a threshold question of whether "the Second Amendment's plain text covers [the plaintiff's] conduct." *Id.* at 24. If it does, then "the Constitution presumptively protects that conduct," and the burden shifts to "the Government" to "prov[e] the constitutionality of its actions." *Id.* "The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*

The threshold inquiry under *Bruen* is thus a narrow one, confined to the Second Amendment's "plain text" or "bare text." *Id.* at 24, 44 n.11. In most cases, as in *Bruen*, this inquiry will necessarily be quite brief because the relevant "textual elements" of the Second Amendment had already been defined by *Heller*. *Id.* at 32. *Heller* itself conducted this "textual analysis" by consulting Founding-Era dictionaries, 554 U.S. at 578, 581, 582, 584, usage in other contemporary legal documents, *id.* at 582–83, 584–85, accepted canons of construction, *id.* at 578, and

6

a structural comparison between the Second Amendment's text and other provisions of the Constitution, *id.* at 579–80. The focus of *Bruen*'s historical analysis, by contrast, is "the Nation's historical tradition of firearm regulation," 597 U.S. at 24, as established by historical legal sources, such as Founding-Era laws, *e.g.*, *id.* at 46–49, judicial decisions, *e.g.*, *id.* at 43, 51, and legal treatises discussing them, *id.* at 45, 46, 56.

2.     Accordingly, *Bruen*'s framework separates text and history. And once this is understood, the place of the "in common use" test is easy to locate. This standard was first articulated in *Heller*, so we begin there. In that case, the Supreme Court was tasked with deciding the constitutionality of a District of Columbia law prohibiting the possession of usable handguns in the home. To answer the question, the Court followed the same text-informed-by-history framework that it made explicit years later in *Bruen*. It began by interpreting the plain text of the Amendment. *See Heller*, 554 U.S. at 576 ("We turn first to the meaning of the Second Amendment.").

With respect to whether the handguns banned in that case constituted "Arms" within the scope of the Second Amendment's plain text, *Heller* first held that the normal and ordinary "18th-century meaning" of the word "Arms" was the same as "the meaning today": "weapons of offence, or armour of defence," encompassing "any thing that a man wears for his defence, or takes into his hands, or useth in wrath

7

to cast at or strike another." *Id.* at 581 (cleaned up). It reached that determination based on the suite of tools discussed above: contemporary dictionaries, *id.* (citing *Arms,* 1 SAMUEL JOHNSON, DICTIONARY OF THE ENGLISH LANGUAGE at 106 (4th ed. 1773); *Arms,* 1 TIMOTHY CUNNINGHAM, A NEW AND COMPLETE LAW DICTIONARY (1771); and NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828)), a comparison with other provisions of the Bill of Rights, *id.* at 582, and usage in other Founding-Era legal documents, *id.* at 581. Based on this plain-text analysis, *Heller* concluded that the "prima facie" meaning of "Arms" extends "to all instruments that constitute bearable arms." *Id.* at 582. Put in *Bruen*'s later phrasing, that is the "conduct" that "the Constitution presumptively protects," based on the first, textual phase of the Second Amendment inquiry. 597 U.S. at 24.

Having established the presumptive meaning of the Second Amendment's plain text, the Court then—again, following essentially the same process it would more clearly delineate 14 years later in *Bruen*—proceeded to address historical limits on the right to keep and bear arms. *See Heller*, 554 U.S. at 626–28. In other words, *Heller* determined *Bruen*'s threshold "text" inquiry was met and began its "history" inquiry. And it was at this phase of the analysis that the *Heller* Court announced the "in common use" test.

*Heller*'s historical analysis focused on the same types of materials *Bruen* would later use: Founding-Era laws, *e.g.*, 554 U.S. at 627, 629, 631–34, judicial

decisions, *e.g.*, *id.* at 627, and legal treatises, *e.g.*, *id.* And with respect to the scope of the "Arms" protected by the Second Amendment, the Court explained at the conclusion of this analysis that, in its view, the history of firearm regulation supported one "important limitation on the right to keep and carry arms" that potentially would permit the government to ban a firearm even though it fell within the plain text meaning of the word "Arms." *Id*. Specifically, the Court suggested that "dangerous and unusual weapons" could be banned, *id* (quotation marks omitted); but, the Court made clear, weapons that were "in common use at the time" were "protected" and therefore could not be banned, *id* (quotation marks omitted).

This "limitation" on the "prima facie" textual scope of the term "Arms" was based on the Court's analysis of "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,' " a regulatory tradition that dated back to the 1328 English Statute of Northampton and that *Heller* traced through the commentaries of Blackstone and James Wilson and several early-American state laws. *Id.* at 582, 627. But this historical tradition of firearms regulation does not allow the government to restrict "arms in common use at the time for lawful purposes like self-defense." *Id.* at 624 (quotation marks omitted). *Heller*'s "in common use" test is based on this historical tradition. It is not based on any textual analysis of the plain meaning of the word "Arms." After all, "there is nothing in the plain text of 'arms' that would allow for exclusion of certain types of firearms." Peter A.

Patterson, *Common Use Is Not a Plain-Text Question*, PER CURIAM, HARV. J.L. &

PUB. POL'Y (Aug. 4, 2025), https://perma.cc/BF4V-UW67.

As between *Bruen*'s "plain text" inquiry or its analysis of "historical

tradition," 597 U.S. at 24, the location of the "in common use" test articulated by

*Heller* is clear: that test is part of America's "historical tradition," *Heller*, 554 U.S.

at 627. As a matter of plain text, *Heller* establishes that the term "Arms" "extends,

prima facie, to all instruments that constitute bearable arms"—not only those that

are in common use. *Id.* at 582. Or as the Court later put it when summing up the

"[m]eaning of the [o]perative [c]lause," the "textual elements" of the Second

Amendment "guarantee the individual right to possess and carry *weapons* in case of

confrontation." *Id.* at 592 (emphasis added). As a matter of plain text, then, the

Second Amendment reaches all weapons that can be carried.

3.    Nonetheless, "[s]ome have contended that [*Bruen*] supports a contrary

conclusion or at least introduces uncertain[t]y about where the 'common use'

question fits into the analysis," Patterson, *supra*, based on the following passage

from that decision:

> Having made the constitutional standard endorsed in *Heller* more
> explicit, we now apply that standard to New York's proper-cause
> requirement. . . . It is undisputed that [the plaintiffs]—two ordinary,
> law-abiding, adult citizens—are part of "the people'" whom the Second
> Amendment protects. Nor does any party dispute that  handguns are
> weapons "in common use" today for self-defense. We therefore turn to
> whether  the  plain  text  of  the  Second  Amendment  protects  [the

10

plaintiffs'] proposed course of conduct—carrying handguns publicly
for self-defense.

*Bruen*, 597 U.S. 31–32 (quoting *Heller*, 554 U.S. at 580) (citations omitted). While
this passage cites the "in common use" test and then, in the following sentence,
references "the plain text of the Second Amendment," *id.* at 32, interpreting the
Court as shifting the "in common use" test from the history phase to the text phase
is insupportable.

Such an interpretation would, as an initial matter, "be at odds with the fact
that the common-use test is not about the semantic meaning of the Second
Amendment's plain text, which *Bruen* repeatedly describes as the focus of" the
threshold textual analysis. Joel Alicea, Bruen *Was Right*, 174 Pa. L. Rev. __, 12
(forthcoming 2025). As discussed, the "in common use" test is exclusively grounded
in *history*—there is no basis for it whatsoever in the ordinary meaning of the word
"arms," and *Heller* explicitly bases it on our "historical tradition." 554 U.S. at 627.
That is not simply *Amicus's* interpretation of *Heller*, it is *Bruen's own interpretation
of Heller*. *Bruen* itself quotes *Heller*'s holding that "the Second Amendment extends,
prima facie, to all instruments that constitute bearable arms," *Bruen*, 597 U.S. at 28
(quoting *Heller*, 554 U.S. at 582), "a proposition that is inconsistent with
presumptive textual protection only for arms in common use," Patterson, *supra*. And
*Bruen* also clearly indicates "that the 'common use' standard is the product of
*Heller*'s evaluation of 'historical tradition' and therefore is part of 'the historical

understanding' that 'demark[s] the limits on the exercise of' the 'individual right to armed self-defense.' " *Id.* (quoting *Bruen*, 597 U.S. at 21, 46).

Rather than holding, or even implying, that the "common use" test is analytically located in the threshold inquiry of the text-informed-by-history framework, what the above passage from *Bruen* actually did was "conclude[ ] in summary fashion that there was nothing" in the *historical* phase of the inquiry "that would have defeated the plaintiffs' claims based on who they were or the weapon they wanted to carry." Alicea, *supra*, at 13. Neither the scope of the "people" nor the "Arms" protected by the Second Amendment "were in dispute," *id.*, so this passage merely dispatched those issues—both as a matter of text *and* history—before turning to the real contest in the case: the conduct that those people intended to engage in with those arms. That is evident from the Court's final sentence in the relevant passage: "[w]e therefore turn to whether the plain text of the Second Amendment protects [the plaintiffs'] *proposed course of conduct*—carrying handguns publicly for self-defense." *Bruen*, 597 U.S. at 32 (emphasis added).

Indeed, far from implying that the "in common use" test applies at the threshold "plain text" phase of the inquiry, *Bruen* "*refutes* that very argument." Patterson, *supra*. For in this brief passage, "the Court resolved entirely the question of whether the arms at issue in the case were protected by the Second Amendment, not just presumptively protected by the plain text." *Id. Bruen* does not say that

12

handguns are *prima facie* covered by the Second Amendment as a matter of plain text; no, it says "that they are protected, *period*." *Id.* And that conclusion is only possible because the *Bruen* Court resolved the issue "*conclusively* with respect to text and history, *i.e.*, steps one *and* two." *Id.*

Accordingly, the proper structure of the analysis is clear: the "in common use" test is based on "historical tradition," and so it applies at the second phase of the *Bruen* framework. *Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 627).

> **B. To determine whether a type of arm is "in common use," a court should look to nationwide evidence of the number of that type of arms in circulation.**

The next question posed by the Ninth Circuit was "What is the proper understanding and application of the 'in common use' language?" Order at 1. In this section, we answer this question in two parts. First, we set forth several principles which should guide the Court's application of the "in common use" test. Second, we sketch the method courts should use when determining whether a type of arm is in common use.

1.a.    We begin with three overarching principles governing the "common use" inquiry. The first, evident from *Heller*'s unambiguous language, is that "in common use" is the definitive and exclusive constitutional test for assessing broad bans on "Arms" that fall within the Second Amendment's plain text—that is, all bearable arms. *See Heller*, 554 U.S. at 581–82.

We noted above that the precise question presented in *Heller* was whether the District of Columbia's ban on handguns violated the Second Amendment. *Id.* at 573. While *Heller* establishes many broad principles in the process, it also conclusively resolved that specific question. And it did so by announcing a binding test that, under the rule of *stare decisis*, must govern all future challenges to similar arms bans.

As explained, *Heller* arrived at that binding test in two stages. First, it determined the scope of the arms protected by the Second Amendment's plain text: "all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582. Second, the Court determined that this "prima facie" sweep of the text does not mean that the Amendment ultimately protects "any weapon whatsoever," because the broad meaning of the text on its face was understood from the beginning to be limited by "historical tradition": the Government may ban "dangerous and unusual weapons" but not "those in common use." *Id.* at 582, 626, 627 (quotation marks omitted).

"These passages, taken together, established a *constitutional test*" or "*rule of decision* for arms-ban cases: that is, the legal principle governing judicial decision-making in cases of a particular kind." Mark W. Smith, *What Part of "In Common Use" Don't You Understand?: How Courts Have Defied* Heller *in Arms-Ban-Cases—Again*, PER CURIAM, HARV. J.L. & PUB. POL'Y 1, 4 (Sept. 27, 2023), https://perma.cc/Q6CA-CTH5. This rule of decision "is that arms 'in common use'

are protected by the Second Amendment and cannot be banned." *Id.* Accordingly, under *Heller*'s plain language and accepted principles of *stare decisis*, "[w]hen [a] modern-day regulation seeks to ban a type of arm, the *Heller* test controls." *Id.*

Nothing in *Bruen* casts doubt on the continued application of *Heller*'s "in common use" test to bans on a type of arm. To the contrary, "[f]ar from undermining or altering *Heller*, *Bruen* reinforced it." *Id. Bruen* carefully explained that *Heller* "assessed the lawfulness of [the District of Columbia's] handgun ban by scrutinizing whether it comported with history and tradition" and that it identified the "historical tradition" that is relevant in arms-ban cases: the Government may enforce laws "prohibiting the carrying of 'dangerous and unusual weapons,' " but "the Second Amendment protects the possession and use of weapons that are 'in common use at the time.' " *Bruen*, 597 U.S. at 21–22 (quoting *Heller*, 554 U.S. at 627). *Bruen* quotes and reaffirms this core holding of *Heller*; it does not supersede it.

*Bruen* then goes on, of course, to decide whether the Government may ban "law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose." *Id.* at 60. And in doing so, *Bruen* set forth the general text-informed-by-history framework that applies in Second Amendment cases. But its articulation of that framework does not supersede *Heller*'s specific "in common use" test for arms-ban cases, for that test is the *result* of *Heller*'s previous *application* of the text-informed-by-history framework. By further elaborating and clarifying the

15

methodology used in *Heller*, *Bruen* "merely described for lower courts how to apply

that methodology in types of Second Amendment cases yet to be decided." Smith,

*supra*, at 5. "*Bruen* expressly tied this methodology to the approach the Court had

followed in *Heller*," *id.*; indeed, in announcing the framework it described it as "[i]n

keeping with *Heller*." *Bruen*, 597 U.S. at 17.

Accordingly, in cases challenging arms bans like the one in *Heller*, the "in

common use" test continues to control, "and there is nothing for the lower courts to

do except apply that *test* to the facts at issue." Smith, *supra*, at 2.

A necessary corollary of this conclusion is that the lower courts have no

authority to seek, in the "Nation's historical tradition of firearm regulation," *Bruen*,

597 U.S. at 17, any other historical justification for an arms ban apart from the "in

common use" test. Some post-*Bruen* decisions have committed this error. In

*National Association for Gun Rights v. Lamont*, for example, the Second Circuit

rejected the applicability of the "in common use" test to a flat ban on the possession

of the most popular semi-automatic rifles in the Nation, opting instead to delve anew

into the history of firearm regulation, where it purported to find a historical tradition

justifying "targeted restrictions on unusually dangerous weapons of an offensive

character." No. 23-1162, 2025 WL 2423599, at *13 (2d Cir. Aug. 22, 2025). The

Seventh Circuit in *Bevis v. City of Naperville* likewise assessed a similar arms ban

by asking not whether the banned instruments were "in common use" but rather

whether they were "weapons that are exclusively or predominantly useful in military service." 85 F.4th 1175, 1194 (7th Cir. 2023). These decisions are flatly contrary to *Bruen*, which rejected any test that would "ask[ ] judges to make difficult empirical judgments," 597 U.S. at 25 (quotation marks omitted), such as assessing the "military functionality" or "dangerousness" of an arm. And they are also flatly contrary to Supreme Court precedent. *Heller* already examined the Nation's historical tradition and did not leave lower courts free to root around, there, in search of a different tradition of regulation that the High Court supposedly missed. And in summarily reversing the Massachusetts Supreme Judicial Court's holding that stun guns are both "dangerous" and "unusual," *see Commonwealth v. Caetano*, 26 N.E.2d 688, 692–93 (Mass. 2015), by rejecting the notion that they are "unusual" without addressing dangerousness, the Supreme Court made clear that there is no room within the historical tradition identified by *Heller* for banning a common arm for its perceived dangerousness, *Caetano v. Massachusetts*, 577 U.S. 411, 412 (2016); *see also id.* at 417 (Alito, J., concurring) ("As the *per curiam* opinion recognizes, this is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual.").

b.    A second core principle guiding the "in common use" test's application is that the inquiry into commonality must take place at a national level, not a state or local one.

As an initial matter, that is the only conclusion that is consistent with *Heller*'s language and holding. The Court repeatedly refers to common use as a nationwide test. It concludes that handguns are in common use because "the *American people* have considered the handgun to be the quintessential self-defense weapon" and they "are the most popular weapon chosen *by Americans* for self-defense in the home." *Heller,* 554 U.S. at 629 (emphases added). Moreover, the Court refers to the line between "dangerous and unusual weapons" and those "in common use" as identifying "arms that are highly unusual *in society at large.*" *Id.* at 627 (emphasis added); *see also id.* at 628 (handguns are "overwhelmingly chosen by *American society*" for self-defense (emphasis added)); *Caetano*, 577 U.S. at 420 (Alito, J., concurring) ("stun guns are widely owned and accepted as a legitimate means of self-defense *across the country*" (emphasis added)). This language is necessary to the Court's holding: by the time *Heller* was decided, handgun possession had been illegal in D.C. for over 30 years, since 1976. *See* D.C. CODE § 7-2502.02(a)(4). A common use inquiry limited to the local jurisdiction in question would have thus almost certainly led to the opposite result.

This conclusion is also the only theoretically sound one. The Second Amendment, like the other Bill of Rights guarantees, protects *a nationwide* right. "[T]he people" whose firearm rights it guarantees, U.S. CONST. amend. II, are "the People of the United States" who "ordain[ed] and establish[ed] th[e] Constitution"

18

in order "to form a more perfect Union," *id.* at pmbl.—not the people of each state or local jurisdiction in isolation. Thus, the Amendment protects those who live in states or localities with a less robust tradition of protecting the right to keep and bear arms from outlier legislation that falls short of national standards. In this way, the Second Amendment is similar to many other constitutional guarantees that hold state and local governments to minimum standards that are acceptable nationwide, for "constitutional adjudication frequently involves the justices' seizing upon a dominant national consensus and imposing it on resisting local outliers," Michael J. Klarman, *Rethinking the Civil Rights and Civil Liberties Revolutions*, 82 VA. L. REV. 1, 16 (1996). More pithily, the Supreme Court "obliterates outliers." Frank H. Easterbrook, *Abstraction and Authority*, 59 U. CHI. L. REV. 349, 370 (1992). *Heller*'s common-use test facilitates a similar outcome in the Second Amendment context. *See, e.g.*, *Heller*, 554 U.S. at 629.

c.      A third key point is that when conducting the common use analysis, the focus should not be too granular. An arm is "common" if it is of a common "type" and not somehow distinct from that type. *Heller*, for instance, asked whether "handguns" are common, not whether the specific make and model Dick Heller wanted to own was common. So too in *Caetano*, Justice Alito asked whether "stun guns" were common *as a category*. It is, of course, possible that some firearms of a given "type" really ought to be looked at differently. *Heller*, for instance, suggested

that fully automatic machine guns may fall outside of constitutional bounds, so its holding that "handguns" are categorically common likely does not cover automatic handguns. *See* 554 U.S. at 627. But the government has the burden to show an arm is "dangerous and unusual" and if the government cannot somehow distinguish a banned arm from others of its type, then as long as the *type* is common, the specific arm is common too. *See, e.g. Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039, 136 S. Ct. 447, 447 (Thomas, J., dissenting from denial of certiorari) (noting that the so-called "assault weapons" banned by the challenged ordinance were really just some of the "most commonly owned semiautomatic firearms"); *see also Heller v. District of Columbia*, 670 F.3d 1244, 1287 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("*Heller II*") (treating the District of Columbia's ban on so-called assault weapons as a ban on "semi-automatic rifles" and concluding that "[s]emi-automatic rifles have not traditionally been banned and are in common use today, and are thus protected under *Heller*").

d.     Fourth, it is important to avoid a misinterpretation of the phrase "in common use" as referring to *the firing* of an arm for a specific purpose as opposed to the *possession* of it for any lawful purpose. Some courts, for instance, have erroneously required plaintiffs challenging arms bans to establish that the banned firearms are "actually used for self-defense." *National Ass'n for Gun Rts. v. Lamont*, 685 F. Supp. 3d 63, 88 (D. Conn. 2023), *aff'd,* 2025 WL 2423599. That approach is

wrong not only because it mistakenly places the burden on plaintiffs to establish common use—a test that, as explained above, applies at the *historical* phase of the *Bruen* inquiry—but also because *Heller* and *Bruen* cannot plausibly be read as distinguishing between "use" and "possession" in determining the Second Amendment's application to a particular type of arm.

That is again plain from *Heller*'s clear language. *Heller* repeatedly referred to the "common use" of firearms as encompassing their lawful *possession*. For example, in the course of articulating the "in common use" test, *Heller* explained that citizens at the Founding "would bring the sorts of lawful weapons that they *possessed* at home to militia duty." 554 U.S. at 627 (emphasis added). And when the Court first described the test a few pages earlier, it stated that "the Second Amendment does not protect those weapons not typically *possessed* by law-abiding citizens for lawful purposes." *Id.* at 625 (emphasis added). The notion that possession of a firearm may constitute use is by no means novel. "Consider the paradoxical statement: 'I *use* a gun to protect my house, but I've never had to *use* it.' " *Bailey v. United States*, 516 U.S. 137, 143 (1995). As this example illustrates, " '[u]se' draws meaning from its context," *id.*, and the context of the Second Amendment makes clear that possessing a firearm for a lawful purpose such as self-defense amounts to using the firearm.

This interpretation of the test is also the only one consistent with the way that several Justices of the Supreme Court have applied the test in other cases; they have *never* required a showing that the arm in question is actively used in a particular way. *See Caetano*, 577 U.S. at 420 (Alito, J., concurring) (The "relevant statistic is that hundreds of thousands of Tasers and stun guns have been sold to private citizens, who it appears may lawfully possess them in 45 states." (cleaned up)); *Friedman v. City of Highland Park*, 577 U.S. 1039, 136 S. Ct. 447, 449 (2015) (Thomas, J., dissenting from the denial of certiorari) (explaining that "AR-style semiautomatic rifles" are "common semiautomatic firearms used for lawful purposes" because "[r]oughly five million Americans own" them); *Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting) ("Semi-automatic rifles remain in common use today . . . . According to one source, about 40 percent of rifles sold in 2010 were semi-automatic.").

Moreover, the text of the Second Amendment itself rejects any insistence that only those arms commonly *fired* for a particular purpose are protected. The provision on its face protects both a right to "keep" (i.e., possess) and to "bear" (i.e., to carry) weapons. *See Heller*, 554 U.S. at 592. Given this reality, it would be odd if possession were not a constitutionally relevant "use" of a firearm. And such a result would also conflict starkly with the "the purpose for which the right was codified: to prevent elimination of the militia." *Id.* at 599. As *Heller* detailed, the operative

right to keep and bear arms served this purpose by eliminating "the threat that the new Federal Government would destroy the citizens' militia by taking away their arms"—that is, taking away "the sorts of lawful weapons that they possessed at home" and brought along "to militia duty." *Id.* at 599, 627. It simply does not make any sense to require a firearm to be commonly fired for personal self-defense to merit constitutional protection given that the *stated* purpose of the right was to enable collective self-defense through the militia.

This leads to yet a further problem with the proposition that only arms commonly used for a specific purpose fall within the Second Amendment's protection: which purpose is the qualifying one? Those who advance this interpretation of "common use" generally insist that only actual use in *self-defense* is relevant, *see, e.g.*, *National Ass'n for Gun Rts.*, 685 F. Supp. 3d at 86–87, but while *Heller* of course held that armed self-defense "was the central component" of the Second Amendment, it repeatedly describes the Amendment as protecting arms "in common use at the time for lawful purposes" generally, and it further holds that those lawful purposes include not only self-defense but militia service, training, and hunting. *See Heller*, 554 U.S. at 597, 599, 619, 624 (quotation marks and emphasis omitted). There is no principled basis for confining the "in common use" inquiry to one of these lawful purposes to the exclusion of the others. And even if self-defense were the sole relevant purpose, that would *still* fail to justify limiting the inquiry to

23

incidents when the type of arm is actually *fired* in self-defense. For much of the self-defense utility of a firearm comes not only from those (mercifully rare) instances when the law-abiding citizen finds it necessary to *shoot* an attacker, but from those much more common instances when either brandishing the arm is sufficient or when an attack is deterred by the attacker's mere belief that the subject may be armed. *See* WILLIAM ENGLISH, 2021 NATIONAL FIREARMS SURVEY 13–14 (2022) (finding that in 81.9% of instances of armed self-defense, the gun is never fired); JAMES D. WRIGHT & PETER H. ROSSI, ARMED AND CONSIDERED DANGEROUS 155 (1994 ed.) (40% of convicted felons reported deciding on at least one occasion not to commit a crime because they knew or believed the victim was carrying a gun). Once again, the artificial distinction between "using" a firearm and "possessing" it collapses.

Cabining the "in common use" test in this way would also lead to the absurd and unacceptable result that the millions of long arms used by America's sportsmen would be completely unprotected by the Second Amendment. For while there can be no doubt that the .22, for example, or the bolt-action .270 deer rifle, are "in common use" in this country, and are in no way "dangerous and unusual," such arms may not be commonly used for self-defense. Interpreting the Second Amendment in such a way as to strip constitutional protection from these common arms is totally alien from our "Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

2.    With these general principles in place, we turn to the method of determining whether an arm is in common use. This inquiry typically starts with counting the total number of the type of arm in question. A natural reading of *Heller*'s language—distinguishing between arms "in common use" and those "that are highly unusual in society at large," 554 U.S. at 627—establishes this metric. And for some types of arms, the inquiry can end with this metric, as the sheer numerosity of an arm may establish that it cannot possibly be considered a dangerous and unusual weapon. Justice Thomas's dissent from the denial of certiorari in *Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039, 136 S. Ct. 447 (2015), exemplifies this approach. There, the plaintiffs had challenged a city ordinance that barred the possession of popular semiautomatic rifles such as the AR-15. Justice Thomas reasoned that the ban was "highly suspect" because "[r]oughly five million Americans own AR-style semiautomatic rifles," and "[t]he overwhelming majority" did so for lawful purposes. *Id*. at 449. "Under [the Supreme Court's Second Amendment] precedents, that is all that is needed for citizens to have a right under the Second Amendment to keep such weapons." *Id*; *see also Snope v. Brown*, 145 S. Ct. 1534, 1534 (2025) (Kavanaugh, J., respecting the denial of certiorari) (reasoning that because "Americans today possess an estimated 20 to 30 million AR–15s" there is "a strong argument that AR–15s are in 'common use' by law-abiding citizens and therefore are protected by the Second Amendment under *Heller*").

25

What is the minimum number required to end the analysis? While the Supreme Court has not established a lower bound, it would seem that any type of weapon owned for lawful purposes by a million-plus Americans simply cannot be deemed dangerous and unusual. After all, there are about 1.3 million active lawyers in the country. *See Profile of the Legal Profession 2024: Demographics*, AMERICAN BAR ASSOC., https://perma.cc/3B6H-6FAK. It would be hard to call lawyers "highly unusual in society at large." *Heller*, 554 U.S. at 627.

Whatever the lower bound for establishing commonality based on numbers alone, it does not follow that an arm that is less widely owned is not in common use. The Second Amendment protects *all* common arms, not just the most popular. Therefore, any arm that is owned by substantial numbers of Americans and that is generally lawful for typical Americans to possess and use across the country should be considered in common use. After all, if the American People truly deemed an arm to be a dangerous and unusual weapon, it is likely that they "would … rush[ ] to regulate it" rather than allowing it to be available in the same manner as any other common arm. *Ass'n of N.J. Rifle & Pistol Clubs Inc. ("ANJRPC") v. Att'y Gen. New Jersey*, 974 F.3d 237, 259 (3d. Cir. 2020) (Matey, J., dissenting), *certiorari granted, judgment vacated, and remanded sub nom.*, *ANJRPC v. Bruck*, 142 S. Ct. 2894 (2022).

These principles are illustrated by Justice Alito's concurring opinion in *Caetano*. There, in a decision handed down in the interregnum between *Heller* (and *McDonald*) and *Bruen*, the Supreme Court reversed a decision of Massachusetts's highest court sustaining that state's ban on the possession of stun guns. The full court published only a brief *per curiam* opinion repudiating the state court's reasoning and remanding, but Justice Alito authored a concurring opinion, joined by Justice Thomas, setting out their reasoning more fully. After explaining that the relevant test, in an arms ban case, is whether the arms in question "are commonly possessed by law-abiding citizens for lawful purposes today," Justice Alito went on to apply that test to stun guns. *Caetano,* 577 U.S. at 420 (Alito, J., concurring) (emphasis omitted). "The more relevant statistic," he stated, "is that hundreds of thousands of Tasers and stun guns have been sold to private citizens"—such that "approximately 200,000 civilians owned stun guns as of 2009"—"who it appears may lawfully possess them in 45 States." *Id.* (cleaned up). As a result, Justice Alito concluded, stun guns are "widely owned and accepted as a legitimate means of self-defense across the country" and thus cannot be banned consistent with the Second Amendment. *Id. Caetano* therefore demonstrates that not only is the pure number of arms possessed one manner of demonstrating commonality, but also the Court can find something is "in common use" when an arm is legal in most States. *See also United States v. Bridges*, 150 F.4th 517, 548 (6th Cir. 2025) (Nalbandian, J.,

concurring in part and concurring in the judgment) (concluding that because "semiautomatics" like the AR-15 are legal and hence " 'commonly available' in many states," that "should shield them [from restrictions] under the common use test" (citation omitted)).

The "in common use" test enjoys the benefit of being simple and objective. Assessing the total number of a type of arm in the hands of lawful citizens or the total number of places where it is lawful does not "ask[ ] judges to make difficult empirical judgments about the costs and benefits of firearms restrictions," or about their dangerousness or functionality. *Bruen*, 597 U.S. at 25 (cleaned up). Nor does it rest the constitutionality of an arm ban on the "uncertain foundations" of "public opinion polls, the views of interest groups," or "the subjective views of individual Justices." *Stanford v. Kentucky*, 492 U.S. 361, 369, 377 (1989), *abrogated by Roper v. Simmons*, 543 U.S. 551 (2005). Instead, it merely requires judges to defer to "th[e] balance . . . struck by the traditions of the American people." *Bruen*, 597 U.S. at 26 (cleaned up). "It is they, not we, who must be persuaded." *Stanford*, 492 U.S. at 378. For that reason, the "in common use" test also accords with the fundamental democratic underpinnings of our constitutional system. The Second Amendment protects a right "of the people," U.S. CONST. amend. II, and so it is fitting that the determination of which arms are unprotected must rest on the actual practices of law-abiding Americans.

The ultimate question, under *Heller*'s binding interpretation of historical tradition, is whether the practices and customs of the American people have adjudged an arm to be unfit for ordinary use by the common person—"highly unusual in society at large," *Heller*, 554 U.S. at 627, and thus not "widely owned" or "accepted" as "legitimate." *Caetano*, 577 U.S. at 420 (Alito, J., concurring). If an arm is widely available for purchase by common Americans, the Government cannot bear its burden of showing that it has been deemed to fall outside our constitutional tradition in this way.

## II. The historical tradition of restricting "dangerous and unusual" weapons constitutes the historical basis for the "in common use" test, and the two standards are inverse and mutually exclusive.

The second set of questions posed by the Ninth Circuit mirrors the first, but with the focus shifted to "the Supreme Court's use of 'dangerous and unusual.' " Order at 2. Because, as explained above, the "dangerous and unusual" text is the mirror image of the "in common use" test that we have already discussed at length, we proceed to address this set of questions in a somewhat more summary fashion.

### A. To justify an infringement of the right to keep or carry bearable arms, the Government must demonstrate that the arms are "dangerous and unusual" under *Bruen*'s historical inquiry.

The third question was:

Does a Court assess whether a weapon is "dangerous and unusual" under *Bruen*'s "step one… threshold inquiry" or "step two" historical inquiry?

29

*Id.* As shown above, *supra* pp. 8–13, *Heller* and *Bruen* are crystal-clear that the Founding-era laws restricting "dangerous and unusual" weapons form the "historical tradition" supporting the rule that "the sorts of weapons protected" by the Second Amendment are "those in common use at the time." *Heller*, 554 U.S. at 627 (quotation marks omitted). For all the reasons given above in Part I.A, then, a court must assess whether an arm is "dangerous and unusual" as part of *Bruen*'s historical analysis—with the burden of satisfying the test placed squarely on the Government.

### B. The question whether an arm is "in common use" and the question whether it is "dangerous and unusual" are inverse and mutually exclusive.

The Ninth Circuit's fourth question asked: "Whether and to what extent this language is related to the 'in common use' language?" Order at 2. Again, *Heller* held that the "in common use" test is grounded in "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " 554 U.S. at 627. The two phrases—"in common use" and "dangerous and unusual"—are thus two inverse ways of describing the same constitutional line. If an arm is in common use, it cannot be dangerous and unusual. And if an arm is dangerous and unusual, it cannot be in common use. No arm can fall into both categories. This is clear as a matter of logic. If an arm is in common use, it cannot be unusual. And if an arm is in common use, it also cannot be dangerous. Dangerousness is a relative term—after all, all firearms are dangerous. Thus, to be dangerous in a constitutionally significant sense an arm

must be unusually dangerous in comparison to common arms. And if an arm itself is common, it follows that it is not unusually dangerous.

**C. Accordingly, the proper understanding and application of *Heller* and *Bruen*'s "dangerous and unusual" language mirrors the proper understanding and application of the "common use" test.**

Finally, Ninth Circuit's final question was: "What is the proper understanding and application of the 'dangerous and unusual' language?" Order at 2. The answer to this question necessarily follows from the previous one. Because the "dangerous and unusual" language is a mirror-image way of describing the same line as the "in common use" test, everything we have respectfully set forth above in Part I.B concerning the application of the "in common use" test fully and equally applies to the parallel task of determining whether an arm is "dangerous and unusual."

## CONCLUSION

Asking whether an arm is "dangerous and unusual" or "in common use" are two ways of posing the same question. That inquiry occurs during the second phase of *Bruen*'s text-informed-by-history framework, and the Court must answer the question by considering the total number of the type of arm in question that are extant in the Nation and the treatment of the arm in the Nation's laws. The test applies on a nationwide basis; measures the lawful possession of the arm, not just its affirmative use for a specific purpose; and constitutes the exclusive constitutional decision rule in cases challenging flat arm bans.

31

Dated: October 1, 2025

Respectfully submitted,

/s/ David H. Thompson
David H. Thompson
Peter A. Patterson
John D. Ohlendorf
William V. Bergstrom
Cooper & Kirk, PLLC
1523 New Hampshire
Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com

*Counsel for Amicus Curiae*

## **CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation of Fed. R. App. P.32(a)(7)(B) because it contains 7,899 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32.2.

This brief complies with typeface requirements of Fed. R. App. P. 32(5) and Circuit Rule 32.1 and the type-style requirements of Fed. R. App. P. 32(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font.

The electronic submission is an exact copy of the paper submission, and the brief has been scanned for viruses using Windows Defender and is free of viruses.


Dated: October 1, 2025                    /s/ David H. Thompson
                                          David H. Thompson

                                          *Counsel for Amicus Curiae*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of October 2025, I filed the foregoing Brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the CM/ECF System. Service on counsel for all parties will be accomplished through the Court's electronic filing system.


Dated: October 1, 2025                    /s/ David H. Thompson
                                          David H. Thompson

                                          *Counsel for Amicus Curiae*