# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

KNIFE RIGHTS, INCORPORATED.; RUSSELL ARNOLD; RGA AUCTION SOLUTION, DOING BUSINESS AS FIREARM SOLUTIONS; JEFFERY FOLLODER; MOD SPECIALTIES; EVAN KAUFMANN; ADAM WARDEN; RODNEY SHEDD,

*Plaintiffs-Appellants,*

v.

PAMELA BONDI, ATTORNEY GENERAL; UNITED STATES DEPARTMENT OF JUSTICE,

*Defendants-Appellees.*

_____

On Appeal from the United States District Court
for the Northern District of Texas, Fort Worth Division

_____

## BRIEF OF AMICI CURIAE SECOND AMENDMENT FOUNDATION CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, AND SECOND AMENDMENT LAW CENTER, INC. IN SUPPORT OF PLAINTIFFS-APPELLANTS

_____

C.D. Michel
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Blvd., Ste. 200
Long Beach, CA 90802
cmichel@michellawyers.com

Konstadinos T. Moros
SECOND AMENDMENT FOUNDATION
12500 NE 10th Pl.
Bellevue, WA 98005
(425) 454-7012
kmoros@saf.org

*Counsel for Amici Curiae*

October 1, 2025

**CORPORATE DISCLOSURE STATEMENT AND CERTIFICATE OF**

**INTERESTED PERSONS**

Under Rule 26.1(a) of the Federal Rules of Appellate Procedure, counsel for amici curiae certifies that Second Amendment Foundation, California Rifle & Pistol Association, Incorporated, and Second Amendment Law Center, Inc., are nonprofit organizations and thus have no parent corporations and no stock.

Pursuant to this Court's Rule 28.2.1, Amici Curiae Second Amendment Foundation, California Rifle & Pistol Association, Incorporated, and Second Amendment Law Center, Inc. submit this certificate of interested persons to fully disclose all those with an interest in this motion and provide the required information as to their corporate status and affiliations.

The undersigned counsel of record certifies that the following listed entities have an interest in the outcome of this case:

Amici curiae: Second Amendment Foundation, California Rifle & Pistol Association, Incorporated, and Second Amendment Law Center, Inc.

Counsel of record for Amici: Konstadinos T. Moros, Second Amendment Foundation.

This is in addition to the parties in the case, which include Plaintiffs-Appellants: Knife Rights, Inc., Russell Arnold, RGA Auction Solution, d/b/a Firearm Solutions, Jeffery Folloder, MOD Specialties, Evan Kaufmann, Adan Warden, and Rodney Shed, as well as their counsel John W. Dillon of Dillon Law Group APC, and Brent Cooper of Cooper & Scully PC.

It also includes Defendants-Appellees: Pamela Bondi, in her official capacity as Attorney General of the United States, and the United States Department of Justice, and their counsel Syed Ahmad, Sean Janda, and the United States Department of Justice.

Date: October 7, 2025[1]                    SECOND AMENDMENT FOUNDATION

/s/ Konstadinos T. Moros
Konstadinos T. Moros
*Counsel for Amici Curiae*

---

[1] The date differs from the other dates in the brief because this is submitted as a Proposed Sufficient Brief after the Clerk of this Court helpfully identified Counsel for Amici's error in overlooking 5th Cir. R. 28.2.1 and courteously provided an opportunity to correct that error. Nothing else about the originally submitted brief was changed besides this certificate, the corrected table of contents to reflect the longer certificate, and the updated proof of service.

# TABLE OF CONTENTS

Corporate Disclosure Statement and Certificate of Interested Persons .......................... i

Table of Contents ................................................................................................... iiii

Table of Authorities ................................................................................................ iiv

Interest of Amici Curiae ............................................................................................ 1

Introduction ............................................................................................................. 2

Argument ................................................................................................................. 3

I.       *Bruen*'s Framework Begins and Ends with Historical Analysis Once the Second Amendment Is Implicated ........................................................................ 3

II.     Switchblades Are "Arms." ............................................................................. 7

III.    Arms in "Common Use" Cannot Be "Dangerous and Unusual." .................... 10

        A.     "Uncommon" does not mean "unprotected." ......................................... 11

        B.     "Dangerous" must mean more than "capable of harm" .......................... 13

Conclusion .............................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*B&L Prods., Inc. v. Newsom,*
104 F.4th 108 (9th Cir. 2024) ............................................................ 3, 6

*Boland v. Bonta,*
662 F. Supp. 3d 1077 (C.D. Cal. 2023) ................................................. 5

*Caetano v. Massachusetts,*
577 U.S. 411 (2016) .............................................. 10, 12, 13, 14

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ...........................................................passim

*Ezell v. City of Chicago,*
651 F.3d 684 (7th Cir. 2011) ................................................................. 5

*Friedman v. City of Highland Park,*
784 F.3d 406 (7th Cir. 2015) ............................................................... 11

*Jackson v. City & Cnty. of San Francisco,*
746 F.3d 953 (9th Cir. 2014) ................................................................. 5

*Knife Rights, Inc. v. Bondi,*
785 F. Supp. 3d 195 (N.D. Tex. 2025) ............................................. 3, 7, 12

*Knife Rights, Inc. v. Bonta,*
No. 23-cv-00474, 2024 WL 4224809 (S.D. Cal. Aug. 23, 2024) ......................... 7, 12

*Luis v. United States,*
578 U.S. 5 (2016) .................................................................................. 5

*McRorey v. Garland,*
99 F.4th 831 (5th Cir. 2024) ............................................................. 3, 6

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
597 U.S. 1 (2022) .............................................................passim

*Ocean State Tactical, LLC v. Rhode Island,*
95 F.4th 38 (1st Cir. 2024) ................................................................... 9

*Ortega v. Grisham,*
  No. 24-2121, 2025 U.S. App. LEXIS 21192 (10th Cir. Aug. 19, 2025) ..................... 5

*Pena v. Lindley,*
  898 F.3d 969 (9th Cir. 2018) ........................................................................... 6

*Rigby v. Jennings,*
  630 F. Supp. 3d 602 (D. Del. Sept. 23, 2022) .............................................. 5

*Snope v. Brown,*
  145 S. Ct. 1534 (2025) ..................................................... 4, 8, 9, 11, 12

*Teixeira v. Cty. of Alameda,*
  873 F.3d 670 (9th Cir. 2017) ........................................................................... 6

*United States v. Rahimi,*
  602 U.S. 680 (2024) ..................................................... 4, 5, 6, 8, 12

*Yukutake v. Lopez,*
  130 F.4th 1077 (9th Cir. 2025) ........................................................................... 5

## Statutes

4 Blackstone, *Commentaries on the Laws of England* (1769) ........................................... 9

## Other Authorities

1 A New and Complete Law Dictionary ............................................................. 8

1 Dictionary of the English Language (4th ed.) (reprinted 1978) ...................... 8

N. Webster, American Dictionary of the English Language (1828) (reprinted 1989) ... 8

*The Dead Hand of a Silent Past: Bruen, Gun Rights, and the Shackles of History,*
  73 Duke L.J. (2023) ........................................................................... 2

# INTEREST OF AMICI CURIAE[2]

Second Amendment Foundation ("SAF") is a non-profit membership organization founded in 1974 with over 720,000 members and supporters in every state of the union. Its purposes include education, research, publishing, and legal action focusing on the constitutional right to keep and bear arms. Currently, SAF is involved in several Second Amendment-related lawsuits and thus has great interest in the outcome of this case.

Founded in 1875, California Rifle & Pistol Association, Incorporated, is a nonprofit organization that seeks to defend the Second Amendment and advance laws that protect the rights of individual citizens. In service of its mission to preserve the constitutional and statutory rights of gun ownership, California Rifle & Pistol Association regularly participates as a party or amicus in Second Amendment litigation.

Second Amendment Law Center, Inc. is a nonprofit corporation headquartered in Henderson, Nevada. Second Amendment Law Center is dedicated to promoting and defending the individual rights to keep and bear arms as envisioned by the Founding Fathers. Its purpose is to defend these rights in state and federal courts across the United States. It also seeks to educate the public about the social utility of firearm ownership and to provide accurate historical, criminological, and technical information about firearms to policymakers, judges, and the public.

---

[2] The parties have given their consent to the filing of this brief. No counsel for a party authored the brief in whole or in part. No party, counsel for a party, or any person other than amici and their counsel made a monetary contribution intended to fund the preparation or submission of this brief.

# INTRODUCTION

Amici submit this brief to rebut a misconception about the Second Amendment analysis that has been spreading in a number of courts, including in the district court's ruling in this case: the idea that there are now *two* Second Amendment tests, one for laws that directly affect the plain text of the Second Amendment, and another for implied or "ancillary" aspects of the right to keep and bear arms.

As this brief will make abundantly clear, nothing in any Supreme Court ruling, nor in the opinions of any concurring justice of that Court, support any such "fork" in the historical test of *Heller* and *Bruen*. When an arms regulation is challenged, it must be consistent with historical tradition; if it is not, it cannot stand. The Supreme Court has been unequivocal on this point. Any tortured "plain text analysis" is a fabrication meant to relieve the government of the burden it is supposed to carry.

Amici respectfully urge this Court, in reviewing both the principal and amicus briefs, to consider carefully which arguments rest on the Supreme Court's holdings, and which instead rely on lower-court decisions that have mischaracterized or narrowed them. There is currently an active effort among the critics of *Bruen* to limit its reach and the expansive historical test it laid out. *See, e.g.*, Jacob D. Charles, *The Dead Hand of a Silent Past: Bruen, Gun Rights, and the Shackles of History*, 73 Duke L.J. 67, 153 (2023) (calling for lower courts to narrow the *Bruen* precedent from below rather than follow it faithfully). That effort should be firmly rejected. By adhering to the Supreme Court's guidance, instead of lower court (mis)interpretations, this Court will reach a well-grounded resolution of this case.

## ARGUMENT

### I. *BRUEN*'S FRAMEWORK BEGINS AND ENDS WITH HISTORICAL ANALYSIS ONCE THE SECOND AMENDMENT IS IMPLICATED

The district court reasoned that because Plaintiffs may get switchblades via intrastate trade, the Federal Switchblade Act's restrictions on switchblade sales through interstate commerce do not even implicate the plain text of the Second Amendment. *Knife Rights, Inc. v. Bondi*, 785 F. Supp. 3d 195, at *25-31 (N.D. Tex. 2025). But nothing in the Supreme Court's Second Amendment jurisprudence—either the majority opinions or concurrences—supports the existence of a substantive "threshold inquiry" that goes beyond the simple qualifier that arms-bearing conduct must be implicated.

This Court has nevertheless described such a threshold when it ruled that the right to keep and bear arms can sometimes implicate an ancillary right to purchase, but limited protection arises only when the challenged restrictions on purchasing arms amount to "functional prohibitions on keeping" arms. *McRorey v. Garland*, 99 F.4th 831, 838 (5th Cir. 2024). The Ninth Circuit has ruled similarly. *See B&L Prods., Inc. v. Newsom,* 104 F.4th 108, 117 (9th Cir. 2024).

This analysis misreads *Bruen.* And it unjustifiably makes what the Second Amendment protects much too narrow. By its plain language, *Bruen* eschews a two-step analytical test for deciding Second Amendment challenges: "Despite the popularity of th[e] two-step approach, it is one step too many." *N.Y. State Rifle & Pistol Ass'n v. Bruen,* 597 U.S. 1, 19 (2022). It makes little sense to strike down the old

two-step test only to replace it with a new one, let alone a new two-step test plus also a separate test for "ancillary" rights.

If there were any doubt, the Supreme Court dispelled it in *Rahimi*: "In *Bruen*, we explained that when a firearm regulation is challenged under the Second Amendment, the United States must show that the restriction 'is consistent with the Nation's historical tradition of firearm regulation.'" *United States v. Rahimi,* 602 U.S. 680, 689 (2024) (citing *Bruen*, 597 U.S. at 24); *see also id.* at 692 ("[T]he appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition."). The analysis is one step: history and tradition.

To be sure, a challenger must show that the Second Amendment right to keep and bear arms is at least *implicated. Bruen*, 597 U.S. at 17. As Justice Thomas recently explained, "[a] challenger need only show that 'the plain text' of the Second Amendment covers his conduct. (citation omitted) This burden is met if the law at issue 'regulates' Americans' 'arms-bearing conduct.'" *Snope v. Brown*, 145 S. Ct. 1534, 1536 (2025) (Thomas, J., dissenting from denial of certiorari). But that initial showing is not an intensive analytical step. Like the First Amendment, which applies whenever speech is regulated, the Second Amendment applies whenever the law regulates acquisition, ownership, possession, carrying, use, or commerce in arms.

Put more simply, "implicating" the right to keep and bear arms is far more expansive than covering only laws that directly restrict the literal "keeping" and "bearing" of arms. This discussion is critical here because, ever since *Bruen* was decided, some courts have exaggerated this "first step" into a gatekeeping device that

avoids the historical inquiry altogether, shifting the burden away from the government. Under these "extremely narrow reading[s]," the Second Amendment is "wrongly. . .reduced to 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Yukutake v. Lopez,* 130 F.4th 1077, 1092 (9th Cir. 2025) (citing *Bruen,* 597 U.S. at 70).[3]

A law may "implicate" the Second Amendment either directly or indirectly because constitutional rights protect not only core conduct but they also "implicitly protect those closely related acts necessary to their exercise." *Luis v. United States,* 578 U.S. 5, 26 (2016) (Thomas, J., concurring). Indeed, lower courts have long recognized the Second Amendment protects such "attendant rights." *See, e.g., Boland v. Bonta,* 662 F. Supp. 3d 1077, 1085 (C.D. Cal. 2023) (citing *Jackson v. City & Cnty. of San Francisco,* 746 F.3d 953, 967 (9th Cir. 2014)); *Ezell v. City of Chicago,* 651 F.3d 684, 704 (7th Cir. 2011); *Rigby v. Jennings,* 630 F. Supp. 3d 602, 615 (D. Del. Sept. 23, 2022)).

As the Tenth Circuit recently put it, "[t]he Second Amendment's text is not limited to direct prohibitions on possessing or using firearms. It states that the 'right of the people to keep and bear Arms, shall not be infringed.'" *Ortega v. Grisham,* No. 24-2121, 2025 U.S. App. LEXIS 21192, at *13 n.3 (10th Cir. Aug. 19, 2025). And once that right is implicated, the government "must show that the restriction 'is

---

[3] *Yukutake* was vacated and will be reheard en banc, as is always the case for any Second Amendment victory in the Ninth Circuit, with only one exception. Amici recently discussed this unfortunate practice at length in their amicus brief for that case. *See* Brief of Amici Curiae Second Amendment Foundation, et al. at 3-12, *Yukutake v. Lopez,* No. 21-16756 (9th Cir. Aug. 25, 2025). Nevertheless, the three-judge panel's point quoted above is still persuasive.

consistent with the Nation's historical tradition of firearm regulation'"—full stop. *Rahimi*, 602 U.S. at 689 (quoting *Bruen*, 597 U.S. at 24).

And that makes sense, because if judges got to decide whether an "ancillary right" is important enough to warrant protection, that heralds the reimposition of interest balancing in disguise. For example, before *Bruen*, the Ninth Circuit would look to the "severity of the burden" before deciding which level of scrutiny to apply. *See, e.g.*, *Pena v. Lindley*, 898 F.3d 969, 977 (9th Cir. 2018). Post-*Bruen*, that court simply slapped a fake moustache on that inquiry in *B&L Productions v. Newsom*, asking whether a law "meaningfully constrains" the right before turning to history. 104 F.4th at 118.[4] But "meaningfully constrains" is indistinguishable from "severity of the burden." Both invite courts to decide whether the Second Amendment is "really worth insisting upon." *District of Columbia v. Heller*, 554 U.S. 570, 634 (2008).

Amici were disappointed to see this Court make the same mistake in *McRorey*, and that precedent should be corrected or narrowed because its reasoning is precisely what *Heller* and *Bruen* forbid. Indeed, the Supreme Court has "expressly rejected the application of any "judge-empowering 'interest-balancing inquiry' that 'asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.'" *Bruen*, 597 U.S. at 22. Yet by reviving "burden severity" under another name, this Court has reintroduced the very interest balancing the Supreme Court has twice rejected.

---

[4] The *B&L Productions* panel lifts its "meaningfully constrains" language directly from pre-*Bruen* precedent. *B&L Prods.*, 104 F.4th at 118 (citing *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 680 (9th Cir. 2017)).

6

In short, when a law regulates arms-bearing conduct, the Second Amendment is implicated, and the government must justify the law by reference to historical tradition. Anything more is a disguised interest-balancing test that the Supreme Court has explicitly forbidden.

## II. SWITCHBLADES ARE "ARMS."

As shown above, Supreme Court's precedent establishes that the Second Amendment's "plain text" inquiry is not a complicated and delimiting substantive analysis. If a law implicates the keeping or bearing of arms in any way, the historical inquiry is necessary to ground its constitutionality.

For its part, the district court "assumed without deciding" that switchblades are arms. *Knife Rights, Inc.*, 785 F. Supp. 3d 195, at *25.[5] Because this Court may not agree to make that same assumption, Amici will explain why switchblades are undoubtedly "arms" under current precedent. The relevant question, then, before any examination of "common use," is: What is an "arm"? The Supreme Court has consistently turned to Founding-era definitions to answer that question:

> Before addressing the verbs "keep" and "bear," we interpret their object: "Arms." The 18th-century meaning is no different from the meaning today. The 1773 edition of Samuel Johnson's dictionary defined "arms" as *"[w]eapons of offence, or armour of*

---

[5] In a recent case dealing with California's ban on switchblades, another district court erred by treating "common use" as a preliminary filter, stating that before any historical analysis occurs, "the Court must determine whether the regulated switchblade at issue is commonly used today for self-defense." *Knife Rights, Inc. v. Bonta*, No. 23-cv-00474, 2024 WL 4224809, at *4 (S.D. Cal. Aug. 23, 2024). But the Second Amendment does not protect only arms "commonly used today for self-defense." It protects "the right of the people to keep and bear arms." Accordingly, once an object qualifies as an "arm," it is presumptively protected and can only be regulated consistent with historical tradition.

*defence."* (citation omitted) Timothy Cunningham's important 1771 legal dictionary defined "arms" as "*any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another."* (citation omitted)

*Heller*, 554 U.S. at 581 (quoting 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978); 1 A New and Complete Law Dictionary; N. Webster, American Dictionary of the English Language (1828) (reprinted 1989)) (emphasis added).

And lest there be any confusion about whether the term applies to non-military weapons, the Court added that "[t]he term was applied, then as now, to weapons that were not specifically designed for military use and were not employed in a military capacity." *Id.* Indeed, the Second Amendment "extends, prima facie, *to all instruments that constitute bearable arms,* even those that were not in existence at the time of the founding." *Bruen*, 597 U.S. at 28 (quoting *Heller*, 554 U.S. at 582) (emphasis added); *see also Rahimi*, 602 U.S. 602, 740 (2024) (Barrett, J., concurring) (describing *Bruen* as "explaining that the Amendment does not apply only to the catalogue of arms that existed in the 18th century, but rather to all weapons satisfying the '*general definition*' of 'bearable arms'").

In his dissent from denial of certiorari in a case challenging an AR-15 ban, Justice Thomas made this plain:

> To start, AR-15s are clearly "Arms" under the Second Amendment's plain text. In *District of Columbia* v. *Heller*, 554 U. S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008), we held that the term "Arms" in this context covers all "'[w]eapons of offence, or armour of defence....'" Thus, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." (citations omitted)

*Snope*, [145 S. Ct. at 1535](#) (Thomas, J., dissenting from denial of certiorari). Having determined that "AR-15s fall squarely within this category," Justice Thomas proceeded directly to the historical inquiry. The same reasoning applies here: Switchblades fit neatly within these Founding-era definitions of "arms." They are weapons of offense—instruments that a person takes into his hands to strike at another. They are thus "arms" as the Supreme Court has defined that term and thus may be restricted only if consistent with historical tradition.

The role of "common use," properly understood, arises only within that historical tradition analysis, as *Heller* made clear. There, the Court explained that certain uncommon arms may sometimes be restricted based on the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, [554 U.S. at 627](#) (quoting 4 Blackstone, *Commentaries on the Laws of England* 148-149 (1769)) (emphasis added). Later, in criticizing D.C.'s handgun ban, the Court wrote that "[f]ew laws *in the history of our Nation* have come close to the severe restriction of the District's handgun ban. And some of those few have been struck down." *Id.* (emphasis added).

As a final note on this point, some courts have ruled that statistical evidence of a type of arm's use in self-defense incidents is necessary for any protection to apply. *See, e.g., Ocean State Tactical, LLC v. Rhode Island*, [95 F.4th 38, 46](#) (1st Cir. 2024). But if the "threshold" or "plain text" inquiry really required an arm to be "in common use *for self-defense*" to be presumptively protected, then hunting rifles, shotguns made for trap shooting, and even historical muskets would be unprotected and could be banned without any historical analysis. That would be an absurd result. The Second

Amendment protects arms used for "lawful purposes *like* self-defense," *Heller*, 554 U.S. at 624 (emphasis added), thereby implying the existence of *other* lawful purposes. Even the dissenting opinion in *Bruen* seemed to acknowledge this when it explained that "[s]ome Americans use guns for legitimate purposes, such as sport (e.g., hunting or target shooting), certain types of employment (e.g., as a private security guard), or self-defense." *Bruen*, 597 U.S. at 89 (Breyer, J., dissenting). The suggestion that an arm must be commonly used for the sole lawful purpose of self-defense to merit constitutional protection is baseless. The Court has consistently used the phrase "lawful purposes"—plural—not to exclude other uses, but to include self-defense as one of several protected purposes.

Accordingly, if the switchblade laws at issue are to be upheld by this Court, it must only be because there is a compelling historical tradition of restricting either switchblades or other closely analogous weapons. Because switchblades are plainly "arms," nothing else will suffice.

## III. Arms in "Common Use" Cannot Be "Dangerous and Unusual."

Of course, there is a historical tradition of restrictions on "dangerous and unusual" weapons, and that too is worth analyzing here. The key to understanding the relationship between arms that are in "common use for lawful purposes" and those that are "dangerous and unusual" is to appreciate the significance of the latter term of art's conjunctive nature. *See Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring) ("[T]his is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual.") This conjunctive requirement is significant. An arm that is in common use for lawful purposes—such as self-defense, hunting, or sport—

is, by definition, not "unusual." And if a weapon is not "unusual," it cannot be categorically banned as "dangerous *and* unusual."

So it was with handguns in *Heller*: "It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon. . .. Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." 554 U.S. at 629; *see also Snope*, 145 S. Ct. at 1535 (Thomas, J., dissenting from denial of certiorari) ("Our Constitution allows the American people—not the government—to decide which weapons are useful for self-defense.")

Once the American people have adopted a class of arms for lawful purposes, the government cannot label them "unusual" to justify a ban. If an arm is common, it is protected—unless a historical tradition justifies a particular restriction.

## A.   "Uncommon" does not mean "unprotected."

To be clear, an arm being *uncommon* does not necessarily remove it from Second Amendment protection. It must also be exceptionally dangerous in comparison to other lawful arms. And even then, any restriction must be grounded in historical tradition. Otherwise, the government could stifle the development of new arms technologies simply by banning cutting-edge arms before they ever become popular.

As the Seventh Circuit warned: "[I]t would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it so that it isn't commonly owned. A law's existence can't be the source of its own constitutional validity." *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015). And from *Bruen*, we know that what was once an arm that could be banned may enter into a

protected status if the American people so choose:

> Whatever the likelihood that handguns were considered
> "dangerous and unusual" during the colonial period, they are
> indisputably in "common use" for self-defense today. . .[colonials
> laws restricting handguns] provide no justification for laws
> restricting the public carry of weapons that are unquestionably in
> common use today.

*Bruen*, <u>597 U.S. at 47</u>. In the same way the law is not "trapped in amber," *Rahimi*, <u>602 U.S. at 691</u>, the arms the Second Amendment protects are not either.

As further evidence that arms in common use are necessarily not both dangerous and unusual, we can look to what Justice Kavanaugh explained in his statement respecting denial of certiorari in *Snope*: "Given that millions of Americans own AR-15s and that a significant majority of the States allow possession of those rifles, petitioners have a strong argument that AR-15s are in 'common use' … and therefore are protected by the Second Amendment under *Heller*." *Snope*, <u>145 S. Ct. at 1535</u> (Kavanaugh, J., statement respecting denial of certiorari).

If that logic applies to AR-15s, it applies *a fortiori* to switchblades. Switchblades may or may not have been widely owned in the 18th or 19th centuries, but today, they are plainly in widespread, lawful civilian use. Indeed, plaintiffs in a similar case argue that 'total traffic in this country in switchblade knives exceeds 1,200,000 per year." *Knife Rights*, <u>2024 WL 4224809</u>, at *5. And in this case, the district court appeared to accept that "the number of switchblade knives 'owned and used in the United States is in the **millions**. . ." *Knife Rights, Inc.*, <u>785 F. Supp. 3d 195</u>, *30.

Those figures far exceed the number of stun guns in circulation in 2016—yet Justice Alito's concurrence in *Caetano* considered those to be protected by the Second

Amendment: "'Hundreds of thousands of Tasers and stun guns have been sold to private citizens,' who it appears may lawfully possess them in 45 States." 577 U.S. at 420 (Alito, J., concurring) (quoting *People v. Yanna*, 297 Mich. App. 137, 144 (2012)).

In sum, because switchblades fall squarely within *Heller*'s definition of what constitutes an "arm," they may only be restricted if such a ban fits within our historical tradition of restricting "dangerous and unusual" weapons. But if they are commonly owned for lawful purposes, they are not "unusual" and thus cannot be banned.

### B.     "Dangerous" must mean more than "capable of harm"

Even if this Court were to conclude that switchblades are somehow not common notwithstanding the millions of them in circulation, they still would not meet the constitutional standard for being "dangerous *and* unusual." All arms are dangerous—that is their very nature. So "dangerousness" must mean something more than the mere capability to cause harm that all arms are capable of. As Justice Alito explained:

> [T]he relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes. See *Heller*, *supra*, at 627, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (contrasting "'dangerous and unusual weapons'" that may be banned with protected "weapons . . . 'in common use at the time'")…. *[E]ven in cases where dangerousness might be relevant*, the Supreme Judicial Court's test sweeps far too broadly. *Heller* defined the "Arms" *covered by* the Second Amendment to include "'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'" 554 U.S., at 581, 128 S. Ct. 2783, 171 L. Ed. 2d 637. *Under the decision below, however, virtually every covered arm would qualify as "dangerous."*

13

> Were there any doubt on this point, one need only look at the court's first example of "dangerous per se" weapons: "firearms." *If Heller tells us anything, it is that firearms cannot be categorically prohibited just because they are dangerous.* (citation omitted)

*Caetano*, [577 U.S. at 417-18](#) (Alito, J., concurring) (double emphasis added).

While switchblades may be more lethal than stun guns, they are not more lethal than firearms, nor are they more lethal than other bladed weapons. Even if they are uncommon and thus "unusual," they are not "dangerous" relative to other arms that are nonetheless protected.

## CONCLUSION

The district court in this case erred by failing to properly apply *Bruen*, which demands a historical analysis anytime the Second Amendment is implicated. There is no lesser standard for "ancillary" conduct. Because switchblades are "arms" in common use for lawful purposes, they enjoy constitutional protection, and the challenged provisions of the Federal Switchblade Act should be struck down.

Dated: October 1, 2025

Respectfully submitted,

**SECOND AMENDMENT FOUNDATION**

*/s/ Konstadinos T. Moros*
Konstadinos T. Moros
SECOND AMENDMENT FOUNDATION
12500 NE 10TH Pl.
Bellevue, WA 98005
kmoros@saf.org

C.D. Michel
Michel & Associates, P.C.
180 E. Ocean Blvd., Ste. 200
Long Beach, CA 90802
cmichel@michellawyers.com

*Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and the Rules of this Court, it contains 3,919 words. This brief also complies with the typeface and typestyle requirements of Federal Rules of Appellate Procedure 29(a)(4), 32(a)(5), and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond.

Date: October 1, 2025                    SECOND AMENDMENT FOUNDATION

                                         /s/ Konstadinos T. Moros
                                         Konstadinos T. Moros
                                         *Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the original version of the foregoing Brief of Amici Curiae with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit on October 1, 2025, using the Appellate Electronic Filing system.

I also certify that after receiving a notice from the Clerk identifying an error in that original version, I subsequently electronically filed the current 'Proposed Sufficient Brief' version of the foregoing Brief of Amici Curiae with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit on October 7, 2025, using the Appellate Electronic Filing system.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system. Except for Mr. Syed Ahmad, one of the counsel for Defendants-Appellees, to whom I mailed a copy of the brief to his listed office address at U.S. Department of Justice, Civil Division, Suite 8020, 1100 L Street, N.W., Washington, DC 20005.


Date: October 7, 2025                              SECOND AMENDMENT FOUNDATION

                                                   /s/ Konstadinos T. Moros
                                                   Konstadinos T. Moros
                                                   *Counsel for Amici Curiae*