No. 25-10754

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

Knife Rights, Incorporated; Russell Arnold; RGA Auction Solution, doing business as Firearm Solutions; Jeffrey Folloder; MOD Specialties; Evan Kaufmann; Adam Warden; Rodney Shedd,

Plaintiffs-Appellants,

v.

Pamela Bondi, U.S. Attorney General; United States Department of Justice,

Defendants-Appellees.

On Appeal from the United States District Court
for the Northern District of Texas

## BRIEF FOR APPELLEES

BRETT A. SHUMATE
  *Assistant Attorney General*

RYAN R. RAYBOULD
  *United States Attorney*

MICHAEL S. RAAB
SEAN R. JANDA
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3388*

**STATEMENT REGARDING ORAL ARGUMENT**

Appellees agree with appellants that oral argument could assist the Court in resolving the constitutional issues presented by this case.

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION ..................................................................1

STATEMENT OF THE ISSUES.....................................................................1

STATEMENT OF THE CASE........................................................................2

    A.    Legal Background ........................................................................2

    B.    Factual and Procedural Background ............................................4

SUMMARY OF ARGUMENT.......................................................................7

STANDARD OF REVIEW ...........................................................................9

ARGUMENT .......................................................................................... 10

Plaintiffs' Second Amendment Challenges to Both Section 1242 and Section
    1243 Fail on the Merits .......................................................... 10

    A.    The Automatic Switchblades Regulated by the Federal
            Switchblade Act Are Not Entitled to Second Amendment
            Protection....................................................................................10

    B.    Plaintiffs' Contrary Arguments Are Unpersuasive ....................23

    C.    Plaintiffs' Facial Challenge to Section 1243 Independently Fails.............28

CONCLUSION ........................................................................................ 33

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

## TABLE OF AUTHORITIES

**Cases:**                                                                                    **Page(s)**

*Andrews v. State,*
  50 Tenn. 165 (1871) ...................................................................................................15

*Aymette v. State,*
  21 Tenn. 154 (1840) ..................................................................................................14

*Children's Health Def. v. FDA,*
  No. 23-50167, 2024 WL 244938 (5th Cir. Jan. 23, 2024).......................................11-12

*Collins v. Department of the Treasury,*
  83 F.4th 970 (5th Cir. 2023)..........................................................................................9

*Crowley Cutlery Co. v. United States,*
  849 F.2d 273 (7th Cir. 1988)........................................................................................23

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ........................................ 10, 11, 13, 17, 18, 19, 21, 24, 31

*Fall v. Esso Standard Oil Co.,*
  297 F.2d 411 (5th Cir. 1961).........................................................................................22

*Fife v. State,*
  31 Ark. 455 (1876) ............................................................................................... 15, 16

*Greer v. Spock,*
  424 U.S. 828 (1976) ...............................................................................................31-32

*Hollis v. Lynch,*
  827 F.3d 436 (5th Cir. 2016) .........................................................................................23

*John Doe No. 1 v. Reed,*
  561 U.S. 186 (2010)......................................................................................................29

*McRorey v. Garland,*
  99 F.4th 831 (5th Cir. 2024).........................................................................................28

*Mock v. Garland,*
  75 F.4th 563 (5th Cir. 2023).........................................................................................19

*Moody v. NetChoice, LLC,*
   603 U.S. 707 (2024) ................................................................29

*New York State Rifle & Pistol Ass'n v. Bruen,*
   597 U.S. 1 (2022) ............................................ 10, 11, 24, 31

*Nunn v. State,*
   1 Ga. 243 (1846) ................................................................14

*Reese v. Bureau of Alcohol, Tobacco, Firearms, & Explosives,*
   127 F.4th 583 (5th Cir. 2025) ...........................................28

*Robertson v. Baldwin,*
   165 U.S. 275 (1897) .......................................................13-14

*Sabri v. United States,*
   541 U.S. 600 (2004) ...........................................................30

*Shemwell v. City of McKinney,*
   63 F.4th 480 (5th Cir. 2023) ...............................................9

*State v. Chandler,*
   5 La. Ann. 489 (1850) .......................................................12

*State v. Duke,*
   42 Tex. 455 (1875), *abrogated on other grounds by*
   *New York State Rifle & Pistol Ass'n v. Bruen,*
   597 U.S. 1 (2022) ..............................................................16

*State v. Kerner,*
   107 S.E. 222 (N.C. 1921) ..................................................16

*State v. Mitchell,*
   3 Blackf. 229 (Ind. 1833) ..................................................14

*State v. Reid,*
   1 Ala. 612 (1840) ..............................................................13

*Trump v. CASA, Inc.,*
   606 U.S. 831 (2025) ...........................................................12

*Umphress v. Hall*,
  133 F.4th 455 (5th Cir. 2025) ......................................................................5

*United States v. Jennings*,
  195 F.3d 795 (5th Cir. 1999)......................................................................19

*United States v. Jones*,
  365 F.2d 675 (2d Cir. 1966) ......................................................................30

*United States v. Love*,
  20 F.4th 407 (8th Cir. 2021)......................................................................30

*United States v. Miller*,
  307 U.S. 174 (1939) ....................................................................................19

*United States v. Rahimi*,
  602 U.S. 680 (2024) ...........................................................10, 24, 25, 26, 29

*United States v. Reff*,
  479 F.3d 396 (5th Cir. 2007) ......................................................................30

*United States v. Serna*,
  309 F.3d 859 (5th Cir. 2002) ......................................................................19

*United States v. Thompson/Ctr. Arms Co.*,
  504 U.S. 505 (1992) ....................................................................................18

*Washington State Grange v. Washington State Republican Party*,
  552 U.S. 442 (2008) ....................................................................................30

## U.S. Constitution:

Amend. II ......................................................................................................10

## Statutes:

Pub. L. No. 111-83, § 562, 123 Stat. 2142, 2183 (2009)....................................4

15 U.S.C. § 1241 *et seq.* ............................................................................... 1, 2

15 U.S.C. § 1241(b) .................................................................................... 2, 20

15 U.S.C. § 1242 ................................................................ 1, 3, 4

15 U.S.C. § 1243 ..........................................................1, 4, 28, 30

15 U.S.C. § 1244 ...................................................................... 4

18 U.S.C. § 7 .......................................................................... 30

18 U.S.C. § 7(3) ...................................................................... 30

18 U.S.C. § 7(5) ...................................................................... 30

18 U.S.C. § 7(9)(A) ................................................................ 30

26 U.S.C. § 5801 *et seq.* ......................................................... 18

28 U.S.C. § 1291 ...................................................................... 1

28 U.S.C. § 1331 ...................................................................... 1

**Legislative Materials:**

S. Rep. No. 85-1429 (1958), https://perma.cc/A77X-88Y3 ................................ 2, 3, 22

S. Rep. No. 85-1980 (1958)...................................................... 22, 27

**Other Authorities:**

2 Joel Prentiss Bishop,
   *Commentaries on the Law of Statutory Crimes* (2d ed. 1883)...............................17

Henry Campbell Black,
   *Handbook of American Constitutional Law* (1895)................................................17

Thomas M. Cooley,
   *The General Principles of Constitutional Law in the United States of America* (1880) ............17

David B. Kopel & Joseph G.S. Greenlee,
   *The History of Bans on Types of Arms Before 1900*, 50 J. Legis. 223 (2024).......... 16-17, 17

Daniel D. Slate, *Infringed*, 3 J. Am. Const. Hist. 381 (2025) ................................20

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331. ROA.41. The district court granted the government's motion to dismiss and entered final judgment on May 22, 2025. ROA.1550. Plaintiffs filed a timely notice of appeal on June 17, 2025. ROA.1551. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

This case involves a facial, pre-enforcement Second Amendment challenge to two provisions of the Federal Switchblade Act, 15 U.S.C. § 1241 *et seq.* One provision, Section 1242, generally prohibits introducing automatic switchblades into, or distributing automatic switchblades in, interstate commerce. *Id.* § 1242. The other provision, Section 1243, generally prohibits possessing automatic switchblades on federal or tribal land. *See id.* § 1243. The district court dismissed plaintiffs' complaint. The court concluded that plaintiffs' challenges to Section 1242 failed on the merits and that plaintiffs lacked standing to challenge Section 1243. The questions presented are:

1. Whether the automatic switchblades regulated by the Federal Switchblade Act are protected by the Second Amendment; and

2. Whether Section 1243 is unconstitutional on its face.

## STATEMENT OF THE CASE

### A.    Legal Background

The Federal Switchblade Act, 15 U.S.C. § 1241 *et seq.*, regulates the manufacture, distribution, and possession of automatic "switchblade knives." Such knives include "any knife having a blade which opens automatically" either "by hand pressure applied to a button or other device in the handle of the knife" or "by operation of inertia, gravity, or both." *Id.* § 1241(b).

The Federal Switchblade Act was originally enacted in 1958, following a "full and complete study of juvenile delinquency" conducted by the Senate Judiciary Committee's Subcommittee on Juvenile Delinquency. *See* S. Rep. No. 85-1429, at 1 (1958), https://perma.cc/A77X-88Y3. One aspect of the Subcommittee's investigation focused on "the use of dangerous weapons by juveniles, with special emphasis on the interstate traffic and importation of switchblade knives." *Id.* at 5. The Subcommittee concluded, based on interactions with "police chiefs throughout the country," that automatic switchblade knives were "on many occasions the instrument used by juveniles in the commission of robberies and assaults." *Id.* at 6.

In describing the public-safety risks of automatic switchblades, the Subcommittee emphasized in particular that those weapons "were being widely distributed through the mail" to juveniles who lived in "various States that had local laws prohibiting possession, sale, or distribution of switchblade knives." S. Rep. No. 85-1429, at 6. Thus, the Subcommittee concluded that there was a "need for Federal

control of the interstate shipment of these instruments, since local legislation is being systematically circumvented through the mail-order device." *Id.*; *see also id.* at 7 ("In response to the subcommittee's questionnaire, police chiefs from all sizable communities, with few exceptions, uniformly supported the enactment of legislation prohibiting the interstate traffic in these articles.").

In addition, the Subcommittee detailed the problems caused by the possession of switchblade knives on military installations. The Subcommittee explained that the "possession of these knives" on Army installations "was contrary to post regulations" and that the knives were generally "not used in connection with training for military purposes." S. Rep. No. 85-1429, at 6. Nonetheless, automatic switchblades were frequently sold in military supply stores located near military bases and "frequent assaults had occurred in which these knives had been used within the confines of" military installations. *Id.*; *see also id.* at 7 (explaining that during 1956 alone, military police confiscated 161 automatic switchblades from personnel).

Based on those concerns, Congress enacted the Federal Switchblade Act. Two of that statute's provisions are particularly relevant to this case. First, Section 1242 of the statute generally prohibits introducing into, manufacturing for introduction into, transporting in, and distributing in interstate commerce automatic switchblades. 15 U.S.C. § 1242. Second, Section 1243 of the statute generally prohibits the manufacture, sale, and possession of automatic switchblades "within Indian country"

3

or "within the special maritime and territorial jurisdiction of the United States." *Id.* § 1243.

Violation of either of those provisions is a criminal offense that subjects the offender to up to five years of imprisonment. *See* 15 U.S.C. §§ 1242, 1243. Other than on federal and tribal lands, the statute does not regulate the intrastate distribution or possession of automatic switchblades. The statute also does not regulate other types of knives, including knives with fixed blades and pocketknives that require more manual pressure to open.

The relevant provisions of the Federal Switchblade Act have been revisited by Congress once since their original enactment in 1958: in 2009, Congress amended the statute's set of exceptions, *see* 15 U.S.C. § 1244, to add an exception for certain knifes, *see* Pub. L. No. 111-83, § 562, 123 Stat. 2142, 2183 (2009). Congress did not determine at that point to repeal the statute or otherwise alter its prohibitions. In recent decades, however, the statute's prohibitions have been rarely enforced. *See* ROA.1297.

**B.    Factual and Procedural Background**

Plaintiffs are an advocacy group, five individuals, and two federally licensed firearms dealers. *See* ROA.23-40. Each individual plaintiff alleges that, but for the Federal Switchblade Act, he would sell or purchase automatic switchblades in interstate commerce or would possess automatic switchblades on federal and/or tribal land. Each commercial plaintiff alleges that, but for the statute, it would acquire and distribute in interstate commerce automatic switchblades. *See generally* ROA.23-40.

Plaintiffs' complaint contains a single count alleging that the prohibitions in Sections 1242 and 1243 of the Federal Switchblade Act violate the Second Amendment. *See* ROA.49-53.

Plaintiffs moved for summary judgment, and the government cross-moved to dismiss. At the outset, the government contended that no plaintiff had established standing to sue. And on the merits, as relevant here, the government argued that automatic switchblades are not protected by the Second Amendment because they are well-suited to criminal misuse; they are not typically possessed by law-abiding citizens for lawful purposes such as self-defense; and there is a substantial historical tradition of state law regulating Bowie knives and other bladed weapons. *See* ROA.1276-88. In addition, as to Section 1243, the government contended that plaintiffs' facial challenge to that provision could not succeed because history and precedent demonstrate that the government may prohibit the possession of arms in at least some government facilities. ROA.1290-93.

The district court granted the government's motion to dismiss and denied plaintiffs' motion for summary judgment. As to Section 1242, the court held that the commercial and individual plaintiffs have Article III standing to challenge that provision's restrictions on the interstate distribution of automatic switchblades. *See* ROA.1536-40 (citing *Umphress v. Hall*, 133 F.4th 455 (5th Cir. 2025) (per curiam)). And for similar reasons, the court concluded that the organizational plaintiff has

associational standing to challenge Section 1242 on behalf of its members. *See* ROA.1541-42.[1]

On the merits, however, the district court concluded that plaintiffs failed to state a claim that Section 1242 violated the Second Amendment. The court assumed without deciding that automatic switchblades are protected by the Second Amendment but nonetheless concluded that Section 1242's restrictions on interstate commerce do not infringe plaintiffs' Second Amendment rights. Because plaintiffs' "own evidence" demonstrated that "switchblades are widely distributed, sold, and used in intrastate commerce," the court concluded that Section 1242's restrictions do "not serve as a *de facto* prohibition on possession or an outright ban" and thus do not implicate the Second Amendment's right to keep and bear arms. ROA.1547-49 (quotation omitted).

In addition, as to Section 1243, the district court concluded that no plaintiff had established standing to challenge that provision's prohibition on possessing automatic switchblades on federal and tribal land. The court reached that conclusion because it believed that no plaintiff had demonstrated a substantial threat that the provision would be enforced against it. ROA.1543. In light of that holding, the court

---

[1] The district court also concluded that Knife Rights did not have organizational standing, *see* ROA.1541-42, and that the retailer plaintiffs could not establish third-party standing to assert their customers' rights, *see* ROA.1535-36.

did not address the government's merits arguments in defense of Section 1243's facial

constitutionality.

As a result, the district court granted the government's motion to dismiss and

denied plaintiffs' motion for summary judgment. The court thus dismissed plaintiffs'

complaint with prejudice on the merits as to their claim against Section 1242 and

dismissed plaintiffs' complaint without prejudice for lack of standing as to their claim

against Section 1243. *See* ROA.1549-50.

## SUMMARY OF ARGUMENT

The Federal Switchblade Act imposes restrictions on interstate commerce in

automatic switchblades, and it prohibits the manufacture, sale, or possession of

automatic switchblades in certain federal, territorial, and tribal land. Congress limited

the statute's restrictions to those weapons where the blade is inherently concealed and

may be opened automatically (such as through the press of a button). The statute does

not reach knives with other configurations or modes of operation—including fixed-

blade knives and folding knives that must be opened manually—but instead applies

only to the narrow subset of concealable knives that Congress determined were

particularly dangerous.

Congress's limited regulation of inherently concealed knives is amply supported

by two distinct, through interrelated, historical principles. First, there is a robust

tradition, repeatedly recognized by the Supreme Court, of States' regulating concealed

and concealable weapons. Thus, throughout the nineteenth century, a number of

7

States prohibited the carrying of concealed weapons, and most courts that considered those prohibitions upheld them as constitutional. And relatedly, States have repeatedly extended those prohibitions to—or have severely regulated in various other ways—concealable weapons, such as dirks and daggers. The weight of historical authority demonstrates that those prohibitions and regulations comport with the Second Amendment, because there is no constitutional right to carry concealed or inherently concealable weapons.

Second, there is a similarly robust tradition of permitting legislatures to prohibit the carrying of dangerous and unusual weapons—that is, those weapons that are not in common use for lawful purposes. That tradition, which has been recognized by the Supreme Court, applies to permit the regulation of concealable weapons adapted for criminal misuse. Indeed, Congress has acted on similar concerns in regulating other narrow categories of concealable weapons—such as short-barreled rifles and short-barreled shotguns—and the Supreme Court and this Court have consistently affirmed the permissibility of such regulation.

The Federal Switchblade Act is consistent with those robust historical traditions. In all relevant respects, it mirrors the prohibitions on concealed carry of weapons like dirks and daggers by targeting only those knives inherently adapted for concealability. And properly understood, the statute does no more than regulate the configuration and operation of knives, reaching only those knives that fold and that open automatically. Even setting that aside, the statute is analogous to the many

restrictions on the sale and possession of concealable bladed weapons that proliferated throughout the nineteenth century. And the statute independently fits within the tradition of regulating dangerous and unusual weapons: Congress enacted the statute only after an extensive investigation that led Congress to conclude that automatic switchblades are uniquely suited to criminal use—and, conversely, are not used or useful for lawful purposes as compared to other knife configurations.

In addition, plaintiffs' facial attack on Section 1243—which prohibits the manufacture, sale, and possession of automatic switchblades in certain territorial, tribal, and federal land—would be unsuccessful even if there were some constitutional right to such weapons. To succeed on their facial challenge, plaintiffs would need to demonstrate that Section 1243 has no constitutional application. But the places regulated by that statute include a number of sensitive places where plaintiffs plainly have no Second Amendment right to possess automatic switchblades, including certain aircraft, courthouses, federal prisons, embassies, and military bases.

## STANDARD OF REVIEW

This Court reviews de novo the district court's dismissal of plaintiffs' claims. *Shemwell v. City of McKinney*, 63 F.4th 480, 483 (5th Cir. 2023) (per curiam). The Court may affirm that dismissal "on any basis supported by the record." *Collins v. Department of the Treasury*, 83 F.4th 970, 978 (5th Cir. 2023) (quotation omitted).

# ARGUMENT

## PLAINTIFFS' SECOND AMENDMENT CHALLENGES TO BOTH SECTION 1242 AND SECTION 1243 FAIL ON THE MERITS

### A.     The Automatic Switchblades Regulated by the Federal Switchblade Act Are Not Entitled to Second Amendment Protection

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. As the Supreme Court has recognized, "the right secured by the Second Amendment"—"[l]ike most rights"— "is not unlimited"; it is, in other words, "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). Instead, Congress may properly regulate the keeping and carrying of weapons so long as that regulation comports with "the principles that underpin our regulatory tradition." *United States v. Rahimi*, 602 U.S. 680, 692 (2024); *see also id.* at 691 (explaining that "constitutional text and history" shed light on "the scope of the right" (quotation omitted)); *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022) (asking whether the challenged law is "consistent with the Nation's historical tradition").

In this case, two relevant interrelated historical traditions establish that inherently concealable weapons like automatic switchblades are not entitled to Second Amendment protection. First, as the Supreme Court has repeatedly explained, there is a robust historical tradition permitting the legislature to prohibit the carrying of

"concealed weapons." *Heller*, 554 U.S. at 626; *see also Bruen*, 597 U.S. at 52 (describing State "laws that proscribed the concealed carry of pistols and other small weapons"). Second, as the Supreme Court has also explained, the relevant historical materials reveal a "tradition of prohibiting the carrying of dangerous and unusual weapons," which permits the legislature to prohibit or regulate those arms that are not "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625, 627 (quotation omitted).

These two interrelated historical traditions establish that automatic switchblades like those regulated by the Federal Switchblade Act are not entitled to Second Amendment protection. The defining feature of an automatic switchblade is that its blade is concealed within the handle of the knife up until the moment that it is used. But there is no constitutional right to such inherently concealed weapons. And Congress has properly determined—in a conclusion that parallels similar legislative conclusions throughout our Nation's history—that the concealable nature of a switchblade makes it particularly susceptible to criminal misuse and, thus, a proper subject of regulation.[2]

---

[2] The government no longer disputes that the individual and retail plaintiffs have standing to challenge Sections 1242 and 1243. By contrast, the organizational plaintiff's attempt to show standing to challenge the statute in its own right—based on the expenditure of "time, effort, and cost on litigation matters to protect knife rights," Opening Br. 40-41 (quotation omitted)—runs headlong into this Court's admonition that a claimed injury-in-fact cannot properly be based on litigation expenditures, *see Children's Health Def. v. FDA*, No. 23-50167, 2024 WL 244938, at *5

*Continued on next page.*

1. At the outset, States have long prohibited the carrying of concealed weapons, and courts have long upheld the constitutionality of such prohibitions. For example, in 1813, Louisiana enacted a statute that made it a crime to be "found with a concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in [one's] bosom, coat, or any other place about him, that does not appear in full open view." *State v. Chandler*, 5 La. Ann. 489, 489 (1850) (quotation omitted). In upholding the constitutionality of that prohibition, the Supreme Court of Louisiana explained the prohibition was "necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and assassinations committed upon unsuspecting persons." *Id.* at 489-90. And, the court explained, the prohibition did not "interfere[] with" the "right guaranteed by the Constitution of the United States," which the court described as individuals' "right to carry arms" openly in "defence of themselves, if necessary, and of their country." *Id.* at 490. That right did not, the court concluded, extend to any right to the concealed carry of arms regulated by the statute.

---

(5th Cir. Jan. 23, 2024) (per curiam). Nor may the retail plaintiffs validly assert the constitutional rights of their customers. *See* ROA.1535-36. Nonetheless, the Court need not resolve these questions. Because the individual and retail plaintiffs have Article III standing in their own right, this Court has jurisdiction to reach the merits of plaintiffs' claims. And if this Court were to disagree with the government on the merits, the appropriate disposition would be to remand to the district court to determine in the first instance the appropriate scope of any remedy—a question that would require the district court to exercise its equitable discretion in light of the scope of claims properly presented by plaintiffs. *Cf. Trump v. CASA, Inc.*, 606 U.S. 831 (2025).

Similarly, in 1839, Alabama enacted a statute that prohibited any person from "carry[ing] concealed about his person" various weapons, including firearms, knives, and dirks. *State v. Reid*, 1 Ala. 612, 614 (1840) (quotation omitted). The Alabama Supreme Court rejected the contention that the statute violated a State constitutional provision mirroring the Second Amendment. The court explained that the constitutional provision had "neither expressly nor by implication, denied to the Legislature, the right to enact laws in regard to the manner in which arms shall be borne," because the relevant right "is not to bear arms upon all occasions and in all places." *Id.* at 616. Thus, the court continued, the provision left the Legislature free "to adopt such regulations" as "may be dictated by the safety of the people and the advancement of public morals." *Id.* And the court concluded that this authority permitted the legislature to enact a statue prohibiting the concealed carry of weapons. *See id.* at 617 ("[A] law which is intended merely to promote personal security, and to put down lawless aggression and violence, and to that end inhibits the wearing of certain weapons, in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the constitution.").

In short, a number of States in the 1800s adopted—and courts upheld the constitutionality of—provisions prohibiting "carrying concealed weapons," *Heller*, 554 U.S. at 626, thereby establishing the proposition that there is no constitutional right to the concealed carry of arms. *See also, e.g.*, *Robertson v. Baldwin*, 165 U.S. 275, 281-82

(1897) (explaining that the Second Amendment right "is not infringed by laws prohibiting the carrying of concealed weapons"); ROA.1350-51 (1838 Virginia statute banning the "hidden or concealed" carry of "any pistol, dirk, bowie knife, or any other weapon of the like kind"); *State v. Mitchell*, 3 Blackf. 229, 229 (Ind. 1833) ("I[t] was *held* in this case, that the statute of 1831, prohibiting all persons, except travelers, from wearing or carrying concealed weapons, is not unconstitutional."); *Nunn v. State*, 1 Ga. 243, 251 (1846) (concluding that an 1837 State statute prohibiting "the practice of carrying certain weapons *secretly*" was "valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms," although a different provision "against bearing" certain "arms *openly*" was "in conflict with the Constitution"); *Aymette v. State*, 21 Tenn. 154, 158-60 (1840) (upholding statute that prohibited, among other things, the concealed carry of Bowie knives and other similar weapons).

Moreover, there is a similar historical tradition of extending this prohibition to small concealable weapons, as some States moved beyond regulation simply of the mode of carry to regulation or prohibition of the concealable weapons themselves. And in upholding these laws against constitutional attack, State courts explained—in terms echoing the Supreme Court's later discussion of the permissible regulation of weapons that are not in common use for lawful purposes—that protected arms include those useful to the individual or common defense but not those arms primarily useful for criminal purposes.

14

Thus, for example, in 1870, Tennessee enacted a statute that prohibited the possession of various concealable weapons, including "a dirk, swordcane, Spanish stiletto, belt or pocket pistol or revolver." *Andrews v. State*, 50 Tenn. 165, 171 (1871) (quotation omitted). The Tennessee Supreme Court concluded that the statute's prohibitions related to bladed weapons and pocket pistols did not violate a State constitutional analogue to the Second Amendment. In reaching that conclusion, the court reasoned that right to keep arms did not extend to "every thing that may be useful for offense or defense" but instead extended only to "the usual arms of the citizen of the country," the "use of which will properly train and render him efficient in defense of his own liberties, as well as of the State." *Id.* at 179. Applying that test, the court concluded that bladed weapons like dirks, swordcanes, and Spanish stilettos—as well as the particularly concealable belt or pocket pistol—did not constitute the usual and protected arms and could thus be constitutionally prohibited. *See id.* at 186. By contrast, the court concluded that the statute's regulation of revolvers was potentially unconstitutional, because at least some revolvers were— unlike the other weapons regulated by the statute—properly "adapted to" the aims of defense undergirding the constitutional right. *See id.*

Along the same lines, in *Fife v. State*, 31 Ark. 455, 461 (1876), the Arkansas Supreme Court confronted a state statute prohibiting the carrying of various concealable weapons, including pistols, dirks, Bowie knives, and "the sword or spear in a cane." In addressing a State constitutional challenge to the statute's prohibition as

applied to pistols, the court construed the statute in light of "the company in which the pistol is placed" as applying only to particularly small, concealable pistols—that is, those that were "usually carried in the pocket, or of a size to be concealed about the person, and used in private quarrels and brawls." *Id.* With that limitation, the court concluded that the legislature could properly prohibit the possession of such pistols—and, presumably by the same logic, could also prohibit the possession of the concealable bladed weapons referenced in the statute—"without any infringement of the" State constitutional right. *Id.*; *see also, e.g.*, *State v. Duke*, 42 Tex. 455, 458 (1875) (explaining that a State constitutional analogue to the Second Amendment protected only "such arms as are commonly kept, according to the customs of the people, and are appropriate for open and manly use in self-defense, as well as such as are proper for the defense of the State"—and, thus, that the provision protected "pistols at least as are not adapted to being carried concealed"), *abrogated on other grounds by Bruen*, 597 U.S. at 64-65; *State v. Kerner*, 107 S.E. 222, 224 (N.C. 1921) (similarly concluding that "pistol[s]" properly "com[e] within the meaning of the word 'arms' used in the [State] constitutional guaranty of the right to bear arms" but that various concealable bladed weapons, including Bowie knives, dirks, and daggers do not).

This general regulatory approach of imposing significant restrictions on small concealable weapons was not an outlier. To the contrary, one recent academic article canvassed 221 State or territorial statutes regulating Bowie knives, often alongside "other knives that were well-suited for fighting" such as dirks and daggers. David B.

Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. Legis. 223, 293 (2024); *see id.* at 298-328. Those statutes regulated such concealable weapons in a variety of different ways, including banning their carry or concealed carry, prohibiting their possession in specific locations, subjecting their sale or possession to taxes, or restricting their sale to minors. *See id.* at 329-35.

States' regulation of these small, concealed weapons often reflected the conclusion that such weapons are not protected by the right to bear arms codified by the Second Amendment and State analogues. That reasoning is not only repeated throughout many of the cases discussed above but is also reflected in leading treatises of the era. Thus, for example, Thomas Cooley—a scholar whose explanation of the scope of the Second Amendment has been relied on by the Supreme Court, *see Heller*, 554 U.S. at 616-17—made clear that the "arms intended by the Constitution are such as are suitable for the general defence of the community against invasion or oppression" and therefore that "the secret carrying of those suited merely to deadly individual encounters may be prohibited." Thomas M. Cooley, *The General Principles of Constitutional Law in the United States of America* 271-72 (1880). Other authorities were in agreement. *See, e.g.*, Henry Campbell Black, *Handbook of American Constitutional Law* § 144, at 403 (1895) (explaining that the "arms" protected by the Second Amendment and State analogues "do not include dirks, bowie knives, and such other weapons as are used in brawls, fights, and riots"); 2 Joel Prentiss Bishop, *Commentaries on the Law of Statutory Crimes* § 793, at 469 (2d ed. 1883) (explaining that State analogues to the

17

Second Amendment did not protect the "keeping and bearing of arms" for purposes of "broils, bravado, and tumult, disturbing the public repose," or "private assassination and secret revenge"—and, thus, did not extend to weapons like "dirks").

Moreover, and more generally, this historical tradition of regulating concealable weapons is mutually reinforcing of the distinct historical tradition permitting legislatures to prohibit the carrying of weapons that are not in common use for lawful purposes. *See Heller*, 554 U.S. at 581-82, 625. As the authorities cited above make clear, the reason that small concealable weapons like dirks and daggers have generally been held unprotected is that those weapons are not commonly used for lawful purposes but are, instead, well-suited to criminal misuse.

In addition, in the National Firearms Act of 1934, 26 U.S.C. § 5801 *et seq.* (NFA), Congress relied on similar reasoning as the basis for regulating narrow categories of concealable weapons that it concluded were particularly susceptible to criminal misuse. In that statute, Congress imposed taxation and registration requirements on specific categories of firearms, including concealable versions of traditionally protected arms such as short-barreled rifles and short-barreled shotguns. Congress was particularly concerned with those weapons because it found that they are particularly dangerous "concealable weapon[s]" that are "likely" to be "used for criminal purposes." *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517 (1992) (plurality opinion) (discussing short-barreled rifles specifically).

18

And although full-length rifles and shotguns are quintessential arms protected by the Second Amendment, courts—including the Supreme Court and this Court— have consistently affirmed the constitutionality of the NFA's regulation of short-barreled rifles and shotguns. Thus, shortly after the NFA's enactment, the Supreme Court rejected a Second Amendment challenge to the statute's restrictions on short-barreled shotguns. *United States v. Miller*, 307 U.S. 174, 178 (1939). And in *Heller*, the Court reaffirmed that conclusion, explaining that "short-barreled shotguns" are unprotected because they are not "in common use" for "lawful purposes like self-defense." 554 U.S. at 622-27 (quotation omitted). This Court has repeatedly embraced similar logic. *See, e.g.*, *Mock v. Garland*, 75 F.4th 563, 570 (5th Cir. 2023) (the NFA's regulation of short-barreled shotguns targets weapons "valued for their ability to be easily concealed and to unleash devastating damage at short range"); *United States v. Serna*, 309 F.3d 859, 863 (5th Cir. 2002) ("In enacting gun control legislation Congress expressed the view that a short-barreled firearm, or sawed-off shotgun, when unlawfully possessed, is primarily used for violent purposes."); *United States v. Jennings*, 195 F.3d 795, 799 (5th Cir. 1999) ("[T]he primary reason that unregistered possession of [NFA] weapons is a crime is the virtual inevitability that such possession will result in violence.").

2. The Federal Switchblade Act follows in these robust historical traditions by regulating the sale and possession of a narrow class of automatic switchblades that are inherently concealed and that Congress has reasonably determined are uniquely suited

19

to criminal misuse. Because this history demonstrates that automatic switchblades are not protected arms, those restrictions do not violate the Second Amendment.

As an initial matter, in all relevant respects, the Federal Switchblade Act mirrors the prohibitions on concealed carry of weapons like Bowie knives, dirks, and daggers that abounded throughout history. The statute regulates only automatic "switchblade" knives—that is, only those knives whose blades are necessarily concealed, such as within a handle, and then may be "open[ed] automatically" in various ways. *See* 15 U.S.C. § 1241(b). The statute thus targets only those knives that are inherently adapted for concealability; conversely, it leaves entirely unregulated functionally identical—but less concealable—knives with fixed blades. In that way, the statute is relevantly similar to (indeed, is less harsh than) the many statutes that prohibited concealed carry of knives and similar weapons but permitted their open carry, because it regulates only inherently concealed weapons.

That alone suffices to uphold the Federal Switchblade Act's constitutionality. And indeed, that description of the statute makes clear an additional reason why it is constitutionally legitimate: properly understood, the statute is a constitutional regulation on the mode of operating knives rather than unconstitutional infringement of the right to keep and bear arms. *Cf.* Daniel D. Slate, *Infringed*, 3 J. Am. Const. Hist. 381, 382-87 (2025) (distinguishing between valid regulation and impermissible "infringement").

20

Under that framework, the Federal Switchblade Act is a constitutional regulation that operates on the configuration and mode of a switchblade's opening. The statute does not broadly negate the right to keep and bear arms—or even any right to keep and bear knives. Instead, it merely requires that knives (or, at least, those switchblades sold in interstate commerce or possessed on federal and tribal land) operate in particular ways: either by having a fixed-blade configuration or by permitting the blade to open only through manual (rather than automatic) mechanisms. As a restriction on the mode of operation, the Federal Switchblade Act is unlike (for example) the law that the Supreme Court held unconstitutional in *Heller*, 554 U.S. at 629-30, which was a "complete prohibition" on handguns, "the most popular weapon chosen by Americans for self-defense in the home."

Even setting that aside, the Federal Switchblade Act regulates only small, concealable bladed weapons similar to those that were substantially regulated by States throughout the nineteenth century, as explained. And it regulates those weapons because Congress has reasonably determined that they are uniquely adapted for criminal misuse, bringing the statute within the related tradition of regulating dangerous and unusual weapons.

In enacting the Federal Switchblade Act, Congress determined that automatic switchblades are uniquely suited to criminal use. The defining feature of such a weapon is that its blade is concealed up until the moment the weapon may be used, which enables a criminal to carry the weapon undetected and to threaten serious

injury at the press of a button. As a result, Congress concluded at the time of the statute's enactment that "the use of switchblade and other quick-opening knives for criminal purposes" had developed into an "acute" problem. S. Rep. No. 85-1980, at 2 (1958). Congress's conclusion on this score was well-supported by the legislative record, which included an extensive investigation that revealed that automatic switchblades were frequently used to commit "robberies and assaults." S. Rep. No. 85-1429, at 6. Indeed, the problems occasioned by criminal misuse of automatic switchblades were such that, in response to Congress's inquiries, "police chiefs from all sizable communities, with few exceptions, uniformly supported the enactment of legislation prohibiting the interstate traffic in" those switchblades. *Id.* at 7.

Moreover, Congress specifically considered whether automatic switchblades were used or useful for lawful purposes, and Congress concluded "that, practically speaking, there is no legitimate use for the switchblade to which" other knives, such as "a conventional sheath or jackknife," is "not better suited." S. Rep. No. 85-1980, at 3. Thus, Congress explained, the "switchblade knife is, by design and use, almost exclusively the weapon of the thug and the delinquent." *Id.*

Recognition of the particular dangers of switchblade knives was not limited to Congress. Indeed, around the same time the Federal Switchblade Act was enacted, this Court stated—citing some of the material that Congress had compiled in enacting the statute—that it is "settled beyond doubt that a switchblade knife is a dangerous weapon." *Fall v. Esso Standard Oil Co.*, 297 F.2d 411, 416-17 (5th Cir. 1961); *see also, e.g.*,

*Crowley Cutlery Co. v. United States*, 849 F.2d 273, 278 (7th Cir. 1988) ("Switchblade knives are more dangerous than regular knives because they are more readily concealable and hence more suitable for criminal use."). And through the present day, a large number of States and local jurisdictions prohibit or heavily regulate the carrying (or concealed carrying) of many or all automatic switchblades. *See* ROA.1279-80; *cf. Hollis v. Lynch*, 827 F.3d 436, 448-49 (5th Cir. 2016) (evaluating, among other things, the extent to which a particular weapon is regulated or banned in various jurisdictions in considering whether it is dangerous and unusual).

### B.    Plaintiffs' Contrary Arguments Are Unpersuasive

Against the backdrop of these interrelated historical traditions establishing the permissibility of Congress's regulation of automatic switchblades, plaintiffs briefly raise a mishmash of arguments. *See* Opening Br. 62-66, 74-81. None is persuasive.

1. At the outset, plaintiffs barely engage with the historical materials and principles related to the lack of any Second Amendment right to carry concealed or inherently concealable weapons. As explained, the robust historical traditions of banning concealed carry of weapons and of regulating—and, in some instances, prohibiting the possession or sale of—small concealable weapons make clear that the Federal Switchblade Act is constitutional. That is true both because the statute is properly understood as regulating weapons based on the inherent manner in which those weapons are carried and because, at the least, the statute reaches only a small class of concealable weapons that have long been subject to extensive regulation.

23

As to the many historical restrictions and prohibitions on concealed carry, plaintiffs initially try to discount those restrictions by claiming that they are not from the relevant "time period" and are "contradicted by" the practice of the Founding Era. Opening Br. 80. But that attempt fails at the threshold. The Supreme Court has thrice canvassed the relevant history and identified the historically grounded principle that the government may prohibit the concealed carry of arms. *See Rahimi*, 602 U.S. at 691; *Bruen*, 597 U.S. at 52; *Heller*, 554 U.S. at 626. And although many of the relevant restrictions were enacted in the decades after the Founding, plaintiffs nowhere identify any separate Founding Era tradition that "contradict[s]" those regulations or suggests that the Founders believed that such regulations would violate the Second Amendment.

Nor do plaintiffs advance their position when they explain (at 80) that the relevant laws regulated the manner of carrying arms rather than regulating the sale or possession of arms. That explanation misses the important point: In the relevant respects, the Federal Switchblade Act too reflects a regulation aimed at the manner in which arms are carried, because it regulates only a narrow class of inherently concealable weapons (while leaving less concealable versions of the same bladed weapons—such as fixed-blade knives—entirely unregulated). Indeed, in this respect the Federal Switchblade Act reflects regulation that "burdens the right" less than did the concealed carry regulations. *Rahimi*, 602 U.S. at 692. The statute does not generally prohibit carrying concealed or concealable automatic switchblades but instead only

imposes commercial restrictions on their sale and limited restrictions on possession in certain areas.

Plaintiffs fare no better when they confront the extensive history of regulating—in a variety of manners—small concealable weapons similar to the automatic switchblades at issue here. In attempting to discount that history, plaintiffs minimize the relevant historical through-line, claiming for example that the government has identified only nine relevant laws before 1885. Opening Br. 79. Many of plaintiffs' complaints are wrong on their own terms. For example, the relevant historical materials include many more than nine laws, *see supra* pp. 16-17 (citing academic literature identifying more than 200 laws)—not to mention the relevant precedent and secondary sources discussed above.

But more fundamentally, plaintiffs' approach to the question is misguided. The relevant inquiry is not simply a counting exercise to determine if there are enough historical regulations or a matching game to find a "historical twin" for the modern regulation. *Rahimi*, 602 U.S. at 692 (quotation omitted). Instead, the relevant analysis requires canvassing the historical sources to identify "the principles that underpin our regulatory tradition" and applying those principles "to modern circumstances." *Id.* (quotation omitted). Here, there is a robust historical tradition permitting the regulation in many different ways of small concealable weapons like Bowie knives, dirks, and daggers. And as is explained above, that historical tradition rests in substantial part on the principle, articulated in many of the relevant authorities, that

such weapons are not protected by the Second Amendment or state analogues because they are more suited for criminal misuse than for lawful purposes. That principle is reflected in the relevant authorities even if many States did not make the policy choice to entirely prohibit the possession of concealable weapons. *Cf. id.* at 739-40 (Barrett, J., concurring) (cautioning against "assum[ing] that founding-era legislatures maximally exercised their power to regulate"). And it more than suffices to justify the limited restrictions—on commercial manufacture and sale and on possession in specific areas—embodied in the Federal Switchblade Act.

2. Plaintiffs also fail to rebut the conclusion that the Federal Switchblade Act falls into the similarly robust historical tradition of regulating dangerous and unusual weapons—that is, those weapons that are not in common use for lawful purposes. In the main, plaintiffs argue (at 62, 65-66, 76-77) that automatic switchblades are not, in a colloquial sense, "dangerous" or "unusual" because millions of the weapons are in circulation, only five States ban their possession, and an automatic switchblade is similar to "a common pocket knife" that is used for lawful purposes.

But plaintiffs' arguments fail on all levels. As an initial matter, plaintiffs' explanation that automatic switchblades are similar to common pocket knives underscores the error in their position. To the extent that the relevant class of weapons is common pocket knives, then the Federal Switchblade Act's regulations, which are limited to only a subset of that class as defined by their configuration and mode of operation, operates not as a "ban[]"—or even a regulation—of an entire

"class of arms in common lawful use." Opening Br. 78 (quotation omitted). It instead operates as a limited regulation of a configuration and mode of the relevant class of weapons that Congress has determined is particularly dangerous—no relevantly different from, for example, regulations of pocket pistols, short-barreled shotguns, and machineguns. And plaintiffs nowhere identify any support for the notion that the Second Amendment confers upon them an unrestricted right to even particularly dangerous configurations of weapons.

Regardless, plaintiffs' focus on the number of automatic switchblades in circulation misses the mark. As explained, the relevant principle permits Congress to regulate weapons that are not in common use for lawful purposes. And in applying that principle to uphold Congress's regulation of other dangerous, concealable weapons like short-barreled shotguns, courts have focused not simply on the absolute number of the weapons in existence but instead on their potential for criminal misuse. *See supra* pp. 18-19. And that is the exact inquiry that Congress focused on in this context, as Congress investigated and concluded that automatic switchblades are uniquely adapted for criminal use and do not provide substantial advantages for lawful purposes when compared to other, less dangerous knives. *See* S. Rep. No. 85-1980, at 3. And Congress's conclusion in that regard is further supported by the fact that many States and other jurisdictions continue to heavily regulate automatic switchblades—not only the five States (and the District of Columbia) acknowledged by plaintiffs that

generally prohibit their possession but also the many other States and local

jurisdictions that impose restrictions short of total prohibition. *See supra* p. 23.[3]

### C.    Plaintiffs' Facial Challenge to Section 1243 Independently Fails

Even if the automatic switchblades regulated by the Federal Switchblade Act

were protected under the Second Amendment, plaintiffs' challenge to Section 1243

would fail. In challenging that provision, plaintiffs assert a facial claim, but the

provision plainly has constitutional applications. Plaintiffs thus cannot succeed on

their challenge.

1. Section 1243 generally prohibits the manufacture, sale, and possession of

automatic switchblades "within Indian country" or "within the special maritime and

territorial jurisdiction of the United States." 15 U.S.C. § 1243. As plaintiffs made clear

in district court, their challenge to this provision is a facial challenge. Rather than

---

[3] The government no longer disputes that the district court's judgment as to Section 1242 should not be affirmed on the ground adopted by the district court: that Section 1242 does not "serve[] as 'a *de facto* prohibition on possession' of switchblade knives." ROA.1547 (quoting *McRorey v. Garland*, 99 F.4th 831, 840 (5th Cir. 2024)). *McRorey* involved a background-check law that imposed only a modest burden on the ability of certain individuals to purchase firearms; by contrast, Section 1242 generally prohibits the interstate sale of automatic switchblades altogether. Thus, in the government's view, Section 1242 operates more like "a complete ban of" one of the "most common way[s] for" individuals to acquire automatic switchblades and therefore does not come within *McRorey*'s framework. *Reese v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 127 F.4th 583, 590 n.2 (5th Cir. 2025); *cf., e.g.*, Opening Br. 45 (averring that plaintiffs are not aware of any switchblade manufacturer operating in Oklahoma, where one of the plaintiffs resides). Nonetheless, the district court's dismissal of plaintiffs' claim challenging Section 1242 should be affirmed on the alternative grounds explained in this brief.

limiting their challenge to, or even advancing particularized arguments hinging on, specific applications of Section 1243, plaintiffs claimed that Section 1243 was unconstitutional in its entirety and sought relief wholly prohibiting the government from enforcing Section 1243. *See* ROA.49-54; *cf. John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (in determining whether a claim is "properly viewed as a facial or as-applied challenge," courts consider whether "plaintiffs' claim and the relief that would follow" "reach beyond the particular circumstances of these plaintiffs"). Thus, as plaintiffs properly accepted in district court, for their claim against Section 1243 to succeed, they "must show the [statute] is facially unconstitutional." ROA.1463.

As the Supreme Court recently reaffirmed, plaintiffs advancing a facial challenge are required to clear a "very high bar." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). To prevail, the plaintiffs must "establish[] that no set of circumstances exists under which the law would be valid" or that "the law lacks a plainly legitimate sweep." *Id.* (alteration and quotation omitted). Conversely, for the government "to prevail," it "need only demonstrate that [the challenged law] is constitutional in some of its applications." *Rahimi*, 602 U.S. at 693.

The Supreme Court has explained that facial challenges are "hard to win" for "a host of good reasons." *NetChoice*, 603 U.S. at 723. Such challenges "threaten to short circuit the democratic process by preventing duly enacted laws from being implemented in constitutional ways." *Id.* (quotation omitted). They "run contrary to the fundamental principle of judicial restraint" that "courts should neither anticipate a

question of constitutional law in advance" nor "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008) (quotation omitted). And the resolution of questions in a facial posture "los[es] the lessons taught by the particular, to which common law method normally looks." *Sabri v. United States*, 541 U.S. 600, 608-09 (2004).

2. Under that framework, plaintiffs cannot succeed on their facial challenge because Section 1243 plainly has constitutional applications. Among other things, Section 1243 prohibits the manufacture, sale, and possession of automatic switchblades in the "special maritime and territorial jurisdiction of the United States," 15 U.S.C. § 1243; *see also id.* (incorporating definition of "special maritime and territorial jurisdiction" in 18 U.S.C. § 7). Some of the places to which that prohibition attaches include certain land acquired by, and under the jurisdiction of, the United States, 18 U.S.C. § 7(3), such as certain military bases, courthouses, and federal prisons, *see, e.g.*, *United States v. Reff*, 479 F.3d 396, 400-01 (5th Cir. 2007) (per curiam) (military base); *United States v. Jones*, 365 F.2d 675, 676 n.1 (2d Cir. 1966) (courthouse); *United States v. Love*, 20 F.4th 407, 412 (8th Cir. 2021) (prison); certain aircraft, 18 U.S.C. § 7(5); and the premises of American diplomatic and military missions abroad, *id.* § 7(9)(A).

As the Supreme Court has made clear, Congress may validly prohibit the possession of arms protected by the Second Amendment in certain sensitive places.

30

Thus, in *Heller*, the Supreme Court explained that "nothing in [the Court's] opinion should be taken to cast doubt" on "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." 554 U.S. at 626. And in *Bruen*, the Supreme Court elaborated: "Although the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions." 597 U.S. at 30. Thus, the Court "assume[d] it settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment," and the Court explained that "courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." *Id.*

Under those principles, Section 1243's prohibition plainly may be constitutionally applied in a number of circumstances. The prohibition applies to certain federally owned land, such as some courthouses and other government buildings, that are the exact locations described in *Heller* and *Bruen* as the paradigmatic sensitive places where protected arms may be forbidden. Similarly, plaintiffs could not seriously argue that the Second Amendment protects the right to carry automatic switchblades on aircraft or in American embassies, even assuming the Amendment applies extraterritorially. So too with military bases, one of the sensitive locations with which Congress was most concerned in enacting Section 1243. *See supra* p. 3; *cf. Greer*

*v. Spock*, 424 U.S. 828, 838 (1976) (explaining that the First Amendment does not provide any "generalized constitutional right to make political speeches or distribute leaflets" on a military base).

Thus, given the historical tradition permitting Congress to prohibit the possession of arms in sensitive places, it is clear that Section 1243 has a number of constitutional applications. And indeed, nowhere in their opening brief do plaintiffs grapple with the tradition of sensitive-place regulations. Nor do they attempt to explain how they could have a constitutional right to possess automatic switchblades (for example) in courthouses, on military bases, in federal prisons, and on aircraft. Thus, their facial challenge to Section 1243 cannot succeed.

# CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

RYAN R. RAYBOULD
  *United States Attorney*

MICHAEL S. RAAB

  *s/ Sean R. Janda*
SEAN R. JANDA
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3388*
  *sean.r.janda@usdoj.gov*

December 2025

**CERTIFICATE OF SERVICE**

I hereby certify that on December 22, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*s/ Sean R. Janda*
Sean R. Janda

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 7862 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

                                         *s/ Sean R. Janda*
                                         Sean R. Janda

**ADDENDUM**

# TABLE OF CONTENTS

15 U.S.C. § 1241 ...........................................................................................A1

15 U.S.C. § 1242 ...........................................................................................A1

15 U.S.C. § 1243 ...........................................................................................A1

15 U.S.C. § 1244 ...........................................................................................A2

18 U.S.C. § 7...................................................................................................A2

## 15 U.S.C. § 1241 - Definitions

### § 1241 – Definitions

As used in this chapter—

. . .

**(b)** The term "switchblade knife" means any knife having a blade which opens automatically—

**(1)** by hand pressure applied to a button or other device in the handle of the knife, or

**(2)** by operation of inertia, gravity, or both.


## 15 U.S.C. § 1242

### § 1242 – Introduction, manufacture for introduction, transportation or distribution in interstate commerce; penalty

Whoever knowingly introduces, or manufactures for introduction, into interstate commerce, or transports or distributes in interstate commerce, any switchblade knife, shall be fined not more than $2,000 or imprisoned not more than five years, or both.


## 15 U.S.C. § 1243

### § 1243 – Manufacture, sale, or possession within specific jurisdictions; penalty

Whoever, within any Territory or possession of the United States, within Indian country (as defined in section 1151 of title 18), or within the special maritime and territorial jurisdiction of the United States (as defined in section 7 of title 18), manufactures, sells, or possesses any switchblade knife, shall be fined not more than $2,000 or imprisoned not more than five years, or both

**15 U.S.C. § 1244**

**§ 1244 – Exceptions**

Sections 1242 and 1243 of this title shall not apply to—

. . .

**(5)** a knife that contains a spring, detent, or other mechanism designed to create a bias toward closure of the blade and that requires exertion applied to the blade by hand, wrist, or arm to overcome the bias toward closure to assist in opening the knife.


**18 U.S.C. § 7**

**§ 7 – Special maritime and territorial jurisdiction of the United States defined**

The term "special maritime and territorial jurisdiction of the United States", as used in this title, includes:

**(1)** The high seas, any other waters within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State, and any vessel belonging in whole or in part to the United States or any citizen thereof, or to any corporation created by or under the laws of the United States, or of any State, Territory, District, or possession thereof, when such vessel is within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State.

**(2)** Any vessel registered, licensed, or enrolled under the laws of the United States, and being on a voyage upon the waters of any of the Great Lakes, or any of the waters connecting them, or upon the Saint Lawrence River where the same constitutes the International Boundary Line.

**(3)** Any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building.

**(4)** Any island, rock, or key containing deposits of guano, which may, at the discretion of the President, be considered as appertaining to the United States.

**(5)** Any aircraft belonging in whole or in part to the United States, or any citizen thereof, or to any corporation created by or under the laws of the United States, or any State, Territory, district, or possession thereof, while such aircraft is in flight over the high seas, or over any other waters within the admiralty and

maritime jurisdiction of the United States and out of the jurisdiction of any particular State.

**(6)** Any vehicle used or designed for flight or navigation in space and on the registry of the United States pursuant to the Treaty on Principles Governing the Activities of States in the Exploration and Use of Outer Space, Including the Moon and Other Celestial Bodies and the Convention on Registration of Objects Launched into Outer Space, while that vehicle is in flight, which is from the moment when all external doors are closed on Earth following embarkation until the moment when one such door is opened on Earth for disembarkation or in the case of a forced landing, until the competent authorities take over the responsibility for the vehicle and for persons and property aboard.

**(7)** Any place outside the jurisdiction of any nation with respect to an offense by or against a national of the United States.

**(8)** To the extent permitted by international law, any foreign vessel during a voyage having a scheduled departure from or arrival in the United States with respect to an offense committed by or against a national of the United States.

**(9)** With respect to offenses committed by or against a national of the United States as that term is used in section 101 of the Immigration and Nationality Act—

    **(A)** the premises of United States diplomatic, consular, military or other United States Government missions or entities in foreign States, including the buildings, parts of buildings, and land appurtenant or ancillary thereto or used for purposes of those missions or entities, irrespective of ownership; and

    **(B)** residences in foreign States and the land appurtenant or ancillary thereto, irrespective of ownership, used for purposes of those missions or entities or used by United States personnel assigned to those missions or entities.

    Nothing in this paragraph shall be deemed to supersede any treaty or international agreement with which this paragraph conflicts. This paragraph does not apply with respect to an offense committed by a person described in section 3261(a) of this title.