No. 25-10754

# In the United States Court of Appeals
# For the Fifth Circuit

KNIFE RIGHTS, INCORPORATED.; RUSSELL ARNOLD; RGA Auction Solution, doing business as Firearm Solutions; JEFFREY FOLLODER; MOD Specialties; EVAN KAUFMANN; ADAM WARDEN; RODNEY SHEDD,

*Plaintiffs-Appellants,*

v.

PAMELA BONDI, U.S. ATTORNEY GENERAL; UNITED STATES DEPARTMENT OF JUSTICE,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of Texas, Fort Worth Division

## APPELLANTS' REPLY BRIEF

John W. Dillon (Cal. State Bar No. 296788)
DILLON LAW GROUP, APC
2647 Gateway Road
Suite 105, No. 255
Carlsbad, California 92009
Email: jdillon@dillonlawgp.com
Telephone: (760) 642-7150
Fax: (760) 642-7151

*Counsel for Appellants*

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................... i

TABLE OF AUTHORITIES .......................................................... iii

INTRODUCTION AND SUMMARY OF ARGUMENT ............................ 1

ARGUMENT ............................................................................. 7

I.    THE AG'S CONCESSIONS CONFIRM THIS CASE
      MUST BE DECIDED ON THE MERITS ...................................... 7

      A. Standing Is No Longer in Dispute as to Section
         1242 or 1243 .................................................................. 7

      B. The AG Now Admits Section 1242 is a "Complete Ban"
         on a Primary Channel of Acquisition .................................. 8

      C. Switchblades are Arms and the Conduct is Protected
         Under the Second Amendment. ............................................ 9

II.   THE AG INVENTS A "DANGEROUS AND UNUSUAL"
      DOCTRINE AND IGNORES UNDISPUTED EVIDENCE OF
      COMMON USE ................................................................... 10

      A. There is no Stand Alone "Dangerous and Unusual" Test;
         Arms in Common Use Are Protected ................................... 10

      B. The AG's Criminal-Misuse Narrative is Not a Valid
         Consideration Under the Second Amendment ........................ 13

      C. The AG's "Inherently Concealable" Theory Lacks Merit. ........ 15

      D. The AG's NFA Analogy Does Not Justify the FSA's
         Prohibitions, Nor Displace the "In Common-Use"
         Record. ......................................................................... 16

      E. The AG Does Not Establish That Switchblades are Not in
         Common Use .................................................................. 17

III.   EVEN IF THE COURT CONCLUDES THAT THE AG IS
       ALLOWED TO REDO THE HISTORICAL ANALYSIS,
       BRUEN REQUIRES RELEVANT HISTORICAL
       ANALOGUES, WHICH THE AG FAILS TO PROVIDE .............. 19

IV.    THE AG'S CONCEALED-CARRY AUTHORITIES CANNOT
       JUSTIFY THE FSA'S PROHIBITORY SCHEME ........................ 22

       A. Concealed Carry Statutes and Case Law Are Insufficient ....... 23

       B. The AG's Other Historical Support is Misconstrued ............... 24

V.     THE AG'S "FACIAL CHALLENGE/SENSITIVE PLACES"
       SECTION 1243 DEFENSE FAILS. ............................................... 30

VI.    CONCLUSION ................................................................. 34

CERTIFICATE OF SERVICE ................................................. 35

CERTIFICATE OF COMPLIANCE ....................................... 36

# TABLE OF AUTHORITIES

**Cases**

*Ayotte v. Planned Parenthood of N. New England*,
  546 U.S. 320 (2006) ............................................................ 34

*Baird v. Bonta*, No. 24-565, (9th Cir. Jan. 2, 2026) ......................... 21, 33

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) ................................ 10-12

*Commonwealth v. Canjura*, 494 Mass. 508 (2024) ................................ 10

*Crowley Cutlery Co. v. United States*,
  849 F.2d 273 (7th Cir. 1988) ............................................... 17

*Dep't of Commerce v. U.S. House of Representatives*,
  525 U.S. 316, 330 (1999) ................................................... 7

*District of Columbia v. Heller*, 554 U.S. 570 ................................. *Passim*

*Fall v. Esso Standard Oil Co.*, 297 F.2d 411 (5th Cir. 1961) ................. 17

*Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016) ............................... 18

*Jackson Women's Health Org. v. Dobbs*,
  945 F.3d 265 (5th Cir. 2019) ............................................... 33

*Konigsberg v. State Bar of Cal.*, 366 U.S. 36 (1961) ......................... 19

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ........................... 3, 14

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) ................................ 32, 33

*New York State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. 1 (2022) .......................................................... *Passim*

*Nunn v. State*, 1 Ga. 243 (1846) ............................................. 21

*Reese v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*,
  127 F.4th 583 (5th Cir. 2025) .............................................. 2

*Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023) ............................................ 10

*Umphress v. Hall*, 133 F.4th 455 (5th Cir. 2025) ..................................... 7

*United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023) ............................ 9

*United States v. Rahimi*, 602 U.S. 680 (2024) ............... 19, 28, 30, 33, 34

*United States v. Reese*, 92 U.S. 214 (1876) ............................................. 32

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ............................................................................ 7

## Federal Switchblade Act

15 U.S.C. § 1241 ........................................................................................ 1

15 U.S.C. §§1242 and 1243 ................................................................ *Passim*

15 U.S.C. § 1243 ................................................................................ *Passim*

18 U.S.C. § 7 ............................................................................................ 31

## U.S. Constitution

Second Amendment .......................................................................... *Passim*

## Other Authorities

David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900,* 50 J. LEGIS. 223 (2024). .......................................... 24

2 J. Kent, Commentaries on American Law *340, n. 2 (O. Holmes ed., 12th ed. 1873) ........................................................................................ 26

Patterson, *Facial Confusion*, Harv. J.L. & Pub. Pol'y: Per Curiam No. 19, at 6–7 (Fall 2025) .............................................................................. 32

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Attorney General and its department (collectively, the "AG") retreats from the district court's dismissal and concedes several dispositive issues that materially narrow the scope of this appeal. Notably, the AG "no longer disputes that the individual and retail plaintiffs have standing to challenge Sections 1242 and 1243" of the Federal Switchblade Act (FSA, 15 U.S.C. § 1241 *et seq.*). Response Brief ("Response") at 11 n.2. The AG likewise implicitly acknowledges that Knife Rights has associational standing to challenge both provisions. *Id.* And because the AG concedes standing as to some Plaintiffs, it acknowledges "this Court has jurisdiction to reach the merits of plaintiff's claims." *Id.*, at 12, n.2.

On the merits, the AG does not dispute that automatically opening knives ("switchblades") are "arms" within the Second Amendment's plain text. In doing so, the AG effectively concedes the threshold inquiry governing Second Amendment challenges—whether "the Second Amendment's plain text covers an individual's conduct." *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022). The AG acknowledges that the FSA burdens constitutionally protected conduct but attempts to

justify the FSA through historically analogous arms regulations. Response, at 10–28. The AG's brief is now devoted largely to the lone argument that that there are relevant historically analogous arms regulations justifying the FSA's ban on switchblades (and there are none).

The AG also "no longer disputes" the district court's erroneous ruling that Section 1242 of the FSA "does not 'serve[] as '*de facto* prohibition on possession' of switchblade knives." Response, at 28, n.3. The AG now concedes that "Section 1242 generally prohibits the interstate sale of . . . switchblades altogether," and therefore, "operates more like 'a complete ban of' one of the 'most common way[s]'" to acquire switchblades. *Id.*, citing *Reese v. Bureau of Alcohol, Tobacco, Firearms, & Explosives,* 127 F.4th 583, 590 n.2 (5th Cir. 2025).

The AG's belated concessions collectively confirm that: (1) Appellants have standing to challenge both Sections 1242 and 1243 of the FSA; (2) switchblades are "arms" under the Second Amendment; (3) the challenged conduct is presumptively protected; and (4) the burden rests on the government to establish that the FSA's sweeping bans and prohibitions are consistent with this Nation's historical tradition of arms

regulation. *Bruen*, 597 U.S. at 24. Appellants ask this Court to apply the Common Use test, reverse the district court and declare the FSA unconstitutional on the merits.[1]

On the merits, the AG asks this Court to accept extraordinary propositions: that switchblades—indisputably "arms" under the Second Amendment—receive no constitutional protection because (1) some 19th-century *states* regulated *concealed carry* of certain weapons, and (2) legislatures historically could restrict weapons characterized as "dangerous and unusual," in which the AG attempts to equate "switchblades" with modern National Firearms Act (NFA)-regulated weapons like machine guns and sawed-off shotguns. At bottom, the AG's historical inquiry is driven not by any relevant historical tradition of analogous arms regulations but by policy assertions that switchblades are "adapted for criminal misuse" and "inherently adapted for concealability." Response, at 8. The Supreme Court has rejected such interest-balancing to define the scope of the Second Amendment. *See District of Columbia v. Heller*, 554 U.S. 570, 634; *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010); *Bruen*, 597 U.S. at 19-20. And

---

[1] Appellants are not challenging the FSA's importation restrictions.

3

Appellants have demonstrated that the AG's historical inquiry fails for at least four independent reasons. Appellants' Opening Brief on Appeal ("Op. Br.") at 72-81.

**First**, under *Heller*, the Common Use test is fully dispositive of the historical inquiry in arms ban cases. No further historical inquiry is appropriate. The Supreme Court already conducted the historical analysis relevant to arms bans in *Heller*, and the result was the Common Use test. The AG does not get to redo that historical analysis to try to introduce new claims of historical tradition to defend an arms ban.

**Second**, the AG mistakenly claims there is a distinct Supreme Court "dangerous and unusual" doctrine. Not so. *Heller* explains that arms "in common use" for lawful purposes are protected, and that the historical tradition of restricting "dangerous and unusual weapons" does not authorize bans on commonly possessed arms. *Heller*, 554 U.S. at 627; *Bruen*, 597 U.S. at 21. The AG attempts to ignore this rule by creating a policy-based interest balancing inquiry already foreclosed under *Bruen*, focused on alleged criminal misuse or concealability. Response, at 18–23. There is no "criminal misuse" or "concealability" rule. Put simply, the Supreme Court's prohibition on interest balancing means that courts

*may not consider* criminal misuse as part of any Second Amendment analysis.

Appellants introduced unrebutted evidence that switchblades are lawfully possessed "in the millions;" they are broadly legal across most jurisdictions; and they are part of a common category of one-hand-opening folding pocketknives. Op. Br. at 75-81. Under *Heller* and *Bruen*, arms in common lawful use cannot be banned—full stop. *Heller,* 554 U.S. at 624-625, 627; *Bruen,* 597 U.S. at 4-5, 21, 47.

**Third,** even if this Court disagrees with Appellants and allows the AG to reargue the historical analysis, the AG still fails to meet its burden, as its concealed-carry authorities address only *the manner of public carry*, largely leaving lawful purchase, sale, possession, transfer, and open carry intact. Response, at 10-18; s*ee also* ROA.131-149, 1448-1464. Those regulations are not analogous under *Bruen*'s "how and why" inquiry to the FSA's sweeping prohibitions. By the AG's own description, Section 1242 operates as a "complete ban" on a principal channel of acquiring the arm. Response, at 28 n.3. There is no historical tradition of banning "concealable arms." If there were, *Heller* would have been decided differently.

**Fourth**, the AG misstates how facial challenges work and repackages Section 1243 as a "sensitive places" law, misconstruing both the facial challenge doctrine and the statute. Response, at 29-32. Section 1243 is not a narrow restriction tied to discrete government facilities; it criminalizes the manufacture, sale, and possession of switchblades across an expansive jurisdiction that covers roughly one-third of the country. Op. Br. at 52; ROA.1486-1489, 1501-1504. The AG cannot salvage this sweeping prohibition by pointing to courthouses and military bases— especially where those locations already impose separate, distinct restrictions on weapons generally. This is because the FSA does not ask whether a place is a courthouse or prison, it asks only whether a place is federal or "Indian Country" lands. The FSA's prohibition on all federal lands and Indian Country is what is facially invalid.

Accordingly, Appellants ask the Court to reverse the district court, invalidate the FSA's sweeping prohibitions under the Second Amendment, and instruct the District Court to enter judgment for Appellants.

# ARGUMENT

## I. THE AG'S CONCESSIONS CONFIRM THIS CASE MUST BE DECIDED ON THE MERITS

### A. Standing Is No Longer in Dispute as to Section 1242 or 1243.

The AG expressly states it "no longer disputes" that the Individual and Retail Plaintiffs have standing. Response, at 11, n.2. The district court likewise held that the Individual and Retail Plaintiffs have Article III standing to challenge Section 1242 under binding Fifth Circuit precedent. *See Umphress v. Hall*, 133 F.4th 455 (5th Cir. 2025) (per curiam); ROA.1536–1540; Op. Br., 36–38. And though the district court rejected Knife Rights' organizational standing, it held that Knife Rights has associational standing to challenge Section 1242 on behalf of its members. ROA.1541–1542; Response, at 12–13. In any event, "the standing requirement is satisfied if any one plaintiff has standing." Op. Br., 48–49 (citing *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 330 (1999)); *see also Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 & n.9 (1977).

Appellants also independently establish Section 1243 standing through Plaintiff Shedd, whose sworn declaration alleges Section 1243 prohibits his lawful possession where he resides on the Muscogee (Creek)

Nation tribal reservation, forcing him to surrender his switchblade or risk criminal liability. ROA.211–214; Op. Br. 44–46. The district court did not meaningfully address Shedd's Section 1243 injury. ROA.1542–1543. The AG's only residual objections—retailer third-party standing and Knife Rights' organizational standing—appear only in footnotes, and the AG correctly acknowledges this Court "need not resolve" them because standing exists and the Court "has jurisdiction to reach the merits." Response, at 7 n.1, 11–12 n.2.

## B.  The AG Now Admits Section 1242 is a "Complete Ban" on a Primary Channel of Acquisition.

The district court dismissed the Section 1242 claim on the ground that the statute does not "serve[] as 'a de facto prohibition on possession'" because switchblades remain "widely available in intrastate commerce," and thus is not an "outright ban." ROA.1547-1548. It therefore granted dismissal and denied Appellants' summary judgment motion as "moot." ROA.1529, 1548-1549; *see also* Op. Br. at 61–67.

The AG now abandons that rationale. It "no longer disputes" that affirmance cannot rest on the district court's premise and concedes Section 1242 "generally prohibits the interstate sale of automatic switchblades altogether," thereby operating like "a complete ban" on "one

8

of the most common way[s]" law-abiding citizens acquire them. Response, at 28 n.3 (citing ROA.1547; *Reese,* 127 F.4th at 590 n.2). That concession eliminates the district court's sole basis for dismissal. ROA.1547-1548. It also confirms that the district court misapplied *Reese*, which the court acknowledged invalidated a law barring "the most common way to secure" a firearm for the affected class. ROA.1545-1549. Because the district court never addressed the merits and denied summary judgment as "moot" (ROA.1548-1549), this Court should reverse and remand with instructions to enter summary judgment in favor of Plaintiffs. Op. Br. at 60–61.

## C.     Switchblades are Arms and the Conduct is Protected Under the Second Amendment.

There is no dispute that the switchblades regulated by the FSA are "arms" within the Second Amendment's meaning. The Supreme Court's decisions confirm the Second Amendment protects "bearable arms," including modern instruments commonly possessed by law-abiding citizens for lawful purposes, and this Court has reiterated that constitutional protections apply beyond the Founders' specific expectations. *See United States v. Daniels*, 77 F.4th 337, 341–42 (5th Cir. 2023). Switchblades are plainly bearable arms—folding pocketknives

9

designed for everyday carry. ROA.140–142, 850, 853–854, 857–860, 952, 979–980, 1001–1002, 1008–1009. Other courts have likewise recognized knives as "arms." *See, e.g.*, *Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023); *Caetano v. Massachusetts*, 577 U.S. 411 (2016) (per curiam); *Commonwealth v. Canjura*, 494 Mass. 508 (2024). The AG does not argue otherwise and instead proceeds directly to the merits—confirming the burden rests with the government under *Heller's* Second Amendment analysis. Response, at 10–28.

## II. THE AG INVENTS A "DANGEROUS AND UNUSUAL" DOCTRINE AND IGNORES UNDISPUTED EVIDENCE OF COMMON USE

The AG asserts that switchblades are "dangerous and unusual" and analogizes them to NFA weapons, including short-barreled shotguns. But that framing conflicts with Supreme Court precedent and, critically, disregards the record evidence.

### A. There is no Stand Alone "Dangerous and Unusual" Test; Arms in Common Use Are Protected.

*Heller* recognized that arms "in common use" for lawful purposes may not be prohibited, and that the historical tradition of restricting "dangerous and unusual weapons" does not justify bans on commonly

possessed arms. *Heller*, 554 U.S. at 627. *Bruen* reaffirmed that point, explaining that colonial-era restrictions prove "at most" that legislatures "sometimes prohibited" the carry of "dangerous and unusual weapons," but such history provides "no justification" for restricting the public carry of arms "unquestionably in common use today." *Bruen*, 597 U.S. at 47 (citing *Heller*, 554 U.S. at 627, 629).

In *Caetano*, Justice Alito issued a concurring opinion, joined by Justice Thomas, explaining that, in determining whether an arm is protected under the Second Amendment, "the pertinent Second Amendment inquiry is whether stun guns are commonly possessed by law-abiding citizens for lawful purposes today." *Id*. 577 U.S. at 420.

In *Heller*, and reaffirmed in *Bruen*, the Supreme Court held that an arms ban is unconstitutional unless the government can show that the arms are not "typically possessed by law abiding citizens for lawful purposes" that is, "in common use at the time." While this conclusion was supported by the historical tradition of some states prohibiting arms that were *both* "dangerous and unusual" (*Heller*, 554 U.S. at 625-27; *Bruen*, 597 U.S. at 21), "dangerous and unusual" is not itself a test. The only inquiry for arms bans is whether they are "typically possessed by law

11

abiding citizens for lawful purposes." In *Heller* the Court performed the complete historical analysis for all arms bans. No further historical inquiry is appropriate.

Consequently, if an arm is commonly possessed and used by lawful citizens, it cannot be unusual. Thus, arms in "common use" for lawful purposes cannot be banned according to *Heller's* historical analysis of arms bans. *Heller*, 554 U.S. at 627; *Bruen*, 597 U.S. at 4-5, 21, 46-49; *see also Caetano,* 577 U.S. 411, at 420 ("The more relevant statistic is that '[h]undreds of thousands of Tasers and stun guns have been sold to private citizens,' who it appears may lawfully possess them in 45 States.").

Appellants submitted record evidence that switchblades are "in common use" under multiple metrics, including numerical and jurisdictional commonality. Op. Br. at 76-77 (citing ROA.134-142, 137-141, 142). Appellants' record further establishes widespread lawful uses by ordinary citizens. *Id.* at p. 76–77 (citing ROA.320-324, 404, 536-537, 763, 797, 836, 842-843, 857-860, 859, 979-980, 1001-1002, 1008-1009).

The AG does not rebut that record. It does not submit competing data or opposing expert evidence. Instead, the AG offers legislative-era

conclusions, policy assertions, and urges the Court to discount Appellants' evidence. Response, at 18-23. That approach conflicts with *Heller* and *Bruen*.

### B.    The AG's Criminal-Misuse Narrative Is Not a Valid Consideration Under the Second Amendment.

The AG asserts that switchblades are "uniquely adapted for criminal misuse," and relies on 1958 legislative materials to make that claim. Response, at 21-22. The AG quotes the Senate Report's assertion that switchblades have "no legitimate use" and are "almost exclusively the weapon of the thug and the delinquent." *Id.*, at 22. These are policy conclusions. They do not answer the doctrinal question under *Heller* and *Bruen*, namely, whether switchblades are in common use by law-abiding citizens for lawful purposes. *See Heller*, 554 U.S. at 627; *Bruen*, 597 U.S. at 39.

The focus on the use of arms by criminals is simply impermissible interest balancing plainly prohibited under the Second Amendment. As previously explained, the Second Amendment inquiry considers *only* possession and use by the law-abiding. Criminal misuse is not relevant to the analysis.

*Bruen* acknowledged that both *Heller* and *McDonald* "expressly rejected the application of any "judge-empowering 'interest-balancing inquiry' that 'asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.'" *Bruen*, 597 U.S. at 22.

The "common use" inquiry asks *solely* what the law-abiding do, that is, what arms *they* choose to possess for lawful purposes. That criminals may also misuse them for nefarious purposes is irrelevant for Second Amendment purposes. *See Heller*, 554 U.S. at 698 (Breyer, J., dissenting).

Even so, the AG's own contemporaneous federal evidence *undermines* its claims. The Department of Justice explicitly stated that the proposed legislation would prohibit "an item that is *not inherently dangerous*" and "requires the introduction of a wrongful human element to make it so." Op. Br. at 77 (citing ROA.768–769, 771) (emphasis added).

The AG also never supplies evidence of any present-day "acute" criminal misuse. It relies on legislative assertions from 1958—*nearly seven decades ago*. Response, at 22.[2] That is not a *Bruen*-compliant

---

[2] These criminal-use assertions are, in fact, "demonstrably false." See ROA.797.

substitute for the required historical-analogue showing, and it is not a rebuttal to Appellants' record proof of widespread lawful use. Op. Br. at 76-77. The record is *devoid* of any criminal misuse of switchblades from 1958 to the present day.

### C. The AG's "Inherently Concealable" Theory Lacks Merit.

The AG continues its policy arguments, claiming the FSA targets "dangerous and unusual" knives "inherently adapted for concealability" and leaves "functionally identical—but less concealable—knives with fixed blades" unregulated.[3] Response, at 20. The AG continues to incorrectly apply the concept of "dangerous and unusual" with this unsupported claim.

Concealability turns on size and profile. A switchblade of a given length is no more concealable than any other folding knife of the same length. ROA.859, 978-980, 1008-1009. The AG does not explain how the mechanism of opening changes concealability. Appellants uncontested expert evidence establishes that switchblades are no more concealable, nor are they more dangerous, than any other folding pocketknife. Op. Br.

---

[3] There is no evidence in the record that supports the assertion that switchblades are "inherently adapted for concealability."

at 77 (citing ROA.859, 978–980, 1008–1009). Moreover, the AG's "defining feature" narrative — that the blade is "concealed … up until the moment the weapon may be used" — describes virtually *every* folding knife. Response, at 21. And this unsupported assertion has been explicitly contradicted by expert evidence.[4] ROA.859, 978-980, 1008-1009. *All folding knives store the blade inside the handle until opened.*

### D. The AG's NFA Analogy Does Not Justify the FSA's Prohibitions, Nor Displace the "In Common-Use" Record.

The AG analogizes switchblades to NFA-regulated weapons and cites cases addressing short-barreled rifles and shotguns. Response, at 18–19. Those authorities turn on the assumption that the regulated NFA weapons are *not in common use for lawful purposes. Id.*, at 19-20.

*Heller* explicitly stated, "We therefore read *Miller* to say *only* that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens *for lawful purposes…" Heller*, 554 U.S. at 625 (emphasis added). Here, Appellants submitted evidence that

---

[4] Appellants' experts also disprove any allegation that switchblades open any faster than other knives, as many non-switchblade knives open as fast or faster than a switchblade, including a fixed blade knife, which does not need to be opened. ROA.856-857, 1009.

switchblades are commonly owned, widely lawful, and used for lawful purposes. Op. Br. at 76–77 (citing ROA.134-142, 142, 320-324, 404, 536-537, 763, 797, 836, 842-843, 857-860, 859, 979-980, 1001-1002, 1008-1009). The AG has no contrary evidence.

The AG's analogy also fails as to the underlying mechanism. The AG's NFA discussion concerns what are described as taxation and registration regimes.[5] Response, at 18–19. Sections 1242 and 1243 of the FSA are prohibitory bans. They ban interstate introduction and distribution and prohibit manufacture, sale, and possession in vast areas of this country. The AG concedes this fact. *See* Response, at 10.

### E.    The AG Does Not Establish That Switchblades Are Not in Common Use

The AG cites a 1961 Fifth Circuit statement that it is "settled beyond doubt that a switchblade knife is a dangerous weapon," and a Seventh Circuit statement that switchblades are "more dangerous" because "more readily concealable." Response, at 22–23 (citing *Fall v. Esso Standard Oil Co.*, 297 F.2d 411, 416–17 (5th Cir. 1961); *Crowley Cutlery Co. v. United States*, 849 F.2d 273, 278 (7th Cir. 1988)). Those

---

[5] Appellants do not concede that NFA restrictions are tax-and-registration measures, or that they are constitutional under *Heller* and *Bruen*.

pre-*Heller* statements do not resolve the question under the controlling Second Amendment case law, especially whether switchblades are "in common use" by law-abiding citizens for lawful purposes.

The AG also invokes modern state and local restrictions and cites *Hollis* to suggest widespread regulation is relevant. Response, at 23 (citing ROA.1279-80; *Hollis v. Lynch*, 827 F.3d 436, 448–49 (5th Cir. 2016)). But this regulatory patchwork does not establish lack of common use particularly where Appellants' record shows switchblades are lawful in the overwhelming majority of states and widely possessed. (Op. Br. at 76–77 (citing ROA.142, 320-324, 134-142)). Under *Heller* and *Bruen*, the common-use showing forecloses the AG's attempt to place switchblades outside the Second Amendment.

The AG's "dangerous and unusual" argument is ultimately a policy defense. It rests on legislative-era assertions about delinquency, concealability, and criminal misuse. Response, at 20–23. That is not the test. Under *Heller*, arms may not be banned if they are typically possessed by law-abiding citizens for lawful purposes. *Heller*, 554 U.S. at 624-625.

Here, Appellants made a record-based showing that switchblades are arms in common use for lawful purposes Op. Br. at 76–77. The AG does not rebut that showing. And it cannot convert "dangerous and unusual" into a means-end inquiry.

## III. EVEN IF THE COURT CONCLUDES THAT THE AG IS ALLOWED TO REDO THE HISTORICAL ANALYSIS, *BRUEN* REQUIRES RELEVANT HISTORICAL ANALOGUES, WHICH THE AG FAILS TO PROVIDE

The Common Use test is fully dispositive of arms ban cases such as this one. However, if this Court concludes otherwise, because switchblades are "arms" under the Second Amendment's plain text and the challenged conduct involves the manufacture, sale, acquisition, and possession of those arms, "the Constitution presumptively protects that conduct," and "the government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearms regulation." *Bruen*, 597 U.S. at 24; *see also United States v. Rahimi*, 602 U.S. 680, 691 (2024). Stated differently, the government must "affirmatively prove that [the challenged] regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," and only then may a court conclude the conduct falls outside the Second Amendment's "unqualified command." *Bruen*, 597

19

U.S. at 19, 24 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)). That burden cannot be discharged through interest-balancing or means-end scrutiny. *Bruen*, 597 U.S. at 19–20, 22–24; *Heller*, 554 U.S. at 634.

*Bruen* also makes clear that the relevant inquiry is anchored in history as understood at the Founding. "Not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.' […] "[t]he Second Amendment was adopted in 1791." *Bruen*, 597 U.S. at 34 (citing *Heller*, 554 U.S. at 634–35). Thus, courts should not give post-enactment history "more weight than it can rightly bear," and "to the extent later history contradicts what the text says, the text controls." *Bruen*, 597 U.S. at 35–36. The Supreme Court further cautioned that post-Civil War sources "do not provide as much insight into [the Second Amendment's] original meaning as earlier sources." *Id.* at 36 (citing *Heller*, 554 U.S. at 614). And the absence of a "distinctly similar historical regulation addressing [the] problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26. Whether a regulation is "relevantly similar" turns on "how and why" it

burdens the right—particularly where "earlier generations addressed the societal problem" through "materially different means." *Id.* at 29; *see also Baird v. Bonta*, No. 24-565, 2026 WL 17404, at *6 (9th Cir. Jan. 2, 2026). *Bruen* likewise rejected reliance on 20th-century evidence where it "does not provide insight into the meaning of the Second Amendment" and "contradicts earlier evidence." *Bruen*, 597 U.S. at 66 n.28.

The AG bears a heavy burden to identify genuinely comparable Founding-era analogues for the FSA's sweeping prohibitions. *Bruen*, 597 U.S. at 24, 27. The AG has not carried that burden here. The record demonstrates that for the first 182 years of the Republic, the federal government enacted no law banning the sale, transfer, transportation, or possession of any bladed arm. ROA.1455–1456. The 1958 FSA was the first federal statute in American history to regulate knives. *Id.* That prolonged silence is powerful evidence under *Bruen* that despite knives and other bladed arms being plainly associated with crime and violence from the Founding onward, Congress did not attempt a categorical federal knife prohibition until 1958. *See Bruen*, 597 U.S. at 26–27. Even at the state level, only two pre-1850 laws prohibited the sale and possession of knives of any kind, and one was held unconstitutional.

21

ROA.1456; *Nunn v. State*, 1 Ga. 243, 251 (1846). "In any case, we would not stake our interpretation of the Second Amendment upon a single law … that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms." *Heller*, 554 U.S. at 632.

## IV.    THE AG'S CONCEALED-CARRY AUTHORITIES CANNOT JUSTIFY THE FSA'S PROHIBITORY SCHEME

The AG's primary historical justification under *Bruen* of the FSA's prohibitions is the allegedly "robust historical tradition permitting the legislature to prohibit the *carrying of concealed weapons*."[6] Response, at 11 (emphasis added). The AG's assertion fails for two reasons: (1) the cited laws regulated the *manner of carry* (specifically, the act of concealed carry); they did not impose broad prohibitions on acquisition, commerce, and possession of arms; and (2) the Supreme Court in *Heller* and *Bruen* considered these *same* concealed carry restrictions and ruled they did not justify D.C.'s handgun ban (*Heller*), nor New York's "proper cause" requirements for concealed carry permits (*Bruen*). These same restrictions cannot justify the much broader and sweeping bans under Sections 1242 and 1243.

---

[6] The AG's position then switches to the assertion there is a tradition of *entirely banning "concealable" weapons*. Response, at 8, 25.

**A.    Concealed Carry Statutes and Case Law Are Insufficient.**

The AG refers to statutes and case law from the 1800s to support the assertion there is "no constitutional right to inherently concealed weapons." Response, at 11. Such a claim, and its supporting historical evidence, may have been relevant if this case were challenging statutes regulating the manner of carrying concealed weapons. However, the FSA does not prohibit concealed carry. Instead, it is a ban on the manufacture for sale, sale, transfer, purchase, and acquisition of switchblade knives through all interstate commerce, and a flat prohibition on the manufacture, sale, and possession of such knives in approximately one-third of this country. *See* Op. Br. at 17; *see also* ROA.16, 56, 1468.

Nonetheless, the AG cites only *six state* statutes enacted before 1850 that specifically prohibited the act of carrying certain weapons concealed on one's person. Response, at 12-14. None of these statutes regulated or prohibited the manufacture, manufacture for sale, sale, purchase, transfer, possession, or open carry of said weapons in public. Op. Br. at 77-81; *see also* ROA.131-134, 142-149, 1454-1464.

The AG claims that "there is a similar historical tradition of extending this prohibition to small concealable weapons, as some states

moved beyond regulation simply of the mode of carry to regulation or prohibition of the concealable weapons themselves." Response, at 14. Only two statutes are cited to support this assertion, namely, an 1870 Tennessee statute addressed in *Andrews v. State,* and an 1876 Arkansas statute addressed in *Fife v. State*. *Id*. Both statutes, and the cases addressing their application, fall well outside of the relevant time period and should be rejected.[7] *Bruen*, 597 U.S. at 36. Further, two statutes are too few to form a tradition. *Id*. at 46 (". . . we doubt that three colonial regulations could suffice to show a tradition of public-carry regulation").

## B.    The AG's Other Historical Support is Misconstrued.

The AG cites the article, *The History of Bans on Types of Arms Before 1900,* stating that "the general regulatory approach of imposing significant restrictions on small concealable weapons was not an outlier," and claiming that the 221 state or territorial statutes referenced in the article regulating Bowie knives support the claim of a robust regulatory tradition. Response, at 16-17. But the AG failed to read the article in its entirety. Of the 221 statutes surveyed:

---

[7] The AG's reliance on *State v. Duke* and *State v. Kerner* are misplaced. Both involved concealed-carry restrictions—not bans on possession—and in both, the courts set aside the indictment or invalidated the law, offering no support for the AG.

"Bowie knives did not set any precedent for a uniquely high level of control…. Bowie knives and many other knives were often regulated like handguns. Both types of arms are concealable, effective for defense, and easy to misuse for offense. For Bowie knives, handguns, and other arms, a few states prohibited sales. The very large majority, however… allowed open carry while some of them forbade concealed carry… Based on history and precedent, legislatures may regulate the *mode of carry*, as the Supreme Court affirmed in *Bruen*."

ROA.1087-1088.

According to the article, "[p]rohibitory laws [of Bowie Knives] for adults, however, were exceptional. As with firearms, sales bans or bans on all manner of carrying existed but *were rare*." ROA.1087 (emphasis added.) And, "[o]f the 221 state or territorial statutes . . . , 115 come from just 5 states: Mississippi, Alabama, Georgia, Virginia, and North Carolina. And most of these laws consisted of various tax regulations." *ROA.1088.*

The AG's reference to Thomas Cooley's statement fares no better. First, as stated in the excerpt, Cooley claims that the "secret carrying" of certain arms "*may be* prohibited." Response, at 17. (emphasis added). This merely supports the notion that restrictions on the *manner of carrying* arms may be permitted. Despite the AG's claims of universal acceptance, the notion of regulating concealed carry was also subject to

significant dispute: "it has been a subject of grave discussion, in some of the state courts, whether a statute prohibiting persons, when not on a journey, or as travelers, from *wearing or carrying concealed weapons,* be constitutional. There has been a great difference of opinion on the question." *Heller*, 554 U.S. at 618 (2008) (citing 2 J. Kent, Commentaries on American Law *340, n. 2 (O. Holmes ed., 12th ed. 1873).

Further, Founding era evidence explicitly contradicts the government's claims regarding bladed weapons. As "*Heller* observed, 'Many colonial statutes required individual arms bearing for public-safety reasons.' Colonies required arms carrying to attend church or public assemblies, travel, and work in the field." ROA.1034. "The statutes that required the keeping of arms—by all militia and some nonmilitia—indicate some of the types of arms that were so common during the colonial period that it was practical to mandate ownership." ROA.1035. Of the many arms that were mandated, the Jackknife—a folding pocketknife, with blades ranging from three to twelve inches— was one of those arms. ROA.1036. As shown, the switchblade is merely a modern variation of the pocketknife. ROA.128, 326. As such, according to Cooley, it would be classified as an "arm[] intended by the Constitution .

. . as [] suitable for the general defence of the community against invasion or oppression…." *See* Response, at 17.

The AG's other secondary sources consist of two late 1800s commentaries in which the authors' interpretations of the Second Amendment were strictly militia-based and inapplicable to the states—an interpretation explicitly rejected by the Supreme Court. *Heller*, 554 U.S. at 616-619. The Supreme Court has also cautioned against giving these late century commentaries significant weight. *Bruen*, 597 U.S. at 36-37 ("we made clear in *Gamble* that *Heller's* interest in mid-to late-19th-century commentary was secondary.")

In sum, selective quotes from two treatises written well after the relevant historical period—expressing constitutional interpretations for which the Supreme Court has ruled are wrong—cannot substitute for the required, relevant historical analogues under *Bruen*. This is particularly true when the underlying statutes still regulate only the mode of carry, rather than broad prohibitions, as in Sections 1242 and 1243.

Under *Bruen*, historical analogues demand more than superficial similarity. The AG must show that the historical analogues are both relevant and similar to the challenged law by considering the "how" and

27

"why" of the arms regulations. *Bruen*, 597 U.S. at 29; *United States v. Rahimi*, 602 U.S. at 692. The AG's reliance on concealed-carry statutes typically left open the ability to carry arms openly. By contrast, the AG now describes Section 1242 as a "complete ban" on a primary means of acquisition, while Section 1243 imposes categorical prohibitions on the manufacture, sale, and possession throughout vast federal and tribal lands. Response, at 28, fn. 3.

The AG's reliance on 19th-century concealed-carry restrictions also fails because the Supreme Court has already considered that historical tradition and made clear what it can — and cannot — justify. *Heller,* 554 U.S. at 605-636.  *Heller* observed that many courts historically upheld prohibitions on *carrying* arms concealed, yet the Court still held unconstitutional the district's categorical ban on handguns. *Heller*, 554 U.S. 570. *Bruen* likewise invalidated New York's "proper cause" requirement, notwithstanding this same historical record reflecting restrictions on *the manner* of carrying arms in public, including concealed carry. *Bruen*, 597 U.S. 1.

The AG's theory, if followed, would stretch concealed-carry precedents beyond recognition—turning the limited proposition that

legislatures may regulate the *mode* of public carry into a license to ban an entire class of "concealable" arms or, as here, to prohibit the primary channels of lawful acquisition *and* possession—all of which is incompatible with *Bruen*'s "how and why" inquiry.

The AG's also attempts to redefine the FSA as a minor regulation requiring knives to "operate in particular ways" (manual opening or fixed blade) and casting the law as regulating "the configuration and mode of a switchblade's opening." Response, at p. 21. By the government's own admission, Section 1242 acts as a complete ban on the most common way of acquiring switchblades in the country. And there is no dispute that Section 1243 is a categorical ban on possession on all federal land, Indian country, and maritime areas. The AG's contradictory claims cannot be squared with reality—Sections 1242 and 1243 operate as complete bans with severe criminal penalties if violated.

## V.    THE AG'S "FACIAL CHALLENGE/SENSITIVE PLACES" SECTION 1243 DEFENSE FAILS.

The AG argues Appellants' challenge to Section 1243 fails because facial challenges are "hard to win," and because Section 1243 has constitutional applications in "sensitive places" such as courthouses,

military bases, federal prisons, aircraft, and U.S. missions abroad. Response, at 29–32. That argument fails for two independent reasons.

**First**, the AG mistakes how facial challenges are analyzed. A facial challenge attacks the face of the law, that is, what the law *itself* restricts. Section 1243 prohibits possession of switchblade knives on federal land and within Indian country. "Federal" and "sovereignty" lands trigger criminal liability. That such lands happen to include courthouses does not make the statute a law about courthouses and treating it as such is error.

The fact that prohibiting switchblades in federal courthouses might be valid does not run afoul of the requirement that Plaintiffs in this facial challenge "establish that no set of circumstances exists under which the Act would be valid." *Rahimi*, 602 U.S. at 693 (2024). If banning the possession of switchblades in a courthouse is valid it is only because it is a courthouse *not because it is a on federal land*. Thus, this facial challenge to the ban of switchblades on federal land and Indian country satisfies the requirements of *Salerno*.

**Second**, *Heller* and *Bruen* recognize only a narrow, historically grounded set of sensitive places—such as "schools and government

buildings," and "legislative assemblies, polling places, and courthouses"—where restrictions on carrying arms may be permissible. *Heller*, 554 U.S. at 626; *Bruen*, 597 U.S. at 30–31. That doctrine concerns discrete locations and, at most, regulation of carry within them. *Id.*

Section 1243 is nothing of the sort. It criminalizes the manufacture, sale, and possession of switchblades across broad areas encompassing federal lands and Indian country, including the "special maritime and territorial jurisdiction" of the United States. 15 U.S.C. § 1243; 18 U.S.C. § 7. Appellants established that Section 1243's possession ban operates "over more than one-third of the United States," including vast areas far removed from courthouses or other discrete facilities. Op. Br. 52–53 (citing ROA.1475, 1486–87, 1488–90). *Bruen* warned against expanding "sensitive places" so broadly that the category "eviscerate[s]" the right, rejecting attempts to declare large swaths of territory "sensitive" based on generalized characteristics. *Bruen*, 597 U.S. at 31. The AG's defense repeats that mistake. Response, at 31–32.

Nor does the AG's facial-challenge rhetoric cure the defect. Even accepting that facial challenges are "hard to win," *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024), the AG still must identify a constitutional

31

"application" of Section 1243 as written, not a hypothetical narrower law. The AG argues Section 1243 is valid because it may be enforced at courthouses and military bases. Response, at 31–32. But Section 1243's elements do not require proof of a courthouse, checkpoint, or any other "sensitive place." It criminalizes manufacture, sale, and possession within the defined jurisdictions—full stop. 15 U.S.C. § 1243.

The narrowing fact the AG relies on is not part of the statute and cannot supply a constitutional limiting principle *post hoc*. *See* Patterson, *Facial Confusion*, Harv. J.L. & Pub. Pol'y: Per Curiam No. 19, at 6–7 (Fall 2025). The Supreme Court has long rejected that approach. Congress may not "cast[] a net large enough to catch all possible offenders" and then ask courts "to step inside and say who could be rightfully detained." *United States v. Reese*, 92 U.S. 214, 221 (1876). This Court likewise has recognized that it is "not our role to rewrite an unconstitutional statute" to make it valid in a narrower subset of circumstances. *Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265, 273–74 (5th Cir. 2019). That is precisely what the AG asks for here.

The question is not whether Congress may ban arms in a courthouse. The question is whether Congress may ban arms on land

merely because it is "federal" or "Indian Country." The AG offers no historical tradition for that broad prohibition and cannot avoid its burden by pointing to a handful of locations that are neither elements of the offense, nor representative of the statute's operation. Response, 29–32; Op. Br. 52–53.

The AG's reliance on *Moody* and *Rahimi* also misreads how the Supreme Court has adjudicated facial Second Amendment challenges. As the Ninth Circuit recently observed, the Supreme Court's principal Second Amendment cases—*Heller*, *Bruen*, and *Rahimi*—were facial challenges in which the Court evaluated the challenged law on its face, rather than searching for some theoretical constitutional application. *Baird v. Bonta*, No. 24-565, Slip op. at 43–44 (9th Cir. Jan. 2, 2026).

*Heller* did not ask whether the District's ban might have some conceivable constitutional use; it invalidated the law as written. *Id.* *Bruen* likewise did not uphold New York's regime based on any hypothetical "set of circumstances." *Id.* at 44. Even where *Rahimi* reiterated general facial-challenge principles, it still applied *Bruen*'s framework to the statute itself. *Rahimi*, 602 U.S. at 693–700.

Finally, even if some discrete sensitive-place restrictions may be permissible, that does not justify affirming dismissal of a challenge to Section 1243's sweeping prohibitions as written. The AG's examples are not a basis to reject Appellants' claim wholesale simply because a courthouse exists somewhere within Section 1243's reach. *See Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328–29 (2006).

## VI.  CONCLUSION

The AG's response fails under *Heller* and *Bruen*. Appellants request that the Court reverse and instruct the district court to enter judgment for Plaintiffs.

January 26, 2026

Respectfully submitted,
DILLON LAW GROUP, APC
 */s/ John W. Dillon*
John W. Dillon
jdillon@dillonlawgp.com
**DILLON LAW GROUP APC**
2647 Gateway Road, Suite 105
Carlsbad, California 92009
Phone: (760) 642-7150
Attorneys for Appellants

## CERTIFICATE OF SERVICE

This is to certify that the foregoing instrument has been served via the Court's ECF filing system in compliance with Rule 25(b) and (c) of the Federal Rules of Appellate Procedure, on January 26, 2026, on all registered counsel of record, and has been transmitted to the Clerk of the Court.

*/s/ John W. Dillon*
John W. Dillon

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Fed. R. App. P. Rule 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), This brief contains 6,500 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), and with 5th Cir. R. 32.1 because this brief has been prepared in a proportionally spaced typeface using Microsoft Word (version 11), in Century Schoolbook font (font size 14) for the text and 12-point font for footnotes.

/s/ John W. Dillon
John W. Dillon