# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
October 21, 2026
Thomas B. Plunkett, III
Clerk

No. 25-10754

Knife Rights, Incorporated; Russell Arnold; RGA Auction Solution, *doing business as* Firearm Solutions; Jeffrey Folloder; MOD Specialties; Evan Kaufmann; Adam Warden; Rodney Shedd,

*Plaintiffs—Appellants*,

*versus*

Todd Wallace Blanche, *Acting U.S. Attorney General*; United States Department of Justice,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:24-CV-926

Before Elrod, *Chief Judge*, Willett and Wilson, *Circuit Judges*.

Jennifer Walker Elrod, *Chief Judge*:

This case presents a Second Amendment challenge to the Federal Switchblade Act (FSA)'s restrictions on switchblade knives. Applying the framework articulated in *New York State Rifle & Pistol Association, Inc. v. Bruen*, we hold that the FSA is unconstitutional. We determine that switchblade knives qualify as "Arms" and are covered by the "plain text" of the Second Amendment. Because the regulation implicates the amendment,

the government bears the burden of establishing that the FSA comports with well-established principles of the Second Amendment and its regulatory tradition. The government fails to meet its burden. Specifically, the FSA's restrictions on the introduction, manufacture, transportation, and distribution of switchblades fail step two's "how" analysis. The plaintiffs, however, fail to satisfy the stringent requirements for mounting a facial challenge to § 1243.

Accordingly, we conclude that this regulation violates the Second Amendment. We REVERSE the district court's grant of the government's motion to dismiss as to the § 1242 claim. We AFFIRM the district court's dismissal of the § 1243 claim, and we REMAND for further proceedings.

# I

## A

Over thirteen million Americans watched the following on the silver screen in 1955:

A high school field trip brought a group of students from Dawson High to Griffith Observatory. After a lecture on the place of man in the universe, a new student, Jim Stark, is confronted by a gang of his classmates as he exits the planetarium. The gang's leader, Buzz Gunderson, draws a knife from his jacket. Buzz effortlessly depresses the knife's release. The blade flicks open. Though reluctant, Jim, played by James Dean, agrees to play the "blade game." Jim wins this opening round, but his victory only sets up the next round—one that ends with Buzz's death.

*Rebel Without a Cause* debuted on October 27, 1955. The headline of the *New York Times* review, entitled "The Screen: Delinquency," described the movie as "a violent, brutal and disturbing picture of modern teen-agers." Bosley Crowther, *Delinquency*, N.Y. Times (Oct. 27, 1955),

https://timesmachine.nytimes.com/timesmachine/1955/10/27/issue.html. Particularly disturbing was the "horrifying duel with switchblade cutlery between the reluctant Mr. Dean and another lad (Corey Allen) on a terrace outside the planetarium." *Id.*

The movie debuted around the peak of hysteria surrounding juvenile delinquency. *See* James Gilbert, A Cycle of Outrage: America's Reaction to the Juvenile Delinquent in the 1950s, at 14 (1986). This "hysteria" was coupled with the "widespread perception that switchblade knives were the tool of thugs and juvenile delinquents." *See* Paul A. Clark, *Criminal Use of Switchblades: Will the Recent Trend Towards Legalization Lead to Bloodshed?*, 13 Conn. Pub. Int. L.J. 219, 219 (2014); *see also Knife Rts., Inc. v. Bonta*, 165 F.4th 1330, 1333 (9th Cir. 2026) (noting that switchblades "became associated with criminal activity" in the 1950s). Still, the fear of switchblade-wielding teenage gangs roaming the streets did not stand in the way of *Rebel Without a Cause* becoming a box-office success.[1] *See* Graydon Carter, Vanity Fair's Tales of Hollywood: Rebels, Reds, and Graduates and the Wild Stories Behind the Making of 13 Iconic Films 71–72 (2008).

---

[1] Not all knives have acquired a notorious reputation in the public imagination. The Bowie knife, for one, gained fame following the Texians' last stand at the Alamo. Robert F. Scott, *Who Invented the Bowie Knife*, 8 W. Folklore 195, 195–96 (1949). One popular account told of James Bowie, who, having engaged several Mexican combatants, "broke off his sword some fifteen or twenty inches from the hilt." *Id.* The shorter blade, which came to be known as the "Bowie knife," was found to be so useful for hand-to-hand fighting that others later replicated it. *Id.* Soon, the knives became "omnipresent in Texas" and were credited with aiding Texans gain their independence. *See* David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms before 1900*, 50 J. Legis. 223, 314 (2024) (citing Charles Edwards Lester, Sam Houston and His Republic 97 (1846)). During the Civil War, *Harper's Weekly* reported James Bowie's story as the knife's origin story. Scott, *Who Invented* at 196 (citing *Concerning Fire-Arms*, Harper's Wkly., Vol. V, No. 240, Aug. 3, 1861, at 495).

Congress was less entertained by the film. The Senate Judiciary Committee launched a Subcommittee on Juvenile Delinquency. S. Rep. No. 85-1429, at 1. It noted in 1956 "upwards of 1,300,000 boys and girls [came] to the attention of local law-enforcement officers." *Id.* at 2. Concerned about juvenile delinquency, the Subcommittee initiated a series of studies, one of which examined "the interstate traffic in guns and switchblade knives used by many youths and youth gangs in large urban areas." *Id.* at 4.

The Subcommittee found that switchblade knives were often used in the commission of robberies and assaults, especially by juvenile perpetrators. *Id.* at 6. The study estimated that 1,200,000 switchblade knives entered the market each year. *Id.* Many of these knives crossed state lines, circumventing over twenty states' prohibitions on the sale of automatic-opening knives. *Id.* at 7; *see also* H. Rep. No. 85-1945, at 3 (1958) (discussing that city ordinances are circumvented by the interstate switchblade market). The proposed solution was to target the interstate trafficking of switchblade knives. H. Rep. No. 85-1945, at 3.

In 1958, the Committee on Interstate and Foreign Commerce introduced H.R. 12850, which would become the FSA. Pub. L. No. 85-623, 72 Stat. 562 (1958) (codified as amended at 15 U.S.C. §§ 1241–45). The House Report explicitly stated that the goal of the legislation was to combat the introduction, manufacture for introduction, transportation, and/or distribution of switchblade knives.[2] H. Rep. No. 85-1945, at 1 (1958). Section 2 of the FSA, codified as 15 U.S.C. § 1242, explicitly targeted the

[2] The statute defines "switchblade knife" as any knife having a blade which opens automatically — (1) by hand pressure applied to a button or other device in the handle of the knife, or (2) by operation of inertia, gravity, or both." 15 U.S.C. § 1241. Another provision of the statute contains various exceptions, such as what is in essence a pocketknife exception, *id.* at § 1244(4), and an exception for spring-assisted knives that require a second hand, *id.* at § 1244(5).

switchblade supply chain. Pub. L. 85–623, § 2, 72 Stat. 562. Specifically, it placed a fine of up to "$2,000 or imprison[ment] not more than five years, or both" for anyone who "knowingly introduces, or manufactures for introduction, into interstate commerce, or transports or distributes in interstate commerce, any switchblade knife." *Id.* Another section proscribed the manufacture, sale, or possession of switchblade knives "within any Territory or possession of the United States, within Indian country . . . or within the special maritime and territorial jurisdiction of the United States."[3] Pub. L. 85–623, § 3, 72 Stat. 562 (1958) (codified as 15 U.S.C. § 1243). By leveraging its Commerce power to target the supply chain, Congress sought to "remove one of the favorite weapons of our juvenile and criminal element," which, at its price point, was "within the reach of teenagers." H. Rep. No. 85-1945, at 2–3.

B

In September 2024, plaintiffs-appellants initiated this action in the Northern District of Texas.[4] Their complaint seeks a declaration that two sections of the FSA, 15 U.S.C. §§ 1242 and 1243, facially violate the Second Amendment. The plaintiffs also seek to enjoin defendants from enforcing the FSA.

The plaintiffs comprise an advocacy organization, two Texas-based businesses, and five individuals. The organization, Knife Rights, Inc., is a

---

[3] Section 1243 cross-references 18 U.S.C. § 7, which provides the operative definition of "special maritime and territorial jurisdiction of the United States."

[4] Several of the current plaintiffs brought a similar action to the FSA in 2023. *See Knife Rts., Inc. v. Garland*, No. 4:23-cv-547, 2024 WL 2819521 (N.D. Tex. June 3, 2024) (*Knife Rts. I*) (challenging only § 1242). The district court granted the government's motion to dismiss under Rule 12(b)(1) on the grounds that the plaintiffs lacked standing. *Id.* at *4–5. The plaintiffs did not appeal.

§ 501(c)(4) member advocacy organization whose mission is primarily to challenge state and federal restrictions on bladed weapons. Knife Rights brings this lawsuit on behalf of itself and its members. The two retail plaintiffs are RGA Auction Services and MOD Specialties. Both retail plaintiffs are federally licensed firearms dealers who attest that they sell knives, but they do not currently advertise or "market the sale of automatic opening knives" due to the FSA. Both plead that they would acquire and sell such knives if the requested relief were granted. Russell Gordon Arnold and Jeffrey E. Folloder are the owners of these two retail plaintiffs. They aver that due to the FSA, they do not travel with switchblade knives when going out-of-state and they reaffirm that they do not sell them in their stores.

The other three individual plaintiffs are Knife Rights members who plead that they wish to purchase and carry switchblade knives in ways that currently implicate the FSA. Evan Kaufmann is a filmmaker, visual artist, and photographer who often travels interstate and pleads that he wishes to obtain a switchblade knife for "utility purposes and self-defense." Adam Warden is "an avid hunter and outdoorsman" who wants to own switchblade knives because "they are incredibly useful" for "hunting, fishing, and in everyday life." Finally, Rodney Shedd is a recent Arizona transplant now living within the jurisdiction of the Muscogee Nation in Tulsa, Oklahoma. He previously owned a switchblade knife while living in Arizona, but he had to "abandon" his switchblade knife before moving to Muscogee Nation tribal land.

The government filed a motion to dismiss pursuant to Rules 12(b)(1) and (6). It contended that the individual plaintiffs, retail plaintiffs, and Knife Rights lacked standing. It also argued that, even if these plaintiffs had standing, they failed to state a claim because they failed to demonstrate that the FSA implicates the Second Amendment.

The district court rejected the government's argument that the plaintiffs lacked standing to challenge § 1242, but agreed that they did not have standing to challenge § 1243. *Knife Rts., Inc. v. Bondi* (*Knife Rts. II*), 785 F. Supp. 3d 195, 209, 210–12 (N.D. Tex. 2025). It determined that the individual and retail plaintiffs lacked standing to challenge § 1243 because they could not demonstrate a substantial threat of enforcement, especially given the absence of any known prosecutions under that provision.

Turning to the Second Amendment challenge to § 1242, the district court found that the statute did not violate the plaintiffs' constitutional rights. *Knife Rts. II*, 785 F. Supp. 3d at 215. It assumed without deciding that switchblade knives constituted "arms" under the Second Amendment. *Id.* at 214 n.7. After surveying recent Fifth Circuit and out-of-circuit Second Amendment cases, the district court concluded that § 1242 was not unlawful because it did not amount to "an effective ban on possession" of switchblade knives. *Id.* at 214–15.

The plaintiffs timely appealed.

## II

We review motions to dismiss *de novo*. *Sw. Airlines Pilots Ass'n v. Sw. Airlines Co.*, 120 F.4th 474, 481 (5th Cir. 2024); *see also Reese v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 127 F.4th 583, 589 (5th Cir. 2025) (stating that constitutional questions are reviewed *de novo*). "Generally, when a party files a motion to dismiss for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1) in conjunction with a motion to dismiss under Rule 12(b)(6), the jurisdictional challenge is addressed first." *Sw. Airlines Pilots Ass'n*, 120 F.4th at 481 (citing *Fort Bend Cnty. v. U.S. Army Corps of Eng'rs*, 59 F.4th 180, 188 (5th Cir. 2023)). We can affirm the district court "on any basis supported by the record." *United States v. Chacon*, 742 F.3d 219, 220 (5th Cir. 2014).

## III

As a threshold matter, we must ensure that we have jurisdiction to review this pre-enforcement, facial challenge.

The government previously asserted that the plaintiffs lacked standing to challenge §§ 1242 and 1243. *Knife Rts. II*, 785 F. Supp. 3d at 205. The district court found that the plaintiffs had standing to challenge § 1242, but not § 1243. *Id.* at 209, 211–12. Now, the government no longer disputes that the individual and retail plaintiffs have standing to challenge §§ 1242 and 1243. Still, because standing is jurisdictional, we must satisfy ourselves that standing exists. *See N.A.A.C.P. v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998) (stating a court must assure itself of standing, even if it must do so *sua sponte*).

We determine that the district court correctly concluded that the plaintiffs have standing to challenge § 1242. However, the district court erred in determining that the plaintiffs lack standing to challenge § 1243.

### A

First, the plaintiffs have standing to challenge § 1242. Again, this provision imposes a fine and/or imprisonment on "[w]hoever knowingly introduces, or manufactures for introduction, into interstate commerce, or transports or distributes in interstate commerce, any switchblade knife."

The plaintiffs assert that they have standing to challenge § 1242 because they face a substantial threat of enforcement, especially given that the government has not disavowed enforcement. The district court agreed that, under our case *Umphress v. Hall*, 133 F.4th 455 (5th Cir. 2025), plaintiffs had a cognizable injury and, in turn, standing. *See Knife Rts. II*, 785 F. Supp. 3d. at 208–09.

The standing analysis determines "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). There are three elements that constitute "the irreducible constitutional minimum of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). First, the plaintiff must show that he suffered concrete, particularized injury that was either actual or imminent. *Id.* Second, the plaintiff must establish that injury was likely caused by the defendant, or can be said to be "fairly . . . trace[able] to the challenged action of the defendant." *Id.* at 560–61 (quoting *Simon v. Eastern Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976) (internal quotation marks omitted)). Third, the plaintiff must show that judicial relief can "likely" redress his alleged injury. *Id.* at 561 (internal quotation marks omitted). Standing is claim specific. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (citations omitted).

The central issue here is whether the plaintiffs satisfy the injury-in-fact requirement. The plaintiffs seek to meet this requirement by proving that a substantial likelihood of facing prosecution exists if they violate § 1242. To establish injury in fact on a pre-enforcement challenge, a plaintiff must show (1) an "intention to engage in a course of conduct arguably affected with a constitutional interest," (2) that the intended future conduct is "arguably . . . proscribed by" the law in question, and (3) that "the threat of future enforcement of the [challenged law] is substantial." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161–64 (2014)). Plaintiffs bear the burden of proving each of these elements. *Nat'l Press Photographers v. McCraw*, 90 F.4th 770, 781 (5th Cir. 2024) (citations omitted). They "must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (citing *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)). In facial

challenges, such as this one, "courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." *Umphress*, 133 F.4th at 465 (quoting *Speech First*, 979 F.3d at 330); *see also Speech First, Inc. v. Schlissel*, 939 F.3d 756, 766 (6th Cir. 2019) (noting that the "distinction between facial and as-applied challenges bears legal significance when assessing standing").

As stated, the district court relied on our *Umphress* opinion to support its conclusion that a credible threat of enforcement existed. *Knife Rts. II*, 785 F. Supp. 3d. at 209. In *Umphress*, we largely credited Umphress's allegation that a credible threat of enforcement existed based on the Texas State Commission on Judicial Conduct's refusal to disavow future enforcement action. 133 F.4th at 466. Here, the government affirmatively stated that it will continue to enforce this statute. At argument, the government represented that "we are not in a position to disavow enforcement. I'm, like, affirmatively telling you we will not, have not, are not disavowing enforcement." Or. Arg. Tr. at 23:35–42. The government has, in fact, brought prosecutions under § 1242. *See Knife Rts. II*, 785 F. Supp. 3d at 207. Together, these past prosecutions and the government's willingness to bring them again are sufficient to establish that the plaintiffs face a substantial threat of enforcement.

Now, we turn to the two other elements of the pre-enforcement injury-in-fact analysis. Again, those elements are an "intention to engage in a course of conduct arguably affected with a constitutional interest" and the intended future conduct is "arguably . . . proscribed by" the law in question. *Speech First*, 979 F.3d at 330 (5th Cir. 2020) (citing *Susan B. Anthony List*, 573 U.S. at 161–64). Taking the second first, all but one individual and all retail

challengers plead that they will engage in conduct that is violative of § 1242.[5] Specifically, they intend to either transport or distribute switchblade knives that have been introduced into interstate commerce. Even though the case is at the motion-to-dismiss stage, these pleadings are supported by declarations. The government agrees that if the plaintiffs carried out their intentions, they would be in violation of the statute. Or. Arg. Tr. at 23:25–32. This element is met. And, as we will discuss further below, the plaintiffs have a constitutional interest at stake. *See infra* Part IV.B.

Traceability and redressability are also satisfied. Any prosecution under § 1242 is necessarily brought by the government and the injunctive and declaratory relief sought would remedy the plaintiffs' alleged injury.

Accordingly, the retail and individual plaintiffs, with one exception, have standing to challenge § 1242.[6] Because this is a facial challenge and "at least one plaintiff has standing, the suit may proceed." *See Biden v. Nebraska*, 600 U.S. 477, 489 (2023) (citing *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006)).[7]

---

[5] Rodney Shedd is the only plaintiff who does not plead that he intends to pursue conduct that is violative of § 1242.

[6] To be clear, the retail plaintiffs' standing to challenge § 1242 is based on their own injury. The district court correctly determined that the retail plaintiffs cannot establish standing based on their theory that they are asserting the rights of their customers. *Knife Rts. II*, 785 F. Supp. 3d at 207; *see also Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (declaring that for a party to successfully assert third-party standing, it must have a "'close' relationship with the person who possesses the right" and there must be a "hindrance" barring the right possessor from asserting his own interest (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (2004))). For the reasons that the individual plaintiffs here have standing, the retail plaintiffs' customers have no "hindrance" barring them from bringing a lawsuit of their own.

[7] Because standing exists to bring this facial challenge, we pretermit analysis of Knife Rights' organizational standing. *See Clinton v. City of New York*, 524 U.S. 417, 431

B

The plaintiffs likewise have standing to challenge § 1243. This provision penalizes the manufacture, sale, or possession of switchblade knives "within any Territory or possession of the United States, within Indian country," or "within special maritime and territorial jurisdiction of the United States." 15 U.S.C. § 1243. The challengers' theory is that one plaintiff, Rodney Shedd, can "alone" establish their standing to challenge the provision. Shedd lives on Muscogee National Tribal land in Oklahoma. As such, the challengers contend that Shedd is their gateway to challenging § 1243 on its face.

The question, again, is whether Shedd faces a credible threat of enforcement such that he has a cognizable injury.

In *Chiles v. Salazar*, the Supreme Court concluded that the government litigating the law at issue and declining to disavow enforcement of that law was more than enough to establish a credible threat of future enforcement. 607 U.S. 627, 637 n.* (2026). In *Franciscan Alliance, Inc. v. Becerra*, we also held that plaintiffs have standing when the government "repeatedly refused to disavow enforcement" or "has not to date evaluated" whether to enforce the law. 47 F.4th 368, 376 (5th Cir. 2022). We have said that when dealing with pre-enforcement challenges, "courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." *Speech First*, 979 F.3d at 335 (quoting *N.H. Right to Life PAC v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996)). To make this showing, plaintiffs need not show that the authorities have actually threatened to prosecute them. *Cf. Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988). This is

n.19 (1998) (pretermitting standing analysis as to the rest of the plaintiffs after establishing standing existed as to some).

because "the threat is latent in the existence of the statute." *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003). We do not require a challenger to "first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights." *Babbitt*, 442 U.S. at 298 (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)). The standard for determining whether a "credible threat of prosecution" exists is, therefore, "quite forgiving." *N.H. Right to Life*, 99 F.3d at 14.

Here, Shedd clears that "forgiving" standard. As with § 1242, the government does not disavow enforcing § 1243.[8] Tr. Or. Arg. at 18:50–08. So, this is not an instance where prosecution is "imaginary or speculative," *see Younger v. Harris*, 401 U.S. 37, 42 (1971), especially given Shedd's intent to reacquire a switchblade knife. This dilemma clarifies the injury-in-fact analysis: Shedd must either abandon his intent to reacquire a switchblade knife, despite his belief that the FSA violates his constitutional right to do so, or risk criminal prosecution to challenge the statute. The Supreme Court, however, has made clear that those in Shedd's position "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief" when "constitutional interest[s]" are at stake. *See Babbitt*, 442 U.S. at 298 (citation omitted); *see also Ezell v. City of Chicago*, 651 F.3d 684, 695–96 (7th Cir. 2011) (concluding, in the Second Amendment context, that the "very existence of a statute implies a threat to prosecute, so pre-enforcement challenges are proper, because a probability of future injury

---

[8] We acknowledge that the Department of Justice does not have records of any prosecution brought under § 1243. However, the Department's records only date to 2004 and the Department made clear at oral argument that it could charge a defendant under § 1243. Moreover, a Knife Rights' member signed a plea agreement, which prohibits the defendant from importing, transporting, distributing, selling, or introducing into interstate commerce switchblades.

counts as injury for the purpose of standing" (citation and internal quotation marks omitted)). Because Shedd faces a credible threat of prosecution should he follow through with his intention to reacquire a switchblade knife,[9] conduct in which he has a reasonable constitutional interest, he has established an injury in fact.

In addition, traceability and redressability are also satisfied. Any prosecution under § 1243 is necessarily brought by the government and the injunctive and declaratory relief sought would remedy Shedd's alleged injury. Thus, Shedd has standing. The plaintiffs' challenge to § 1243 can proceed. *See Nebraska*, 600 U.S. at 489.

## IV

We now examine whether these provisions of the FSA comport with the Second Amendment. Section 1242 does not. This is because it regulates the constitutional right to "keep and bear Arms" in a manner incompatible with founding-era regulations and the well-established principles underlying the Amendment. As to § 1243, we do not reach the question whether the regulation violates the Second Amendment because the challengers fail to satisfy the demanding requirements for bringing a facial challenge.

---

[9] *Poe v. Ullman*, 367 U.S. 497 (1961), while relevant because it involved a pre-enforcement challenge, is distinguishable. *Poe* involved a challenge brought by several women and their doctors against Connecticut's prohibition on contraceptives. *Id.* at 498–99. The Supreme Court dismissed the challengers' action on justiciability grounds. *Id.* at 508. The Court understood there to be a "lack of immediacy of the threat" of Connecticut enforcing the statute. *Id.* at 501. The Court declared that this deprived the "controvers[y] of the immediacy which is an indispensable condition of constitutional adjudication." *Id.* at 508. By contrast, the United States does not disavow enforcement of § 1243, leaving Shedd and others similarly situated liable to criminal prosecution.

A

The Second Amendment provides that a "well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend II. The Amendment "codified a *pre-existing* right." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). Central to the Second Amendment right was the notion that "Arms" protected another "inherent right," the right of self-defense. *Id.* at 628. Still, the scope of the right was not, and has not, been limited to the purpose of self-defense. The "ancient right" has been understood to ensure that rights bearers could also engage in hunting and lawful activities. *Id.* at 599. And, as we will elaborate, "Arms" was never understood to merely apply to firearms.

To determine whether a regulation complies with the Second Amendment, courts apply a two-step analysis. *Bruen*, 597 U.S. at 24. First, we determine whether the Second Amendment is applicable by examining whether its "plain text covers an individual's conduct." *Id.* If so, there is a presumption that the conduct is protected and the government bears the burden of "justify[ing] its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*

The first step assesses whether the Second Amendment even applies, and is sub-divided into three parts. *Wolford v. Lopez*, 609 U.S. 185, 195–96 (2026). We first assess whether the challengers are "part of 'the people' whom the Second Amendment protects." *Bruen*, 597 U.S. at 31–32 (citing *Heller*, 554 U.S. at 580). Then, we determine whether the weapons at issue constitute "Arms" under the amendment. *See id.* at 32 (citing *Heller*, 554 U.S. at 627). Finally, we consider whether the conduct at issue involves either the "keep[ing]" or the "bear[ing]" of arms. *Wolford*, 609 U.S. at 195–96 (quoting *Bruen*, 597 U.S. at 32–33). If all three elements are met, the

regulation at issue implicates conduct that is protected by the Second Amendment, and we proceed to step two.

At step two, the burden is on the government to "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. While reasoning by analogy applies to both steps, much of the work at step two involves applying this mode of reasoning to discern whether the "why" and "how" of the challenged law fall within the history and tradition of "Arms" regulation. *See United States v. Rahimi*, 602 U.S. 680, 692 (2024) (citing *Bruen*, 597 U.S. at 29).

The "why" looks to the purpose and "reason[]" behind the regulation. *Id.* So, "if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Id.* Still, the manner of regulation matters. That is the "how." *Id.* "Even when a law regulates arms-bearing for a permissible reason, . . . it may not be compatible with the right if it does so to an extent beyond what was done at the founding." *Id.*; *see also Bruen*, 597 U.S. at 26–27 (stating that "if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional"). Ultimately, the touchstone of the analysis is whether the law "comport[s] with the principles underlying the Second Amendment." *Rahimi*, 602 U.S. at 692.

B

Our application of the *Bruen* analysis leads us to conclude that § 1242 violates the Second Amendment. At step one, we conclude that the plain text of the Second Amendment covers the conduct at issue because switchblades are arms commonly used for defense and manufacturing and procuring them facilitates using them for defense. At step two, the

government fails to meet its burden to demonstrate that the regulation is consistent with this National's historical tradition. The government offers extensive evidence that there is a tradition of regulating "concealed weapons." That goes to the "why" analysis. The government, however, makes little argument as to the "how." As stated, it is possible for a regulation with a permissible purpose to regulate in a manner incompatible with the approaches taken at the founding or the well-established tradition of the Second Amendment. *See Rahimi*, 602 U.S. at 692. So, even if § 1242's "why" may fit within the tradition of regulating concealed weapons, its "how" does not comport with the principles of regulating bladed arms.

The district court believed the dispositive question to be whether § 1242 amounted to "a *de facto* prohibition on possession." *Knife Rts. II*, 785 F. Supp. 3d at 214 (quoting *McRorey v. Garland*, 99 F.4th 831, 840 (5th Cir. 2024)). Because "switchblades are widely distributed, sold, and used in intrastate commerce," the district court reasoned that § 1242 does not impose a "a *de facto* prohibition on possession." *Id.* at 214–15. While the district court assumed that switchblade knives are "arms" under the Second Amendment, *id.* at 214 n.7, it is not clear whether it concluded that the Second Amendment was implicated. And, if so, it did not engage in step two's inquiry. Instead, after identifying the dipositive question to be whether § 1242 amounted to "a *de facto* prohibition on possession," it merely looked to two of our cases as guideposts, and followed the one that it thought best answered its own question. *Id.* at 213–14 (first citing *McRorey*, 99 F.4th at 836–40; then *Reese*, 127 F.4th at 586–90).

This approach led the district court's analysis astray.[10] Instead, the district court should have applied *Bruen*. We do so here and determine that

---

[10] Nothing here raises any question about the correctness of our decision in *McRorey*. The district court erred by not applying the *Bruen* analysis in the first instance

the Second Amendment is implicated at step one and that the government fails to meet its burden at step two.

1

To start, we examine whether the Second Amendment is implicated by first assessing whether the plaintiffs are among "the people" protected by the Second Amendment. *Bruen*, 597 U.S. at 31–32. No party disputed that the plaintiffs are among "the people"; that is, "members of the political community." *See Heller*, 554 U.S. at 580; *see also id.* at 581 (declaring that there is "a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans"). For present purposes, we assume without deciding that the retail plaintiffs and the Knife Rights organization are "members of the political community" and therefore among "the people." *See id.* at 580.

Next, we consider whether switchblades are "arms." Amongst other definitions, *Heller* highlighted that the founding era understood the term to mean "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Id.* at 581 (quoting *Arms*, 1 A New and Complete Law Dictionary (2d ed. 1771)). Switchblade knives have surely been used for "defence" and to "strike another."

Knives have been used for defense throughout human history, including the American founding. *See Knife Rts. v. Bonta*, 182 F.4th 797, 817–19 (9th Cir. 2026) (Tung, J., dissenting from denial of rehearing *en banc*) (surveying the history of knives and switchblades). During the colonial

---

because it understood § 1242 to be an "ancillary" regulation. *See Knife Rts. II*, 785 F. Supp. 3d at 214; *cf. McRorey*, 99 F.4th at 836–37 (discussing how *Bruen* reiterated *Heller*'s instruction that "ancillary firearm regulations such as background checks preceding sale" may be lawful under certain conditions).

period, "[e]veryone had a knife," and "as long as a man was required to defend his life," a "knife was a constant necessity." Harold L. Peterson, American Knives: The First History and Collectors' Guide 6 (1958). In the 1700s and during the American Revolution, knives were used for scavenging, hunting, and defense, and "[b]elt and pocket knives" accompanied frontiersmen "in the developing eastern settlements and on the western frontiers." *Id.* at 21; George C. Neumann, Swords and Blades of the American Revolution 14 (1973). Well into the 1800s, "men of all walks of life" were "accustomed to wear a knife as a necessary part of their garb." Harold L. Peterson, Daggers and Fighting Knives of the Western World, from the Stone Age till 1900, at 68 (1968).

Switchblade knives are no exception. "Springblade knives" (precursors to the modern switchblade) "have been made for hundreds of years because there has always been a need for a pocketknife that can be opened easily when the hands are wet, cold, or covered with gloves." Ben Myers & Lowell Myers, An Introduction to Switchblade Knives 6 (1982). In the 1700s, such knives were a part of certain types of flint-lock pistols: "[i]f the pistol mis-fired (which frequently happened) the person would touch the release button and the blade would open up, and be available for use." *Id.*; *see also* H. Gordon Frost, Blades and Barrels 230–32 (1972). After the Civil War, patents for switchblade knives proliferated, and the large-scale production of "switchblades in the United States began in the 1880s, shortly" thereafter. Mark Erickson, Antique American Switchblades: Identification & Value Guide 6 (2004). Then, "[o]ver a 50 year period from the mid 1890s to the mid 1940s there had been approximately 20 different companies who had manufactured switchblade knives in this country." *Id.* In short, some forms of switchblades have been commonly used for defense for hundreds of years. *See Knife Rts.*, 182 F.4th at 817–19. They are "arms."

Accordingly, the government's not-in-common-use argument fails. In addition to the wealth of history indicating the founding-era uses of switchblades for defense, the record indicates that there are "millions" of automatically opening knives in the United States now. *Cf. Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 183 F.4th 211, 241 (3d Cir. 2026) (en banc) (determining AR-15s are in common use given that there are 24 million in circulation); *Snope v. Brown*, 145 S. Ct. 1534, 1534 (2025) (Kavanaugh, J., respecting the denial of certiorari) (stating that there is a strong argument that AR-15s are in "common use" because millions of law-abiding citizens own and use them).

The record further reflects that switchblade knives are lawfully used for "every day utility use, hunting, fishing, recreation, and camping and hiking." *Cf. Ass'n of N.J. Rifle*, 183 F.4th at 243 (determining that there are "lawful purposes including self-defense, target shooting, hunting, and pest control"); Letter from Deputy Attorney General William P. Rogers to Representative Oren Harris (April. 12, 1957), *in* S. Rep. No. 85-1980, at 6–7 (1958) (stating that the switchblade "is not inherently dangerous but requires the introduction of a wrongful human element to make it so"). Despite the FSA, there are still lawful sales of switchblade knives in the United States. Consequently, switchblade knives are "arms" "in common use" both then and now.[11]

---

[11] The circuits are not in alignment on whether to conduct the "in common use" analysis during step one or two. *Contrast Hanson v. District of Columbia*, 120 F.4th 223, 232 n.3 (D.C. Cir. 2024) (assuming without deciding at step one); *Nat'l Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213, 234 (2d Cir. 2025) (stating that "[t]his Court has understood the 'in common use' analysis to fall under the first step of *Bruen*" (citation omitted)); *Bianchi v. Brown*, 111 F.4th 438, 460–61 (4th Cir. 2024) (en banc) (assessing it at step one's right to "keep and bear" arms analysis); *Sealed Appellee v. Sealed Juv.*, No. 24-60348, 2026 WL 2641073, at *4 (5th Cir. Aug. 28, 2026) (reiterating that the "dangerous-and-unusual analysis" "occurs at *Bruen* Step 1"); *and United States v. Morgan*, 150 F.4th 1339, 1346

Finally, we assess whether the FSA regulates the right to "keep and bear" arms. *Heller* clarified that the phrase "keep arms" means "to have weapons," and "bear arms" commonly meant "the carrying of weapons outside of an organized militia." 554 U.S. at 582, 584. The question, then, is whether this right to have and carry weapons extends to the procurement of weapons such that it would implicate § 1242's prohibition on the introduction, manufacture, transportation, or distribution of switchblades into interstate commerce.

We conclude that it does. In *Reese v. Bureau of Alcohol, Tobacco, and Firearms*, we considered whether a statute, which proscribed selling firearms or ammunition "to any individual who the licensee knows or has reasonable cause to believe is less than twenty-one years of age," implicated that right. 127 F.4th at 587. We acknowledged that the "words 'purchase,' 'sale,' or similar terms describing a transaction do not appear in the Second Amendment." *Id.* at 589–90. But they are implied, *see Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring), because the right to keep and bear arms "wouldn't mean much" "without the corresponding right to acquire" them, *Ezell*, 651 F.3d at 704; *see also* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 96 (2012) ("[W]hen a text authorizes a certain act, it implicitly authorizes whatever is a necessary predicate of that act."). Similarly, the right to purchase the arms implies the

---

(10th Cir. 2025) (placing it alongside step one's "arms" analysis), *with Ass'n of N.J. Rifle*, 183 F.4th at 235–37 (explaining why it falls in step two); *United States v. Bridges*, 150 F.4th 517, 524–28 (6th Cir. 2025) (placing the analysis at step two); *and Bevis v. City of Naperville*, 85 F.4th 1175, 1198 (7th Cir. 2023) (assuming without deciding that it is at step two). The Ninth Circuit has declined to resolve the matter. *Knife Rts.*, 165 F.4th at 1339. We need not weigh in on this circuit split here, as the government loses regardless of whether we address this in-common-use inquiry at step one or step two of *Bruen*.

right to manufacture, transport, and distribute the arms. *See Reese*, 127 F.4th at 590 ("[T]he right to 'keep and bear arms' surely implies the right to purchase them."); *see also United States v. Vlha*, 142 F.4th 1194, 1199 (9th Cir. 2025) (agreeing that, as a general matter, the Second Amendment right is implicated when manufacturing of arms—which "facilitates individuals' ability to buy" them—is prohibited). Thus, § 1242 "regulates" "arms-bearing conduct." *Snope*, 145 S. Ct. at 1536 (Thomas, J., dissenting from denial of certiorari). In other words, the conduct that § 1242 regulates is covered by the Second Amendment.

2

We proceed to step two. Here, we assess whether § 1242 is consistent with the principles that flow from the Second Amendment's history and tradition. *See Bruen*, 597 U.S. at 29–31. At step two, we presume that the Constitution protects the conduct at issue until the government establishes that § 1242's regulations are "consistent with the Nation's historical tradition" of arms regulation. *Id.* at 24. The government need not present a "historical twin" or a "dead ringer." *Id.* at 30. Instead, "the appropriate analysis" "consider[s] whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. The Supreme Court has acknowledged that it has yet to provide a complete "survey" of the aspects that we must consider when determining if the regulation is "relevantly similar" to the historical comparators. *United States v. Hemani*, 146 S. Ct. 1677, 1686 (2026) (quoting *Bruen*, 597 U.S. at 29). The Court nevertheless has repeatedly called the "why" and "how" of the law to be "central" to the analysis. *Id.*

The government makes its stand primarily by citing a host of nineteenth-century cases in support of its argument that there existed a well-established tradition of regulating "inherently concealable weapons." The

concealable nature of these weapons, the argument goes, makes them "particularly dangerous." The government connects this with the clear congressional history that suggests that Congress enacted the FSA because it believed that switchblades posed a unique danger and therefore needed to be restricted. This line of argument is focused on answering the "why" portion of the step two inquiry.

However, we do not reach the question of whether the government meets its burden as to the "why" analysis because it fails the "how" analysis. As mentioned, the Supreme Court has informed us that "[e]ven when a law regulates arms-bearing for a permissible reason," it may not be "compatible with the right if it does so to an extent beyond what was done at the founding." *Rahimi*, 602 U.S. at 692. So, even if we grant the government's argument that there is a well-established tradition of regulating "inherently concealable weapons," this only addresses the "why" inquiry.[12]

The government cites no historical analogue that regulates the manufacture, transportation, or distribution of "inherently concealable weapons," much less switchblade knives. Rather, its analogues suggest that there is a tradition of regulating the manner of carrying concealable weapons. *See State v. Chandler*, 5 La. Ann. 489, 489 (1850) (making it a misdemeanor to be "*found with a concealed weapon*, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed"); *State v. Reid*, 1 Ala. 612, 614 (1840) (specifying that the act proscribed "*carrying* weapons secretly"); *State v. Mitchell*, 3 Blackf. 229, 229 (Ind. 1833) (holding that a statute "prohibiting all persons . . . from *wearing* or *carrying* concealed weapons" is constitutional); *Nunn v. State*, 1 Ga. 243, 249 (1846) (declaring a law constitutional that

[12] *Cf. Wolford*, 609 U.S. at 224 (Barrett, J., concurring) (highlighting that even if the State was right on the "how," it must also identify an analogous "why").

prohibited "*wearing* of certain [concealed] weapons"); *Aymette v. State*, 21 Tenn. 154, 159 (1840) (upholding an act "prohibit[ing] the *wearing* or *keeping*" of weapons); *Andrews v. State*, 50 Tenn. 165, 186 (1871) (upholding the constitutionality of a statute prohibiting "publicly or privately . . . *carry*[ing] a dirk, sword cane, Spanish stiletto, belt or pocket pistol"); *Fife v. State*, 31 Ark. 455, 456 (1876) (describing act that proscribed the "*wear*[ing] or *carry*[ing]" of various weapons) (emphasis added to all citations). So, while the government provides evidence of there being a tradition to regulate the manner of carrying concealable weapons, that does not speak to "how" § 1242 operates.

The government's best attempt at meeting its burden is through a single citation to a treatise-length law review article. *See* Gov't Br. at 16–17 (citing David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. Legis. 223 (2024)). It cites the article to show how "statutes regulated concealable weapons in a variety of different ways, including banning carry or concealed carry, prohibiting their possession in specific locations, subjecting their sale or possession to taxes, or restricting the sale to minors." *Id.* at 17 (citing *History of Bans*, 50 J. Legis. at 329–35). The referenced section of the article catalogs nearly two hundred pre-1900 statutes regulating daggers, dirks, and sword canes. *See History of Bans*, 50 J. Legis. at 328–35 (daggers and dirks); *see also id.* at 335–38 (sword canes).

Of the nearly two-hundred statutes, only two regulate bladed weapons in an analogous manner as § 1242. *See* 1881 Ark. Acts 191, 192 (proscribing the "sell[ing], barter[ing] or exchang[ing]" of "any dirk or bowie knife, or sword or spear in a cane"); 1837 Ga. Laws 90, 90–91 (making unlawful "for any merchant, or vend[o]r of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell . . . Bowie, or any other kinds of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defense, pistols, dirks, sword canes,

spears, &c").[13] Two laws out of nearly two hundred bring us into outlier territory.[14] And *Bruen* instructed that "courts should not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.'"[15] *Bruen*, 597 U.S. at 30 (citing *Drummond v. Robinson*, 9 F.4th 217, 226 (3d Cir. 2021)); *see also Wolford*, 609 U.S. at 207 (stating that "[a]n outlier legal rule adopted in a few locales is not enough" (citation omitted)).

In sum, the government fails to meet its burden to establish that the manner in which § 1242 regulates switchblade knives is consistent with the Second Amendment's history, principles, and tradition. Accordingly, we determine that § 1242 violates the Second Amendment.

---

[13] One additional statute, labeled as an Arkansas law that provided for "[n]o transfers" of sword canes, appears to qualify as a restriction that regulates in a manner similar to § 1242. *History of Bans*, 50 J. Legis. at 337. However, the cited *Indiana* statute, *see id.* at 337 n.985, prohibited the "carry[ing]" of weapons and does not in fact ban transfers, *see* 1881 Ind. Acts 174, 191.

[14] A dozen or more states regulated the sale or transfer of bladed weapons to minors. *See History of Bans*, 50 J. Legis. at 333–35, 337–38. Those regulation employed a similar "how," but are a mismatch with § 1242 on the "why." *See* Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemp. Probs. 55, 76 (2017) (discussing that concerns in the late 1800s through early 1900s about minors accessing weapons led to the enactment of prohibition of sales and transfers to minors).

[15] We recognize that many of these state statutes prohibited the possession or carrying of bladed arms pursuant to their police powers. *See* Daniel D. Slate, *Infringed*, 3 J. Am. Con. Hist. 381, 434–35 (2025). The federal government, by contrast, lacks the same sort of police power and thus turned to its Commerce Clause power when enacting § 1242. *See* H. Rep. No. 85-1945, at 8–10; *see also United States v. Lopez*, 514 U.S. 549, 564 (1995) (noting that the federal government lacks "a general federal police power"). Even so, the "outlier" statutes indicate that the notion of banning sale or transfer was not unknown or otherwise beyond the limits of the states.

### C

The plaintiffs' challenge to § 1243, on the other hand, fails. Again, § 1243 regulates the manufacture, sale, and possession of switchblade knives "within any Territory or possession of the United States, within Indian country . . . or within the special maritime and territorial jurisdiction of the United States." In their briefing and at oral argument, the challengers made it explicit that they bring only a facial challenge to the statute. And, litigating constitutional claims as facial challenges "comes at a cost." *Moody v. NetChoice*, 603 U.S. 707, 723 (2024). To bring a facial challenge outside the First Amendment context, a plaintiff must "establish that no set of circumstances exists under which the Act would be valid."[16] *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also Rahimi*, 602 U.S. at 693 (applying the no-set-of-circumstances standard to a Second Amendment challenge); Richard H. Fallon, Jr., et al., Hart and Wechsler's The Federal Courts and the Federal System 184–95 (7th ed. 2015) (discussing non-First Amendment facial challenges). The government, by contrast, needs to only demonstrate that § 1243 is "constitutional in some of its applications." *Rahimi*, 602 U.S. at 693.

The challengers do not try in earnest to clear this demanding standard. Despite having the burden to clear the *Salerno* standard, they do not even address how § 1243 is facially invalid in their opening brief. Only in their reply brief do the plaintiffs try to recast § 1243 as one that "attacks the face of the law, that is, what the law *itself* restricts." What they mean by this is

[16] In the First Amendment context, the inquiry is whether "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody*, 603 U.S. at 723 (quoting *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021)) (alternation original to *Moody*).

not clear. Nor is it clear where this definition comes from given that they provide no citation.

By contrast, the government, after stating the correct standard, lists a series of applications where § 1243 has a plainly constitutional application, including: "certain aircraft, courthouses, federal prisons, embassies, and military bases." The Supreme Court has already "assume[d] it settled" that it is consistent with the Second Amendment to place restrictions on arms in government buildings, including courthouses. *Bruen*, 597 U.S. at 30; *see also Heller*, 554 U.S. at 626. The Supreme Court's instruction supports the government's position, and the challengers have no good response.

Simply put, the challengers fail to establish that § 1243 has no lawful applications. That is sufficient to determine that their facial challenge fails.

V

The FSA addressed a perceived societal problem: the interstate flow of switchblade knives. H. Rep. No. 85-1945, at 2–3. In response, the FSA sought to ban this activity. *Heller* and *Bruen* also dealt with regulations that purported to deal with "perceived societal problem[s]." *Bruen*, 597 U.S. at 27. And in both cases, the Supreme Court rejected those regulations as inconsistent with the Second Amendment's principles, which were "intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs." *Id.* at 28 (quoting *McCulloch v. Maryland*, 4 Wheat. 316, 415 (1819)).

We REVERSE the district court's grant of the government's motion to dismiss as to the § 1242 claim. We AFFIRM the district court's dismissal of the § 1243 claim. We REMAND for further proceedings consistent with this opinion.